# 23-1315

## United States Court of Appeals
### *for the*
### Second Circuit

---

Rashaun Ferguson,

*Plaintiff-Appellant,*

v.

City of New York, Michael Gildea, Detective Jaeger,

*Defendants-Appellees,*

Unidentified Members of the NYPD, all sued herein in their individual capacities,

*Defendants.*

---

On Appeal from a Judgment of the United States District Court, Eastern District of New York

---

# Brief of Plaintiff-Appellant
## and Special Appendix

---

Stephen Bergstein

Bergstein & Ullrich
5 Paradies Lane
New Paltz, New York 12561
(845) 469-1277

Fred B. Lichtmacher
159 West 25th Street, Room 510
New York, New York 10001
(212) 922-9066

*Counsel for Plaintiff-Appellant*

**Table of Contents**

Table of Authorities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

Jurisdiction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Statement of the Case . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Statement of Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

    1. The fatal shooting on Beach Channel Drive . . . . . . . . . . . . . . . . . . . . . 1

    2. Vargas and Gildea interview Orris Wheeling . . . . . . . . . . . . . . . . . . . . 3

    3. The officers view the surveillance video . . . . . . . . . . . . . . . . . . . . . . . . 7

    4. Defendants do not focus on the possible culprit . . . . . . . . . . . . . . . . . . 9

    5. Defendants pressure a witness during the investigation . . . . . . . . . . . . 10

    6. Plaintiff is arrested and indicted . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

    7. Procedural history . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Question Presented . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Summary of Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Argument: As the jury may find that Defendants lacked probable cause to arrest Plaintiff he may proceed with his malicious prosecution and fair trial claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

A. Standard of review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

B. Defendants lacked probable cause to charge Plaintiff with murder and related charges . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

C. The district court improperly granted summary judgment on the fair trial claim . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

Certification . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

Special Appendix . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

## Table of Authorities

Albright v. Oliver,
    510 U.S. 266 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Bermudez v. City of New York,
    790 F.3d 368 (2d Cir. 2015) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

Bevier v. Hucal,
    806 F.2d 123 (7th Cir. 1986). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Bouche v. City of Mt. Vernon,
    No. 11 Civ. 5246 (SAS), 2013 WL 322613 (S.D.N.Y. Jan. 28, 2013) . . . . . . 19

Boyd v. City of New York,
    336 F.3d 72 (2d Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Coleman v. City of New York,
    688 F App'x 56 (2d Cir 2017). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Dawson v. Snow,
    356 F. App'x 526 (2d Cir. 2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Doninger v. Niehoff,
    642 F.3d 334 (2d Cir. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Fappiano v. City of New York,
    640 F. App'x. 115 (2d Cir. 2016) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 29

Frost v New York City Police Dept.,
    980 F.3d 231 (2d Cir 2020). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

Garnett v. Undercover Officer C0039,
    838 F.3d 265 (2d Cir. 2016) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

Hargroves v. City of New York,
    411 F. App'x 378 (2d Cir. 2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

iii

Jenkins v. City of New York,
   478 F.3d 76 (2d Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Kaytor v. Elec. Boat Corp.,
   609 F.3d 537 (2d Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Kuehl v. Burtis,
   173 F.3d 646 (8th Cir. 1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Loria v. Gorman,
   306 F.3d 1271 (2d Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Lowth v. Town of Cheektowaga,
   82 F.3d 563 (2d Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Manganiello v. City of New York,
   612 F.3d 149 (2d Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Maryland v. Pringle,
   540 U.S. 366 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Mitchell v. City of New York,
   841 F.3d 72 (2d Cir. 2016) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

Poventud v. City of New York,
   750 F.3d 121 (2d Cir. 2014) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29, 30

Rentas v Ruffin,
   816 F3d 214 (2d Cir 2016) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Romero v. Fay,
   45 F.3d 1472 (10th Cir. 1995). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Savino v. City of New York,
   331 F.3d 63 (2d Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

iv

Singer v. Fulton Co. Sheriff,
    63 F.3d 110 (2d Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Smalls v. Collins,
    10 F.4th 117 (2d Cir. 2021) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

Stukes v. City of New York,
    No. 13-CV 06166 (NGG) (VPP), 2015 WL 1246542
    (E.D.N.Y. Mar. 17, 2015) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

United States v. Rivas,
    377 F.3d 195 (2d Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

United States v. Fisher,
    702 F.2d 372 (2d Cir. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Zahrey v. Coffey,
    221 F.3d 342 (2d Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

## Jurisdiction

As Plaintiff-Appellant Rashaun Ferguson brought this action under 42 U.S.C. § 1983, the district court had subject matter jurisdiction. On August 30, 2023, the district court granted Defendants' motion for summary judgment, resolving all claims. This Court therefore has appellate jurisdiction under 28 U.S.C. § 1291. Judgment entered on August 31, 2023. (JA 494). Plaintiff timely filed a notice of appeal on September 21, 2023. (JA 495).

## Statement of the Case

Plaintiff asserts that Defendants maliciously prosecuted him and denied his right to a fair trial in falsely prosecuting him for various charges arising from a fatal shooting that took place on May 3, 2013. On August 30, 2023, the district court (Hon. Eric N. Vitaliano) granted Defendants' motion for summary judgment, dismissing all claims. The district court's ruling is unreported.

## Statement of Facts

### 1. The fatal shooting on Beach Channel Drive.

On the evening of May 3, 2013, outside 54-30 Beach Channel Drive, Far Rockaway, New York, a lone shooter fired at two men. (JA 456 ¶ 3). One of the men, Keith Gulley, was pronounced dead shortly thereafter. (JA 457 ¶ 10). Gully's brother, Reginald Evans, survived. (JA 457-58 ¶ 11).

The shooting was first reported at 8:08 p.m. (JA 233). Defendants, Detectives

Quinn Jaeger and Michael Gildea, were notified of the shooting by radio. (JA 456 ¶ 4). Ten minutes later, an anonymous officer radioed that he was looking for a dark grey Ford Escape driven by a Black male. (JA 243). While he brought his notepad to the scene, Gildea testified that he took no notes in speaking with an eyewitness, Orris Wheeling. (JA 292-93).

Immediately after the shooting, surviving victim Evans told Jaeger that a "light skinned" shooter had pulled the trigger; this evidence is contained in a faded, barely legible note made by Jaeger. (JA 259-267). In contrast to Evans' description, Ferguson has a dark complexion. (JA 335). At deposition, Jaeger testified that Evans provided this description of the shooter as he was being taken to the ambulance. (JA 282-83). No DD5 (complaint follow-up information form) records the details of Evans' statement. Jaeger testified that DD5's allow any officer who reviews the file to see what transpired prior to his involvement, and that these forms are intended to keep a running history of investigative steps. (JA 274-75). Jaeger also testified that officers should write the information received on a DD5 fairly soon after the incident. (JA 278).

The Preliminary Investigation Report described the shooter as 5'9" tall. (JA 324 ¶ 12(f)). Plaintiff Rashaun Ferguson is much taller, over 6 feet tall. (JA 335). However, Gildea testified that he developed a suspect as a result of his preliminary

investigation: Ferguson. (JA 307).

By May 4, 2013 at 2:30 a.m., Gildea had constructed a photo array, in which he claims Wheeling identified Ferguson as the shooter. The photo array was generated only six hours after the shootings, premised on the anonymous report at 8:18 pm of a Ford Escape. (JA 243). The Photo Array Viewing Report contains a handwritten statement, "That is the guy w/ the gun." (JA 442). Any suggestion that this was Wheeling's handwriting is contradicted by Jaeger's testimony: that it looks like Gildea's handwriting. (JA 281). During the photo array, Wheeling did not identify Ferguson, and where the document asked if Wheeling recognized anyone from the lineup, he responded, "not really." (JA 449).

Wheeling was subpoenaed to testify at the criminal trial. Before he testified, when the prosecutor showed him the photo of Ferguson's mother's Ford Escape, Wheeling said that was not the vehicle he saw and that the shooter was either darker or lighter than Ferguson. (JA 440-41). The District Attorney declined to call Wheeling at trial. (JA 203).

**2. Vargas and Gildea interview Orris Wheeling.**

Along with officer Alphonso Vargas, Gildea also interacted with Wheeling. On May 3, 2013, Vargas was working out of the 101st precinct satellite unit (JA 249) when a call came over the radio about the shooting. On the way to 54-30 Beach

3

Channel Drive, Vargas encountered Wheeling. (JA 69).

Wheeling told Vargas that he was an eyewitness to the incident. According to Vargas, Wheeling "said he saw a dark gray Ford Escape, people rushed to it and it was heading westbound towards the 100th Precinct." (JA 252). But Wheeling told Plaintiff's investigator, Elpidio DeLeon, that he never said this to Vargas. (JA 377-78). Wheeling also told the assistant district attorney that the shooter was not driving a gray Ford Escape. (JA 440-41). Although he had encountered an eyewitness to a double shooting, Vargas only remembered Wheeling reciting the make and model of the vehicle but nothing the shooter's physical description. (JA 252, 255-58).

Vargas agreed that "it's important" to put over the radio all information about a fleeing felon once he receives it. (JA 253). But while he spoke to Wheeling, as demonstrated above, he recorded no descriptive information about the fleeing shooter; he only memorialized that Wheeling reported the vehicle was a dark gray Ford Escape, which Wheeling denied ever having said.

At deposition, Gildea identified "a map that I drew with the information provided to me by a witness who observed the shooting and identified the shooter." (JA 285, 376). When asked, "Is it true that Orris Wheeling never told you the SUV was a Ford Escape?" Gildea responded, "I believe, if I remember correctly, Orris Wheeling confirmed it was a Ford Escape being he didn't know the exact model, the

4

style, the way it looked and the color." (JA 293).

A police investigation report, the DD5, notes that Wheeling told Gildea that, while working on his own car, he saw a man exit a vehicle on Beach 56th Street. Wheeling then heard shots fired and saw the man running back to the vehicle with a gun in his hand. The shooter entered the vehicle, which sped down Beach 56th Street towards "Seagirt." (JA 385). According to Gildea, Wheeling told him the vehicle was a gray Ford SUV, later identified as an Escape. However, when speaking to both Investigator DeLeon and later to ADA Regan, Wheeling denied saying this. (JA 377-78, 440-41). The diagram that Gildea drew, with Wheeling's help, has the shooter maneuvering directly past the crime location. (JA 376).

For reasons that remain unclear, the DD5 that Gildea created to memorialize his and Jaeger's meeting with Wheeling on May 3, 2013 was not generated until June 15, 2013, and it was reviewed by a supervisor on June 17, 2013. (JA 380).

As set forth in the investigative report that DeLeon prepared on Plaintiff's behalf, Wheeling's account of the incident and his alleged statements to Gildea differ in several important regards:

> On Friday 8/4/201 at 10:30 hrs, I spoke with Orris Wheeling on the 2nd floor of 5505 Beach Channel Drive, Arverne, NY. I showed Mr. Wheeling DD5 follow up #4 dated 6/15/2013 as reported by Dt. Michael Gildea: He said he described the SUV as being similar to a jeep and silver gray in color. He said the SUV seemed to be a 1997 or 1998. He

said what stood out about the SUV was that the catalytic converter made a lot of noise. Orris said he never told the detective the SUV was a Ford Escape.

Orris said the detectives showed him a photo of a man and asked him if he had ever seen this man driving a Ford SUV. Orris told the detectives he had seen that man in a Ford SUV before in the area. Orris said the detectives had him sign the photo. I showed Orris the photo and he said the writing under the photo "This is man the one who was the driver. I do see him all the time" was not written on the paper before he signed it and that was not his writing. Orris told me he did not know the man in the photo by name. Orris said the detectives asked him to describe the passenger who exited the SUV. He told me he described the man as a light skin male, 5'9" tall, slim, about 160 lbs.

I showed Orris a sketch of the crime scene, where they said he was parked and where the SUV had parked. He said the diagram was wrong. Orris then wanted to go outside. He showed me where the car was parked with the hood up. He said his wife was in the driver's seat. He was parked more in the middle of the block, on Beach 56th Street, under a lamp post and the SUV had parked across the street close to the entrance to PS/MS 333. Orris said the detectives wanted him to identify the man he saw with the gun,

They showed him a photo array. He said he did not recognize anyone. Orris said he told the detective that the men in the array were too dark. He said the detective told him that witnesses were saying it was number 1 and he had to pick him. Orris said to me that since people were saying it was number 1 it must be him, so he signed his name under the number 1 photo. Orris said he later viewed a line up at the 101 detective squad. He said he asked the detectives to have the guy in positions number 5 stand up but that was not him. When Orris came out of the lineup he said the detective told the guy number 4 was too dark and too heavy.

Orris said he had a Fed case pending and they were trying to cut him a deal to cooperate in this murder case. He was undecided with what he wanted to do. Orris told me that the word on the street was that Marcus

6

Ortiz had shot the two guys. I then showed Orris two single color photos of Marcus Ortiz I had on my cellphone. Orris said that was the man he saw exit the SUV and take his shoes off. The man with the gun. Orris said he is afraid for his family and did not want to get involved. I told Orris Marcus had been killed outside of New York. I told Orris the man arrested in this case is Rashaun Ferguson, Orris said the detective wanted him to identify Ferguson but he wouldn't do it. Orris said he would be willing to help Ferguson out but was afraid for his family, and unsure about his fed deal.

(JA 377-78) (paragraphs separated for readability).

### 3. The officers view the surveillance video.

The most important evidence in the case involves the surveillance video, which Defendants knew about but did not contemporaneously share with Plaintiff or his criminal lawyer. Nor did Defendants identify the woman who shared the video with the officers. This video had potential to exonerate Plaintiff from the outset of the case and spare him significant anguish as he spent several years in custody awaiting criminal trial, which resulted in his acquittal.

The Complaint Report that Vargas generated in the criminal case (JA 254) states there were no working cameras in the area. (JA 338). However, while Gildea similarly testified that "[t]here was no surveillance video in regards to this case" (JA 316-17), Goldie Maple School Principal Angela Logan Smith testified that, on May 6, 2013, she spoke with members of law enforcement at the school and showed them footage from Camera 16. (JA 314, 372, 374). Logan Smith's account is significant

7

because the school is located at 365 Beach 56th Street (JA 203), abutting Beach 56th Street (JA 313), just south of Beach Channel Drive. (JA 203). Camera 16 shows a view from the school to Beach 56th Street just south of Beach Channel Drive. (JA 313). This is the street which Gildea's diagram indicates the shooter ran away. (JA 376). There was one person running on the video. (JA 140). The video shows a man running, and a few seconds later a car drives by. (JA 315). Contradicting the initial account that the getaway car was a Ford Escape, Logan Smith was certain the vehicle in the video was a sedan, not an SUV. (JA 373-74). Both the Preliminary Investigation Report and Vargas have the apparent shooter escaping on Beach 56th Street. (JA 324). No DD5 was generated about the viewing, and Logan Smith, an eyewitness to the apparent shooter running away, was never disclosed to Ferguson's defense team. (JA 203). The Complaint Report states there are no witnesses despite Vargas having already spoken to Wheeling.

While Jaeger was involved in the investigation, Gildea was initially the lead detective. (JA 271). On October 2, 2013, Jaeger became the new case detective on the matter. (JA 272). Jaeger recognized the importance of viewing any videos that faced Beach 56th Street. (JA 274-75). But while Jaeger testified that the surveillance camera was blocked (JA 275) and there was construction on the site (JA 276), Logan Smith testified there were no obstructions, generators, or scaffolding blocking the

8

view of Beach 56th Street from the surveillance camera. (JA 375).

While Jaeger testified he had a clear memory of the investigation into the shooting (JA 270-71), he claimed he did not view any video from the school. (JA 273). Jaeger also denied any memory of learning there was a video from the school or discussing the video with Gildea. (JA 273-74). Jaeger further claimed he never discussed watching the video with Gildea, and that he did not know if anyone watched video footage with the school's principal. (*Id*.)

However, contradicting Jaeger, Gildea testified that Jaeger viewed the video at the school. (JA 309-310). At trial, Logan Smith testified that the running man wore dark clothes. (JA 315). Had the video been secured, the police could have utilized stop frames to gain a better view of the runner, and they could have enhanced these images to make an identification. A license plate may have been deciphered, and a clearer view could have been obtained of the runner's clothing. If the fleeing man had tattoos, as did Ortiz, that could have further demonstrated that Ferguson was not the fleeing shooter. (JA 330-35).

**4. Defendants do not focus on the possible culprit**.

Gildea knew that the decedent, Keith Gulley, had shot a gang member named Marcus Ortiz. (JA 286-87). Remarkably, Gildea testified, in sum and substance, that having been shot by someone does not create a motive for murder. (JA 287-89).

Gildea did not interview Ortiz and never investigated his involvement in the murder. (JA 287, 297). Gildea also admitted that he never showed a photo of Ortiz to Wheeling. (JA 289). And, in their reply to Plaintiff's Rule 56.1 statement, in which Plaintiff stated that Gildea did not interview Ortiz and never investigated his role in the killing, Defendants agreed that this fact is undisputed but stated that it is immaterial in any event. (JA 492 ¶ 11). Yet, Ortiz was identified as the shooter from a photograph that Investigator DeLeon had shown to Wheeling. (JA 377-78).

At 5'10" tall, Ortiz was comparable in size to the perpetrator described in the Preliminary Investigation Worksheet, generated hours after the incident which reported the perpetrator was 5'9". (JA 324). Ortiz' mugshot lists him at 5'10". (JA 330). Wheeler told Investigator DeLeon that the fleeing man was 5'9". (JA 377-78). Additionally, Ortiz was more lightly-complected than Ferguson, which is consistent with Evans' initial description of a "light skinned" shooter. (JA 260, 330). As noted above, Ferguson is dark-skinned and over six feet tall. (JA 335). At his deposition, Ferguson testified he is 6'3". (Ferguson Dep. 8:42-9).[1]

**5. Defendants pressure a witness during the investigation.**

Gildea wrote in the DD5 that Wheeling identified the driver as Henry

_____

[1] This portion of Plaintiff's deposition is not part of his summary judgment defense. However, Defendants raised this issue in their peply papers and Plaintiff did not have the opportunity to respond at that time. (JA 490 ¶ 2).

McCummings; however, both Wheeling and McCummings deny this. (JA 277-78).

Gildea harassed McCummings on multiple occasions but never caused charges to be

brought against him for participating in the shooting.

McCummings lives in Far Rockaway. In May 2013, officers from the 101st

Precinct officers picked up McCummings, handcuffed him in front of his neighbors,

and brought him to the 101st detective squad to speak to detectives. (JA 344-46).

Once at the squad, McCummings was told he was an accessory to a murder with a

Ford Escape. (JA 347). Gildea spoke to McCummings (JA 348), falsely stating that

witnesses had identified him as the getaway driver. (JA 349-350).

During this first encounter with Gildea, McCummings was shown photographs

of Ferguson, the murder victim, and of two others; McCummings did not know any

of them. (JA 355-56). McCummings was picked up around 9:30 a.m. and was let out

later that day at around 4:00-5:00 p.m. On the way out of the precinct, in the presence

of McCummings' wife, Gildea told him he knew he had something to do with the

shooting and that he would be watching him. (JA 359).

At the beginning of the interview, the officers asked McCummings if he knew

Ferguson. (JA 358). McCummings was accused of lying when he said he did not. (JA

357-58). He was being pressured to make an identification. (JA 357). The police

showed McCummings a photo, which Gildea said depicted the shooter, and Gildea

11

claimed that McCummings was the driver. (JA 364-65). All the while, during this interview, McCummings was not allowed to use the bathroom, the officers refused his requests for water, and he was in handcuffs the entire time. (JA 354-57). While McCummings complained that the handcuffs were too tight, the officers refused to loosen them. (JA 363). Because he would not admit to any involvement in the shooting, McCummings was not allowed to use the bathroom for approximately seven hours. (JA 362). Gildea was trying to pressure McCummings into saying things that were not true. (JA 370).

Afterwards, Gildea twice led raids on McCummings' home but found nothing. (JA 351). The first raid was approximately one month after the police initially made contact with him. (JA 360). On that occasion, McCummings had called an ambulance for his wife who had pneumonia, but the police showed up, raided his house looking for guns, tore up his home, and arrested him and his wife because his wife's belt allegedly looked like brass knuckles; he spent five days in jail. (JA 351-53). McCummings lost his job over the incident. (JA 353). Despite the police arriving when an ambulance was summoned for his wife, she was also arrested. (JA 367-68). McCummings' wife was not able to get medical treatment until after she was released. (JA 368). On another occasion, Gildea searched McCummings on the street in front of his children. (JA 366-67).

12

On September 12, 2017 during the first day of criminal trial hearings before Hon. Charles S. Lopresto, the Court ordered ADA Regan to look into three issues in order to "fill in the blanks" with respect to the People's evidence, including the missing surveillance camera footage and the corresponding missing DD5s. But the Queens District Attorney's office could not produce that evidence. The NYPD had neither preserved nor documented viewing of the video nor the names of the people who viewed it in a DD5. (JA 304).

**6. Plaintiff is arrested and indicted.**

On January 27, 2014 Plaintiff was arrested and Jaeger swore to a felony complaint. (JA 205-06). Ferguson was later indicted and charged with P.L. 125.25-1. Murder in the Second Degree (1); PL 110/125.25-1. Attempted Murder in the Second Degree (2); P.L. 265.03-3. Criminal Possession of a Weapon in the Second Degree (3); P.L. 265.03-lB, Criminal Possession of a Weapon in the Second Degree (4); P.L. 120.05-2 Assault in the Second Degree (5); and P.L. 260.10-1 Endangering the Welfare of a Child (6). (JA 207-08).

The criminal trial began on September 20, 2017 and concluded on October 16, 2017. Plaintiff was acquitted on all counts. (JA 336). Ferguson was incarcerated throughout the entire process. (JA 222 ¶ 52).

13

## 7. Procedural history.

Ferguson filed a notice of claim against the City of New York on October 17, 2013, claiming malicious prosecution against the City of New York. (JA 212-13). Plaintiff filed his federal complaint on November 22, 2017. (JA 215)

Following the completion of discovery, all Defendants moved for summary judgment as to all three of Plaintiff's claims. On August 29, 2023, Judge Vitaliano granted summary judgment dismissing Ferguson's claims in their entirety. Judgment was entered on August 31, 2023. (JA 494).

## Question Presented

Did the district court properly grant Defendants' motion for summary judgment on Plaintiff's malicious prosecution and fabrication-of-evidence claims?

## Summary of Argument

Summary judgment was improper on Plaintiff's malicious prosecution and false trial claims. The primary issue is whether the jury may find that Defendants had probable cause to arrest Plaintiff for various crimes arising from the shooting. The jury may find that Defendants focused almost entirely on blaming Plaintiff for the shooting without seriously considering other possible culprits. While a grand jury indicted Plaintiff, he deserves a trial for the following reasons: (1) most important, Defendants denied the existence of any video that might have exonerated Plaintiff

14

even though the police viewed the video but did not turn it over to Plaintiff's attorney; (2) Defendants did not target a more likely suspect; (3) Defendants bullied another witness into naming Plaintiff as the shooter; (4) the surviving victim of the shooting initially described the shooter as someone much shorter and lighter-skinned than Plaintiff; and (5) another witness, Wheeler, who partook in the photo array that Gildea orchestrated, did not identify Plaintiff as the shooter. Viewed in the light most favorable to Plaintiff, the jury find that he has overcome the presumption that the grand jury indictment establishes that Defendants had probable cause to arrest him.

## Argument

**As the jury may find that Defendants lacked probable cause to arrest Plaintiff, he may proceed with his malicious prosecution and fair trial claims**

### A. Standard of review.

"Summary judgment is proper only when, construing the evidence in the light most favorable to the non-movant, there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Doninger v. Niehoff*, 642 F.3d 334, 344 (2d Cir. 2011).

"In determining whether the moving party is entitled to judgment as a matter of law, or whether instead there is sufficient evidence in the opposing party's favor to create a genuine issue of material fact to be tried, the district court may not

properly consider the record in piecemeal fashion, trusting innocent explanations for individual strands of evidence; rather, it must 'review all of the evidence in the record.'" *Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 545-46 (2d Cir. 2010).

"Summary judgment is inappropriate when the admissible materials in the record 'make it arguable' that the claim has merit, for the court in considering such a motion 'must disregard all evidence favorable to the moving party that the jury is not required to believe.'" (*Id.*)

Relatedly, "[w]here an issue as to a material fact cannot be resolved without observation of the demeanor of witnesses in order to evaluate their credibility, summary judgment is not appropriate. . . . In sum, summary judgment is proper only when, with all permissible inferences and credibility questions resolved in favor of the party against whom judgment is sought, 'there can be but one reasonable conclusion as to the verdict.'" *Id.* at 546. The standard of review is *de novo*. (*Id.*)

## B. Defendants lacked probable cause to charge Plaintiff with murder and related charges.

The elements of a malicious prosecution claim under § 1983 are substantially the same as the elements under New York law, and "the analysis of the state and the federal claims is identical." *Boyd v. City of New York*, 336 F.3d 72, 75 (2d Cir. 2003). To establish a malicious prosecution claim under New York law, a plaintiff must

16

prove (1) the initiation or continuation of a criminal proceeding against plaintiff; (2) termination of the proceeding in plaintiff's favor; (3) lack of probable cause for commencing the proceeding; and (4) actual malice as a motivation for defendant's actions." *Manganiello v. City of New York*, 612 F.3d 149, 161 (2d Cir. 2010). Because a malicious prosecution claim under § 1983 enforces the Fourth Amendment, plaintiffs must also establish a post-arraignment deprivation of liberty, *i.e.*, a constitutional "seizure." *Coleman v. City of New York*, 688 F. App'x 56, 57-58 (2d Cir 2017) (citing *Albright v. Oliver*, 510 U.S. 266, 274-75 (1994), and *Singer v. Fulton Co. Sheriff*, 63 F.3d 110, 116 (2d Cir. 1995)).

Gildea, Jaeger, and other members of the NYPD played an active role in the prosecution, satisfying the first element. Briefly, Jaeger signed the felony complaint, and he and Gildea were the lead investigators, naming Ferguson as the suspect. The second element is satisfied through Ferguson's acquittal on all the charges. At issue are elements (3) lack of probable cause for commencing the proceeding; and (4) actual malice.

Elements (3) and (4) in this matter are linked. The jury may infer actual malice when the plaintiff is prosecuted without probable cause. *Rentas v. Ruffin*, 816 F.3d 214, 221-22 (2d Cir 2016); *Manganiello*, 612 F.3d at 163. Plaintiff presents substantial evidence of the suppression, destruction and alteration of evidence which

17

could have prevented an indictment. Defendants suppressed evidence about the video which provided them ample opportunity to identify the real shooter, no DD5 was generated about the viewing, and Logan Smith, an eyewitness to the apparent shooter running away, was never disclosed to Ferguson's defense team. (JA 203). The record further supports the inference that Gildea actively intimidated witnesses and added falsehoods to police documents that were different than those provided by witnesses. Jaeger's failure to memorialize in a DD5 and explore Evans' description of a light-skinned man also proves malice. In finding malice, the jury may also consider the focus on Ferguson with no evidence connecting him to the crime, and the subsequent manipulation of the investigation and dishonest DD5's presented to the DA. Plaintiff has demonstrated an issue of material fact as to probable cause, and because malice and probable cause are linked in these allegations, this cause of action should proceed to trial. In addition, since Plaintiff was incarcerated for more than three years before the jury acquitted him at the criminal trial, he can prove the constitutional deprivation.

In granting summary judgment for Defendants, the district court held that Plaintiff cannot overcome the presumption that the grand jury indictment establishes that Defendants had probable cause to arrest him in connection with the fatal shooting. (SPA 7). As the district court noted, "indictment by a grand jury creates a

18

presumption of probable cause that may *only* be rebutted by evidence that the indictment was procured by fraud, perjury, the suppression of evidence or other police conduct undertaken in bad faith." (SPA 7) (citing *Bouche v. City of Mt. Vernon*, No. 11 Civ. 5246 (SAS), 2013 WL 322613, at *5 (S.D.N.Y. Jan. 28, 2013), and *Savino v. City of New York*, 331 F.3d 63, 72 (2d Cir. 2003) (emphasis in original)). Relatedly, as the district court held, malice may be proven where the police procured the grand jury indictment through bad faith. (SPA 13) (citing *Dawson v. Snow*, 356 F. App'x 526, 529 (2d Cir. 2009)). As demonstrated below, the jury may find that Defendants procured the indictment through bad faith.

"Probable cause . . . exists when the [arresting] officers have knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime." *Jenkins v. City of New York*, 478 F.3d 76, 84-85 (2d Cir. 2007).

In deciding whether Defendants had probable cause to arrest Plaintiff, this Court must "examine the events leading up to the arrest, and then decide whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to probable cause." *Maryland v. Pringle*, 540 U.S. 366, 371 (2003). While "[t]he quantum of evidence required to establish probable cause to arrest need

19

not reach the level of evidence necessary to support a conviction, . . . it must constitute more than rumor, suspicion, or even a strong reason to suspect." *United States v. Fisher*, 702 F.2d 372, 375 (2d Cir. 1983).

Failure to disclose relevant exculpatory evidence and allowing such evidence to be destroyed are enough to defeat probable cause, allowing a plaintiff to bring claims for malicious prosecution and the denial of a fair trial under the Fourteenth Amendment. "Under New York law, even when probable cause is present at the time of arrest, evidence could later surface which would eliminate that probable cause. . . . In order for probable cause to dissipate, the groundless nature of the charges must be made apparent by the discovery of some intervening fact." *Lowth v. Town of Cheektowaga*, 82 F.3d 563, 571 (2d Cir. 1996).

Courts also emphasize that "law enforcement officers have a duty to conduct a reasonably thorough investigation prior to arresting a suspect, at least in the absence of exigent circumstances and so long as law enforcement would not [be] unduly hampered . . . if the agents . . . wait[] to obtain more facts before seeking to arrest." *Kuehl v. Burtis*, 173 F.3d 646, 650 (8th Cir. 1999); *see also Loria v. Gorman*, 306 F.3d 1271, 1292-93 (2d Cir. 2002). "A police officer may not close her or his eyes to facts that would help clarify the circumstances of an arrest. Reasonable avenues of investigation must be pursued especially when, as here, it is unclear whether a crime

20

had even taken place." *Bevier v. Hucal*, 806 F.2d 123, 128 (7th Cir. 1986). As the Tenth Circuit has noted, before invoking the power of the state to arrest and detain, law enforcement officers need to "reasonably interview witnesses readily available at the scene, investigate basic evidence, or otherwise inquire if a crime has been committed at all." *Romero v. Fay*, 45 F.3d 1472, 1476-77 & n.2 (10th Cir. 1995).

Defendants did not procure the indictment in good faith, and they decided early on that Plaintiff and no one else would be arrested for the fatal shooting. The record demonstrates that Jaeger and Gildea knew or should have known that Ferguson was the wrong man and that the evidence in support of his arrest was shaky.

First, at the earliest stage of the investigation (right after the shooting), Evans, who survived the shooting and was in the best position to know what the shooter looked like, told Jaeger that the shooter was light-skinned; yet, Plaintiff has a dark complexion. (JA 259-267, 282-83, 335). Further suggesting that Plaintiff was not the shooter, the Preliminary Investigation Report stated that the gunman was 5"9". (JA 324 ¶ 12(f)). Plaintiff is over six-feet tall. (JA 335).

Moreover, the record highlights serious discrepancies over the videotape that captured relevant images of the shooting. This set of facts provides powerful evidence that Defendants conducted a bad faith investigation. As the district court held, "[a] plaintiff can rebut, based on a failure to preserve evidence, a presumption of probable

21

cause by showing (1) that the officer in question acted in bad faith, and (2) the suppressed evidence was 'potentially useful' to his criminal defense." (SPA 12) (quoting *Fappiano v. City of New York*, 640 F. App'x. 115, 120 (2d Cir. 2016)); *id.* ("Bad faith exists only where police fail to disclose evidence 'that would conclusively establish the plaintiff's innocence or negate the possibility that plaintiff had committed the crime") (quoting *Stukes v. City of New York*, No. 13-CV-06166 (NGG) (VPP), 2015 WL 1246542, at *5 (E.D.N.Y. Mar. 17, 2015)).

The Rule 56.1 statements highlight the factual disputes on this issue. (JA 459-460 ¶ 14). As an initial matter, while the district court discounted the video evidence in holding that "[b]oth individual defendants have denied ever viewing the video" (SPA 12) (citing JA 110, 273), Logan Smith, the principal of the school that was adjacent to the shooting, testified that she showed the video to police officers (JA 314, 372, 374), and Gildea testified that Jaeger saw the video. (JA 309-310). While Gildea denied the existence of any cameras (JA 316-17), and Jaeger testified that the footage was blocked by neighborhood obstructions (JA 275-76), Logan Smith did show the officers video footage of the aftermath of the incident, depicting a man running away from the scene of the crime, and there were no obstructions. (JA 314, 372, 374-75). It does not appear that Defendants followed up on this lead, as no DD5 was generated about the surveillance video and the principal was not disclosed to

22

Ferguson's defense team. (JA 203).

The video provided various ways for the police to identify the shooter, most likely through enhancement technology that could have identified the runner, the presumed gunman. But the officers did not follow-up accordingly. As demonstrated above, no DD5 was generated about the video, and Logan Smith was never disclosed to Ferguson's defense team. (JA 203). The omission of the video further suggested that Defendants arrested Plaintiff in bad faith and gave the grand jury a false account of their investigation, suggesting that Plaintiff had fired the gun. In all likelihood, the video was destroyed shortly after it was shown to the officers, and the police did not disclose the video and Logan Smith's identify to Plaintiff's defense counsel. Instead, the police said there were camera obstructions that would have interfered with clear images on the video.

Plaintiff will never fully know what might have come from the production of the missing video. But the fabrications told by Defendants, who either saw it themselves as Gildea testified Jaeger did, or had it viewed by their colleagues, suggests they feared what it would do to their criminal case against Ferguson. In any event, Ferguson was illegally deprived of this evidence and the jury may find that deprivation was intentional. As the video depicted the actual fleeing felon, had it been disclosed, Ferguson likely would never have been arrested or indicted.

23

The photo array that Gildea orchestrated one day after the shooting also had anomalies. While another witness, Wheeler, allegedly identified Plaintiff as the shooter, Wheeler did not write the handwritten statement that purportedly memorialized this identification; this notation was in Gildea's handwriting. (JA 281, 442). Moreover, Wheeling told Plaintiff's investigator, DeLeon, that he did not identify Plaintiff as the shooter during the photo array. (JA 449).

Third, contrary to Vargas and Gildea's account, Wheeling told Plaintiff's investigator that he never told these officers that he saw a dark gray Ford Escape leave the scene of the shooting. (JA 252, 377-78, 440-41). Wheeling similarly advised the assistant district attorney that the shooter was not driving such a vehicle. (JA 440-41).

Relatedly, the record permits the inference that Defendants did not target a more likely suspect, Marcus Ortiz. *See generally* Statement of Facts § 4. Defendants' zeal to prosecute Plaintiff is further proven by their efforts to intimidate another witness, McCummings, to identify him as the shooter. *See id.* at § 5. The district court discounted the McCummings angle, holding that his "only testimony was that he was not the driver and that he had an alibi" and that "in no way [did] he suggest that Detective Gildea pressured him to make an identification." (SPA 9). However, McCummings testified that the police were pressuring him to make an identification

24

(JA 357), and they focused on Plaintiff "almost immediately when they put me in the room with them." (JA 358).

This case also implicates precedents holding that the jury may find the police lacked probable cause when they are deliberately indifferent to evidence that might exonerate the Plaintiff. In *Mitchell v. City of New York*, 841 F.3d 72 (2d Cir. 2016), the plaintiffs were arrested for trespass after the police came upon a brownstone where approximately 30 people were engaged in a party. None of the partygoers, including the plaintiffs, knew who owned the property. There was a realtor's for-sale sign on the property and "electricity was being routed in from outside the house via extension cords." *Id.* at 75-76. Recognizing that the defendants' "baseless and unreasonable conjectures and assumptions" about the ownership status of the property did not permit a finding of probable cause, *id*. at 79, this Court noted that probable cause was lacking because the officers only made one unsuccessful phone call to the realtor, and assumed the property was abandoned because the extension cords had drawn power from another property. *See id.* at 78 ("the failure to make a further inquiry when a reasonable person would have done so may be evidence of lack of probable cause"). Like *Mitchell*, Defendants did not pursue obvious leads – including the videotape – and focused on identifying Plaintiff as the shooter by relying on false witness accounts that pointed the finger at him and no one else.

25

Contrary to the district court's observation that Plaintiff "scroung[ed] up support for this brash claim" (SPA 8), the jury may find that the clear deficiencies in the police investigation giving rise to Ferguson's arrest were the product of Defendants' bad faith and tainted the grand jury proceedings.

In granting Defendants' motion for summary judgment, the district court held that Evans' identification of Plaintiff as the shooter, and his testimony as such to the grand jury, provided probable cause for Plaintiff's arrest. (SPA 3-4, 10-11). But the full story is as follows: right after the shooting, although Plaintiff is dark-skinned, Evans told the police that a "light-skinned" man pulled the trigger. (JA 259-267, 335). And, during his interview with the police in the hospital, only one day after the shooting, Evans was presented with Plaintiff's photograph and did not identify him as the shooter. (JA 464 ¶ 31). Evans then changed his mind on May 9, 2013, identifying Plaintiff as the culprit. *Id.* at ¶ 34. But, as Plaintiff argued in his Rule 56.1 statement, "the alleged Evans identification was made only after both Wheeling and McCummings refused to go along with Gildea's fabrication, and after the defendants failed to document the existence of the important surveillance video and the existence of the exonerating witness Logan-Smith." (JA 464 ¶ 34) (citing Exh. 18 McCumings Dep. at 20-23 [JA 354-56]) and (Exh. 21 DeLeon Report [JA 377-78]). Evans' initial account to the police raised serious questions about his subsequent positive

26

identification.

Plaintiff casts no aspersions on Evans, who tragically lost a brother and was the victim of a violent crime. Plaintiff merely points out the change in his original description of the shooter, the distractions he admits to being subjected during the incident, and that Evans could not give the account of the incident without being "coached." The jury may consider the pressure tactics and falsehoods engaged in by Defendants, documented above, when weighing Evans' testimony and how Defendants' tactics, in seeking a conviction, may have affected his testimony. In light of the Defendants' failure to coerce McCummings to testify falsely, and their similar failure with Wheeling, Plaintiff emphasizes that Evans' testimony changed and he identified Ferguson only after the Defendants struck out with the other potential witnesses. McCummings was brought in on an unknown date in May 2023 and he would not help the defendants. On May 6, 2013 Logan Smith showed officers the video and that did not help. On May 7, 2013 Wheeling did not identify Ferguson in a lineup. By May 9, 2013, Defendants needed a witness and Evans then changed his story and identified Ferguson in a lineup.

In rejecting Plaintiff's argument that Evans gave an inherently unreliable identification of Plaintiff by telling the police that the shooter was "light-skinned" rather than "darkly complected," the district court stated that "[w]ell-developed case

27

law supports the finding of probable cause in cases involving much sharper divergence between an initial description and a defendant's actual appearance." (SPA 11). But the only appellate case cited by the district court was *Hargroves v. City of New York*, 411 F. App'x 378 (2d Cir. 2011). In that case, the district court held that, where the eyewitness said he was attacked by a large group of Black men, one of whom was wearing an orange jacket, the police reasonably apprehended the plaintiff, who was in a large group of Black men in "temporal and geographic proximity to the crime scene," and the plaintiff was wearing a "bright jacket of some kind that could reasonably . . . be perceived as being a shade of orange." *Id.* at 385. The apprehension in *Hargroves* was far more reasonable than the apprehension that landed Ferguson in jail on a murder charge for which he was ultimately acquitted.

### C. The district court improperly granted summary judgment on the fair trial claim.

"[T]o establish a section 1983 fair-trial claim based on fabrication of evidence, a plaintiff must demonstrate that 'an (1) investigating official (2) fabricates information (3) that is likely to influence a jury's verdict, (4) forwards that information to prosecutors, and (5) the plaintiff suffers a deprivation of life, liberty, or property as a result.' '[T]o succeed on a claim for a denial of the right to a fair trial against a police officer based on an allegation that the officer falsified information,

28

an arrestee must [therefore] prove by a preponderance of the evidence that the officer created false information, the officer forwarded the false information to prosecutors, and the false information was likely to influence a jury's decision.'" *Smalls v. Collins*, 10 F.4th 117, 132 (2d Cir. 2021).

*Brady* violations are actionable under 42 U.S.C. § 1983. *Poventud v. City of New York*, 750 F.3d 121, 132 n.12 (2d Cir. 2014) (en banc). "A classic *Brady* violation contains three elements: 'The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued.'" *Fappiano*, 640 F. App'x at 118 (quoting *United States v. Rivas*, 377 F.3d 195, 199 (2d Cir. 2004)). However, the Second Circuit has "never held that anything less than an intentional *Brady* violation establishes a [civil] § 1983 due process claim for damages." *Id.* at 118. A claim for denial of a fair trial accrues when the officer forwards false information to the prosecutors. *Garnett v. Undercover Officer C0039*, 838 F.3d 265, 278 (2d Cir. 2016).

Defendants generated DD5's with intentionally inaccurate information, in particular the fraudulent statements they added on Wheeling's behalf. Equally malicious was their failure to generate DD5's regarding the initial identification of the shooter as light-skinned, the fraudulent reports of a Ford Escape (JA 252, 377-78,

440-41), and the intentional failure to document the viewing of the video and to have that video and a key witness's name preserved. (JA 203-04).

A fair trial violation may also be based on an officer's intentional withholding exculpatory evidence. *Poventud*, 750 F.3d at 155; *Bermudez v. City of New York*, 790 F.3d 368, 376 n.4 (2d Cir. 2015). In this case, as demonstrated above, important evidence was withheld, exonerating information was not memorialized, the key witness was hidden, and witnesses were coerced to provide false information. *See Frost v. New York City Police Dept.*, 980 F.3d 231, 250 (2d Cir 2020) ("the fair trial right protects against deprivation of liberty that results when a police officer fabricates and forwards evidence to a prosecutor that would be likely to influence a jury's decision, were that evidence presented to the jury") (citing *Zahrey v. Coffey*, 221 F.3d 342, 355 (2d Cir. 2000) ("It is firmly established that a constitutional right exists not to be deprived of liberty on the basis of false evidence fabricated by a government officer")). This evidence permits the inference that Defendants violated Plaintiff's right to a fair trial under the Fourteenth Amendment, summary judgment was improper.

## Conclusion

The district court improperly granted Defendants' motion for summary judgment on Plaintiff's malicious prosecution claim. This Court should vacate the

30

order granting summary judgment and remand this claim for trial.

Dated: November 25, 2024

| Stephen Bergstein | */s/ Fred B. Lichtmacher* |
|---|---|
| | Fred B. Lichtmacher |
| Bergstein & Ullrich | 159 West 25th Street, Room 510 |
| 5 Paradies Lane | New York, New York 10001 |
| New Paltz, New York 12561 | (212) 922-9066 |
| (845) 469-1277 | Counsel for Plaintiff-Appellant |

**Certification**

Stephen Bergstein, co-counsel for Plaintiff-Appellant, affirms that this brief complies with FRAP 32(a)(7) in that it utilizes non-proportional typeface with no more than 10.5 characters per inch. The font is Times New Roman 14-point. The brief contains 7,349 words.

*/s/ Stephen Bergstein*

**Special Appendix**

**Table of Contents**

Decision and Order, dated August 29, 2023 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF NEW YORK

---------------------------------------------------------------- x

RASHAUN FERGUSON,                                           :
                                                            :
                                                            :
                                    Plaintiff,              :
                                                            :
                                                            :
                    -against-                               :
                                                            :          MEMORANDUM & ORDER
                                                            :
THE CITY OF NEW YORK, et al.,                               :
                                                            :          17-cv-6871 (ENV) (SJB)
                                                            :
                                    Defendants.             :
                                                            x
----------------------------------------------------------------

VITALIANO, D.J.

       Plaintiff Rashaun Ferguson filed this action, claiming violation of his civil rights by

defendants Detective Quinn Jaeger and Detective Michael Gildea, both members of the New

York City Police Department  ("NYPD"), other unidentified NYPD officers, and the City of

New York (the "City") in contravention of 42 U.S.C. § 1983.  After extensive pretrial litigation,

defendants moved for summary judgment pursuant to Federal Rule of Civil Procedure 56.  Mot.,

ECF Dkt. 81.  For the following reasons, defendants' motion is granted.

<u>Background</u>[1]

---

[1] Familiarity of the parties with the facts and history of this case is presumed, and they will not be
needlessly recounted here.  Unless otherwise indicated, the facts that are recounted here are undisputed.
On this motion for summary judgment, the Court considers only admissible evidence drawn from
depositions taken of the parties and their Rule 56.1 statements.  *See Ravenell v. Avis Budget Grp., Inc.*,
No. 08-cv-2113 (SLT)(SMG), 2014 WL 1330914, at *1 (E.D.N.Y. Mar. 31, 2014) (quoting *Raskin v.
Wyatt Co.*, 125 F.3d 55, 66 (2d Cir. 1996)).  Facts set forth in plaintiff's Rule 56.1 statement resting on
information and belief do not satisfy the personal knowledge requirement of Rule 56(e) and will not be

1

On May 3, 2013, a gunman shot Reginald Evans and Keith Gulley while the pair was standing in front of 54-30 Beach Channel Drive in Far Rockaway, Queens. 56.1, ECF Dkt. 89, ¶¶ 1–3. Gulley died that night from his injuries, but Evans survived after being treated at a hospital. *Id.* at ¶¶ 10–11. Shortly after 8:00 PM, NYPD Detective Alfonso Vargas, who is not named as a party in this case, arrived at the scene and interviewed eyewitness Orris Wheeling. *Id.* at ¶¶ 4–6. According to Detective Vargas, Wheeling reported seeing the shooter arrive and flee in a dark gray Ford Escape. *Id.* at ¶ 6.

That would hardly be Wheeling's last interview about the shooting. At approximately 9:15 PM, Detective Gildea and Detective Jaeger, who are defendants in this case, interviewed Wheeling and memorialized his report. 56.1 ¶ 12. According to the officers, Wheeling reported seeing a gray SUV pull up at the scene shortly before the shooting. *Id.* at ¶ 13. Wheeling told the detectives that he had recognized the driver as a resident of a nearby housing complex who went by the nickname "Man." *Id.* A black male, he continued, emerged from the car and proceeded towards Evans and Gulley. *Id.* Wheeling then heard gunshots and saw the same black male, now with a gun in hand, run back into the same car, which sped away. *Id.*

Detective Gildea testified that, while at the scene, he observed a surveillance camera at Goldie Maple Academy, a nearby school. 56.1 ¶ 14. He testified further that the camera was not pointing towards the intersection where the shooting occurred and that he concluded that any video captured by the camera would be immaterial to the investigation. *Id.*; Gildea Dep., ECF Dkt. 82-7, at 44:3–18.

---

considered as advancing facts asserted by plaintiff or denying facts alleged by defendant. *Patterson v. County of Oneida*, 375 F.3d 206, 219 (2d Cir. 2004).

Ferguson, for his part, blanket attacks the police account not only of the crime itself but also as to the accuracy of the detectives' report of their interview of Wheeling at the scene and the veracity of Detective Gildea's observations about the surveillance camera at the nearby school. The dispute is one of naked denial and, as previewed earlier, based mostly on plaintiff's information and belief that the factual assertions made by defendants are not true.[2] At any rate, Detective Gildea procured a computer-generated photo array of six individuals, including plaintiff, who had previously been pulled over while driving a gray Ford Escape. 56.1 ¶¶ 15, 18. On May 4, Detective Gildea and Detective Jaeger showed this array to Wheeling, and Wheeling identified plaintiff as the gunman he saw the night of the shooting.[3] *Id.* at ¶¶ 19–20. That same day, the detectives visited Evans in the hospital and showed him the same array. *Id.* at ¶ 23. Evans, however, refused to provide any information or make an identification. *Id.* Based on Wheeling's identification, NYPD generated an I-Card for Ferguson. *Id.* at ¶ 22.

Plaintiff was arrested on May 6, 2013, and on May 7, 2013, Wheeling was brought in to view a lineup in which plaintiff was placed. 56.1 ¶¶ 27–28. Wheeling did not identify plaintiff as the shooter, and plaintiff was subsequently released from custody. *Id.* at ¶ 31.

Two days later, on May 9, 2013, in an apparent change of heart, Evans identified plaintiff in a photo array as his shooter. 56.1 ¶¶ 33–34. Evans later testified that, while he initially refused to identify the shooter because it is "street code" to not "snitch," he decided to cooperate once he learned that his brother died. *Id.* at ¶ 36. Based on Evans's identification, plaintiff was

---

[2] Although a pleading may at times plausibly rely on facts asserted upon information and belief, summary judgment motions follow an unfettered opportunity at discovery to obtain missing information. Factual assertions uncontroverted by other factual assertions will be deemed established and not disputed for purposes of summary judgment.

[3] Plaintiff asserts, citing only inadmissible evidence, that Detective Gildea "told" Wheeling to pick Ferguson out of the array. 56.1 ¶ 20.

3

once again located and taken into custody on January 27, 2014. *Id.* at ¶ 38. Plaintiff was presented to Evans in a lineup, and Evans again identified him as the gunman. *Id.* at ¶¶ 40–41. Ferguson was then arrested. *Id.* at ¶ 42. On November 3, 2014, the charges were presented to a grand jury, where Evans, the sole eyewitness present, testified that plaintiff shot him and Gulley. *Id.* at ¶¶ 45–46. On November 20, 2014, the grand jury indicted plaintiff and the case proceeded to trial, where Evans again testified that plaintiff was the shooter. *Id.* at ¶¶ 47–49.

That would not be the only word. There was a defense witness, Angela Logan-Smith, principal of Goldie Maple Academy. 56.1 ¶ 50. Logan-Smith testified at trial that on May 6, 2013—three days after the shooting—two NYPD officers came to Goldie Maple Academy and viewed surveillance video from a camera facing Beach 56th Street. *Id.* at ¶ 51. Logan-Smith testified that, while the video did not depict the intersection of the shooting—Beach Channel Drive and Beach 56th Street—"you could see a person run by and a few seconds later a car went by" at the approximate time of the shooting. Logan-Smith Trial Test., ECF Dkt. 82-10, at 1327:17–18. She described the car as "a dark sedan" and specifically denied that it was an SUV, *id.* at 1328:16–18, though she could not make out "facial features and specifics of the individual" and could not see if he was holding anything. *Id.* at 1327:25–1328:7. While two NYPD officers later came and viewed the video, Logan-Smith did not know their names. 56.1 ¶ 55. Detectives Gildea and Jager both deny ever having seen this video or met Logan-Smith. Jaeger Dep. I, ECF Dkt. 86-9, at 13:15–21; Gildea Dep. at 44:19–20.

On October 16, 2017, after Ferguson had spent nearly four years in pretrial detention, the jury acquitted plaintiff of all charges. 56.1 ¶ 58.

<u>Legal Standard</u>

4

Summary judgment shall be granted in the absence of a genuine dispute as to any material fact and upon a showing that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552, 91 L. Ed. 2d 265 (1986). "[A] fact is material if it 'might affect the outcome of the suit under the governing law.'" *Royal Crown Day Care LLC v. Dep't of Health & Mental Hygiene of N.Y.*, 746 F.3d 538, 544 (2d Cir. 2014) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986)). A dispute over material facts is "genuine" where "a reasonable jury could return a verdict for the nonmoving party" based on the evidence cited. *Anderson*, 477 U.S. at 248.

Assertions of fact made in connection with a motion for summary judgment must be supported by citations "to particular parts of materials in the record" that could be presented as admissible in evidence, which may include "depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A) & 56(c)(2); *Lyons v. Lancer Ins. Co.*, 681 F.3d 50, 57 (2d Cir. 2012). "Before summary judgment may be entered, the district court must ensure that each statement of material fact is supported by record evidence sufficient to satisfy the movant's burden of production even if the statement is unopposed." *Jackson v. Fed. Express*, 766 F.3d 189, 194 (2d Cir. 2014). With that standard in mind, the Court's job at this stage is not to try the facts but instead to merely "determine whether there *are* issues of fact to be tried." *Sutera v. Schering Corp.*, 73 F.3d 13, 16 (2d Cir. 1995) (quoting *Katz v. Goodyear Tire & Rubber Co.*, 737 F.2d 238, 244 (2d Cir. 1984)).

The movant carries the burden of demonstrating that there is no genuine dispute as to any material fact, *see Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005), and the Court

will resolve all ambiguities and draw all permissible factual inferences in the light most favorable to the party opposing the motion, *see Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.*, 391 F.3d 77, 83 (2d Cir. 2004). Where the nonmoving party "will bear the burden of proof at trial," it bears the initial procedural burden at summary judgment of demonstrating that undisputed facts "establish the existence of [each] element essential to that party's case . . ." *Celotex Corp.*, 477 U.S. at 322–23. "If, as to the issue on which summary judgment is sought, there is any evidence in the record from which a reasonable inference could be drawn in favor of the opposing party, summary judgment is improper." *Hetchkop v. Woodlawn at Grassmere, Inc.*, 116 F.3d 28, 33 (2d Cir. 1997).

Discussion

## Malicious Prosecution

To succeed on a § 1983 malicious prosecution claim, plaintiff must establish "(1) the initiation or continuation of a criminal proceeding against plaintiff; (2) termination of the proceeding in plaintiff's favor; (3) lack of probable cause for commencing the proceeding; and (4) actual malice as a motivation for defendant's actions.'" *Manganiello v. City of New York*, 612 F.3d 149, 161 (2d Cir. 2010) (quoting *Murphy v. Lynn,* 118 F.3d 938, 947 (2d Cir. 1997)). Because the first two factors are undisputed, the Court addresses only lack of probable cause and actual malice.

Probable cause is "described as such facts and circumstances as would lead a reasonably prudent person to believe the plaintiff guilty." *Buari v. City of New York*, 530 F. Supp. 3d 356, 384 (S.D.N.Y. 2021) (quoting *Boyd v. City of New York*, 336 F.3d 72, 76 (2d Cir. 2003)). An officer relying on "mistaken information" may still have probable cause if "it was reasonable for him to rely on it." *Manganiello*, 612 F.3d at 161 (citing *Hill v. California,* 401 U.S. 797, 803–

6

04, 91 S. Ct. 1106, 1110–1111, 28 L. Ed. 2d 484 (1971)). Of great importance here, "[t]he veracity of citizen complaints who are the victims of the very crime they report to the police is assumed." *Cornett v. Brown*, No. 04CV0754(DGT)(LB), 2006 WL 845568, at \*7 (E.D.N.Y. Mar. 30, 2006) (quoting *Miloslavsky v. AES Engineering Soc., Inc.*, 808 F. Supp. 351, 355 (S.D.N.Y. 1992)); *see also Clark v. City of New York*, No. 09 CV 2533(PKC), 2015 WL 5719612, at \*6 (E.D.N.Y. Sept. 29, 2015) (The victim of a crime is "ordinarily [] presumed to be truthful.").

At any rate, Ferguson falls victim to the bottom-line maxim of the applicable law: The existence of probable cause is an absolute defense to malicious prosecution. *Buari*, 530 F. Supp. 3d at 384 (citing *Boyd v. City of New York*, 336 F.3d at 75). Worse yet for plaintiff, "indictment by a grand jury creates a presumption of probable cause that may *only* be rebutted by evidence that the indictment was procured by fraud, perjury, the suppression of evidence or other police conduct undertaken in bad faith." *Bouche v. City of Mount Vernon*, No. 11 Civ. 5246 (SAS), 2013 WL 322613, at \*5 (S.D.N.Y. Jan. 28, 2013) (quoting *Savino v. City of New York*, 331 F.3d 63, 72 (2d Cir. 2003)). To rebut this, plaintiff must provide more than "mere conjecture and surmise" that the indictment "was procured as a result of conduct undertaken by the defendants in bad faith . . . ." *Brandon v. City of New York*, 705 F. Supp. 2d 261, 273 (S.D.N.Y. 2010) (quoting *Reid v. City of New York,* 00 Civ. 5164 (RCC) (JCF), 2004 WL 626228, at \*7 (S.D.N.Y. Mar. 29, 2004)). This includes establishing "some connection between the alleged falsification of evidence and the procurement of the indictment." *Greene v. City of New York*, 08-CV-00243 (AMD) (CLP), 2017 WL 1030707, at \*22 (E.D.N.Y. Mar. 15, 2017) (citing *Rothstein v. Carriere*, 373 F.3d 275, 275 (2d Cir. 2004)). Ferguson fails to carry this burden.

*NYPD Coercion*

Plaintiff asserts three different theories to rebut the presumption of probable cause created by the November 20, 2014, grand jury indictment.[4]  His first theory is a collection of allegations that the defendants repeatedly lied in order to establish probable cause.  But when scrounging up support for this brash claim, plaintiff produces no admissible evidence.

First, he argues that the NYPD officers "fabricated out of whole cloth" that Wheeling reported seeing a Ford Escape at the shooting.  Pl. Mem., ECF Dkt. 85, at 5.  But Detective Vargas testified to this fact under oath.  Vargas Dep., ECF Dkt. 86-6, at 34:4–7; *see also* Vargas Memo Book, ECF Dkt. 86-7, at 3; DD5, ECF Dkt. 82-2, at 6.  In retort, plaintiff cites two documents that are equally inadmissible on this point: the report of a private investigator (the "DeLeon Report") and deposition testimony of Assistant District Attorney Timothy Regan taken for this litigation, each of whom claim that Wheeling told them, years after the shooting, that he saw a different vehicle at the scene of the crime.  Regan Dep., ECF Dkt. 86-23, at 13:2–14:17; DeLeon Report, ECF Dkt. 86-21, at 1.  This testimony is unequivocally hearsay and thus "not competent evidence on a motion for summary judgment."  *Ruffin v. Kirschenbaum & Phillips P.C.*, No. 20-CV-05422 (PMH), 2022 WL 704943, at *3 (S.D.N.Y. Mar. 9, 2022) (citing *Sarno v. Douglas Elliman-Gibbons & Ives, Inc.*, 183 F.3d 155, 160 (2d Cir. 1999)).

The only other evidence Ferguson cites to rebut the fact that Wheeling reported seeing a Ford Escape is a tiny discrepancy in timing.  Either Detective Vargas, who first interviewed Wheeling, or his supervisor reported via radio at 8:18 PM that the getaway car was a gray Ford Escape.  *See* Sprint Report, ECF Dkt. 86-5, at 14.  Detective Vargas's memo book, however, records "Dark Gray Ford Escape" at 8:35 PM, Vargas Memo Book at 3, a discrepancy which he

---

[4] Plaintiff's opposition memorandum consists of twenty-four pages of undigested factual assertions, capped with four pages of cursory analysis attempting to connect these alleged facts to the law.  While the Court construes plaintiff's submissions as charitably as possible, it cannot spin straw into gold.

later claimed was because his memo book time was "put in as a rough estimate later on." Vargas Dep. at 49:11–12. Plaintiff does not explain his reasoning, but he apparently believes that it is reasonable to infer from this—without further evidence—that Vargas acted as part of a grand conspiracy against him. It suggests no such thing; such a minor inconsistency is immaterial as to whether Wheeling actually told Detective Vargas that he saw a Ford Escape and does not establish the existence of a genuine dispute of material fact.

Ferguson next claims that Detective Gildea "actively intimidated witnesses and added disturbing lies to police." Pl. Mem. at 26. In support of his claims, Ferguson cites deposition testimony from Henry McCummings, the once-suspected getaway driver, contending that Detective Gildea tried "to coerce McCummings to testify falsely" about Ferguson. Pl. Mem. at 23. But McCummings's only testimony was that he was not the driver and that he had an alibi; in no way does he suggest that Detective Gildea pressured him to make an identification. McCummings Dep., ECF Dkt. 86-18, at 9:16–12:25. Regardless of what discussions Detective Gildea had with McCummings, nothing exculpatory of Ferguson precipitated. The testimony Ferguson highlights does nothing to defeat defendants' motion.

Plaintiff then moves on to Wheeling, the eyewitness. He claims that Detective Gildea pressured Wheeling into identifying him as the shooter but, again, cites no meaningful support. The only admissible evidence[5] cited involves a statement written on the photo array that Wheeling used to identify Ferguson, reading "This is the guy I saw with the gun." Photo Array, ECF Dkt. 82-9. Plaintiff asserts that Detective Gildea wrote this statement after Wheeling signed the paper. 56.1 ¶ 21. The only non-hearsay evidence cited in support is that, while Detective

---

[5] Plaintiff also asserts that Wheeling identified Ferguson in the photo array "only because Gildea told him to do so and Gildea told him everyone was picking Ferguson . . . ." 56.1 ¶ 20. Because the only support for this claim is the inadmissible hearsay of the DeLeon Report, it fails to establish a factual dispute.

Gildea testified that the handwriting is Wheeling's, Detective Jaeger testified that it "looks like" Detective Gildea's handwriting.  Jaeger Dep. I at 42:12–22.  Even if the testimony of Detective Jaeger were found to be admissible lay opinion evidence and could be used to support the assertion that Gildea in fact wrote the statement, which is far from clear, it does nothing to suggest that he did so *after* Wheeling signed it.  Like every allegation supporting this theory, this claim fails to establish a genuine factual dispute.

Indeed, the entire line of attack by Ferguson stitched together on snippets of the filings is offered to support that the detectives lied about the getaway car and Wheeling's statements and that they pressured Wheeling and McCummings to identify Ferguson.  This is nothing but a sideshow.  Critically, it is clear beyond contest that the grand jury indictment was not obtained on the basis of any of the evidence plaintiff assails in his attack.  In fact, after Wheeling did not identify plaintiff in the lineup, plaintiff was released from custody.  The indictment at issue was ultimately based on Evans's testimony—neither Wheeling nor McCummings testified before the grand jury.  Thus, even if plaintiff *had* established the existence of a genuine dispute regarding the interactions between Detectives Gildea and Jaeger and witnesses Wheeling and McCummings, which he emphatically has not, the dispute would be regarding immaterial facts, as he would fail to demonstrate a connection between the coercive statements and the indictment. *Greene v. City of New York*, No. 08-CV-00243 (AMD) (CLP), 2017 WL 1030707, at *22 (E.D.N.Y. Mar. 15, 2017).

<u>Evans's Testimony</u>

Plaintiff's second theory attacks Evans's identification of plaintiff as the shooter.  If substantiated, this theory finds the nexus between the malfeasance and procurement of the indictment that the first theory lacked.  But plaintiff avoids one pitfall only to plunge into

10

another.  The entire weight of his argument rests on the fact that Evans initially described the shooter as "light skinned," while Ferguson is "darkly complected."  Pl. Mem. at 22 (citing Jaeger Memo Book, ECF Dkt. 86-8, at 2; Ferguson Mugshot, ECF Dkt. 86-15).

But this does not erase Evans's subsequent identifications of Ferguson as the shooter.  Well-developed case law supports the finding of probable cause in cases involving much sharper divergence between an initial description and the defendant's actual appearance.  *See Hargroves v. City of New York*, 411 Fed. App'x 378, 380–81 (2d Cir. 2011) (witness misdescribed color of the plaintiff's jacket); *Gil v. County of Suffolk*, 590 F. Supp. 2d 360, 364 (E.D.N.Y. 2008) (witness described plaintiff as "5'2" tall wearing a mask and blue hooded shirt" while plaintiff was actually "5'9" tall and wearing, *inter alia*, a black knit earwarmer and black hooded sweatshirt."); *Sorrell v. County of Nassau*, 162 F. Supp. 3d 156, 161–62, 165–66 (E.D.N.Y. 2016) (witness misdescribed the number of individuals involved, the color of their shirt, their hairstyles, and stated they wore "a lot of jewelry" despite the plaintiffs wearing no visible jewelry).  Buttressed by his subsequent reidentifications of Ferguson as the shooter,  Evans's initial and differing description does nothing to undermine the grand jury's finding of probable cause resting on Evans's testimony and does not create a genuine dispute of material fact.[6]

*Video Evidence*

---

[6] Plaintiff refers to trial testimony of Winter Carter, another eyewitness to the murder who testified at trial that Ferguson was not the shooter. Pl. Mem. at 24.  He makes no other reference to Carter.  Trial testimony is immaterial to the existence of probable cause to *conduct* that trial, and Carter testified that she has never spoken to any police officer about the events of the shooting.  Carter Dep., ECF Dkt. 91-2, at 69:25–70:15; *see Bloom v. Town of New Windsor Police Dep't*, 234 F.3d 1261, 1261 (2d Cir. 2000) (declining to find a dispute of material fact on the bases of trial testimony, as "the existence of probable cause must be established by information available to the police *at the time of the arrests*") (emphasis added).  At any rate, plaintiff has failed to provide the court transcripts of the testimony in question and so does not cite to "particular parts of materials in the record."  Fed. R. Civ. P. 56(c)(1)(A); *see also Agosto v. New York City Dep't of Educ.*, 982 F.3d 86, 103 (2d Cir. 2020) (finding no error where the district court did not consider materials cited by a party but not provided to the court).

Plaintiff's final theory for rebutting probable cause is that the defendants failed to preserve exonerating video evidence. A plaintiff can rebut, based on a failure to preserve evidence, a presumption of probable cause by showing (1) that the officer in question acted in bad faith, and (2) the suppressed evidence was "potentially useful" to his criminal defense. *Fappiano v. City of New York*, 640 Fed. App'x 115, 120 (2d Cir. 2016) (quoting *Arizona v. Youngblood*, 488 U.S. 51, 58, 109 S. Ct. 333, 337, 102 L. Ed. 2d 281 (1988)). Bad faith exists only where police fail to disclose evidence "that would conclusively establish the plaintiff's innocence or negate the possibility that plaintiff had committed the crime." *Stukes v. City of New York*, No. 13-CV-6166 (NGG) (VVP), 2015 WL 1246542, at *5 (E.D.N.Y. Mar. 17, 2015) (internal quotation marks and citations omitted).

Ferguson fails to substantiate his allegations of bad faith. The only purported evidence that either defendant even knew of its existence was Detective Gildea's testimony that it is "quite possible" that he told ADA Regan that Detective Jaeger viewed the video.[7] But plaintiff provides no indication that this statement was based on personal knowledge. *See Parker v. Mandarich Law Grp., LLP*, No. 19-cv-6313, 2021 WL 2351177, at *4 (E.D.N.Y. June 9, 2021) (quoting *DiStiso v. Cook*, 691 F.3d 226, 230 (2d Cir. 2012)); *Nanton v. City of New York*, No. 05 Civ. 8989 (DLC), 2007 WL 2319131, at *2 n.1 (S.D.N.Y. Aug. 10, 2007). Even if it were, this sliver of evidence falls far short of creating a material dispute that the defendants viewed the video, let alone that they acted in bad faith. Both individual defendants have denied ever viewing the video, Jaeger Dep. I at 13:15–21; Gildea Dep., ECF Dkt. 82-7, at 44:19–20, and this evidence remains uncontroverted by plaintiff.

---

[7] Plaintiff twice attempts to cite the trial transcript in his brief but provides different page numbers for the same testimony. *See* 56.1 ¶ 56–57. Regardless, he has provided neither page to the court and so fails to make either a part of the record.

Ultimately, though, the conversation about the video is much ado about nothing. This is a classic case concerning facts that are truly disputed but truly immaterial. Logan-Smith's deposition testimony concerning what she saw depicted in the video was certainly at odds with the account given to Detectives Gildea and Jaeger by Wheeling. Despite the graininess of the video, Logan-Smith was able to dispute the SUV body type of the Ford Escape and the height of a man running away from the scene. Logan-Smith Trial Test. at 1328:15–20; Logan-Smith Dep., ECF Dkt. 86-19, at 16:18–21. She pegged the fleeing man at five-foot-six, while Ferguson is six-foot-one. *See* 56.1 ¶ 54; Mugshot Profile, ECF Dkt. 86-15. But, none of the facts claimed by plaintiff to be controverted by Logan-Smith's testimony or the video underlying it were communicated to the grand jury, either by Wheeling or any other witness. In fact, no evidence of any kind was presented to the grand jury regarding any vehicle possibly connected with the charged crime. The long and short of it is that the indictment rested on the eyewitness testimony of Evans identifying Ferguson as the shooter. 56.1 ¶ 46. The factual dispute plaintiff anchors in the video and Logan-Smith's testimony is immaterial and cannot rebut the presumption of probable cause created by the return of the indictment. *White v. Martel-Moylan*, 586 F. Supp. 2d 63 (D. Conn. 2008) (citing *Howard v. Gleason Corp.*, 901 F.2d 154, 1159 (2d Cir. 1990)).

*Actual Malice*

To establish actual malice where the grand jury returned an indictment, a plaintiff must establish that the indictment "was produced by fraud, perjury, the suppression of evidence or other police conduct undertaken in bad faith." *Dawson v. Snow*, 356 Fed. App'x 526, 529 (2d Cir. 2009) (quoting *Colon v. City of New York,* 60 N.Y.2d 78, 82–83, 468 N.Y.S.2d 453, 455 N.E.2d 1248 (1983)). Ferguson's discussion of actual malice, which spans half of one page, rehashes the same unsupported allegations: that there was "suppression, destruction and

alteration of evidence," that Detective Gildea "intimidated witnesses and adding disturbing lies to police documents," and that "dishonest" follow-up investigative reports ("DD5s") were presented to the prosecutor's office. Pl. Mem. at 26. Plaintiff cites no meaningful evidence to support these claims—certainly not enough to create a genuine dispute. The only allegation with any factual support—that Detective Jaeger wrote in his initial notes, but not in a DD5, that Evans described the shooter as "light skinned"—is hardly exemplary of a malicious withholding of evidence when the underlying materials were not destroyed and were available for review. Consequently, Ferguson fails to meet either prong of his malicious prosecution claim. Defendants' motion for summary judgment on this count is granted.

## Denial of Fair Trial

Plaintiffs second and final cause of action is his claim of denial of a fair trial. The elements of a fair trial claim are: "an (1) investigating official (2) fabricates evidence (3) that is likely to influence a jury's decision, (4) forwards that information to prosecutors, and (5) the plaintiff suffers a deprivation of liberty as a result." *Jovanovic v. City of New York*, 486 Fed. App'x 149, 152 (2d Cir. 2012). Focusing on the second prong, plaintiff alleges four specific instances of misconduct. First, the defendants "generated DD5's [*sic*] with intentionally inaccurate information," specifically "fraudulent statements they added on behalf of Wheeling"; second, Detective Jaeger did not generate a DD5 indicating Evans's initial "light skinned" description; third, the defendants made "fraudulent reports of a Ford Escape"; and lastly, they "intentional[ly] fail[ed] to document the viewing of the video and to have that video and a key witness's name preserved." Pl. Mem. at 27. Because the Court finds that plaintiff fails to create a genuine dispute of material fact on the fabrication-of-evidence prong, it is unnecessary to inquire into the others.

14

These contentions are easily dismissed. First, as discussed *supra*, plaintiff wholly fails to substantiate the allegation that the detectives incorrectly recorded Wheeling's statements. Beyond the pure hearsay of the DeLeon Report, no evidence even suggests that the defendants made an inaccurate report. Next, even assuming that it could otherwise qualify as fabrication of evidence, the failure to include the description of "light skinned" in a DD5 does not meet the fabrication-by-omission standard established in this Circuit. *See Harasz v. Katz*, 327 F. Supp. 3d 418, 434 (D. Conn. 2018) ("Information may be 'false' if material omissions render an otherwise true statement false.") (quoting *Morse v. Fusto*, 804 F.3d 538, 548 (2d Cir. 2015)); *Vasicka v. Kerwin*, No. 18-CV-6858 (RPK) (SJB), 2022 WL 4641585, at *9 (E.D.N.Y. Sept. 30, 2022) ("Although these omissions violated police protocols, . . . their inclusion would not have rendered false any otherwise true statement in the Incident Report."). Nothing in the DD5, and nothing else in Detective Jaeger's involvement in the case, was rendered false or misleading due to the exclusion of this statement—and at any rate, Detective Jaeger testified that he provided these notes to the District Attorney's Office, and plaintiff has offered no evidence to challenge this fact. Jaeger Dep. II, EFC Dkt. 91-1, at 59:22–60:18. Third, as discussed above, plaintiff has not cited sufficient evidence to genuinely dispute that the report of a Ford Escape was accurately and honestly reported.

Plaintiff's fourth and final allegation of fabricated evidence concerns the viewing of the Goldie Maple Academy video and witness Angela Logan-Smith. As discussed above, plaintiff fails to cite sufficient evidence that either defendant even viewed the video or met Logan-Smith. But even assuming they did view this video, plaintiff fails to cite any statement made by defendants that would be rendered false from the omission of information about either the video or Logan-Smith. Thus, such failure would not be fabrication of evidence and is immaterial. Nor

15

SPA-015

does Plaintiff's cited precedent support finding fabrication of evidence here. *See Ying Li v. City of New York*, 246 F. Supp. 3d 578, 628–29 (E.D.N.Y. 2017) (finding sufficient allegations of fabrication of evidence where, in contrast to the instant case, one defendant signed a criminal complaint "in spite of his knowing that its content was not true" and "falsely reported facts in reports and search warrant affidavits, and fabricated oral statements of witnesses"). Without a scintilla of proof to establish that, though their investigative steps may have been incomplete, defendants fabricated or provided evidence that was false, there is no genuine dispute of fact, and Ferguson's fair trial claims necessarily fail.

Reaching for the final arrow in his quiver, plaintiff asserts that a *Brady* violation—that is, the withholding of exculpatory evidence that does not itself constitute "fabricating" evidence—can provide the basis for a fair trial claim. The Second Circuit, however, has held that this cause of action is categorically unavailable to plaintiffs who were acquitted at trial. *See Ventillo v. Falco*, 19-CV-03664 (PMH), 2020 WL 7496294, at *12 (S.D.N.Y. Dec. 18, 2020) (jury acquittal "negates any violation of [plaintiff's] *Brady* rights and extinguishes any Section 1983 due process claim that might arise from Defendants' alleged suppression of exculpatory evidence") (quoting *Cambisaca v. Ruhe*, No. 17-CV-87, 2019 WL 2866072, at *12 (S.D.N.Y. July 3, 2019)); *Ambrose v. City of New York*, 623 F. Supp. 2d 454, 471 (S.D.N.Y. 2009) (same).[8]

---

[8] Given the resolution of this motion on substantive grounds, the Court need not, and does not, reach the issue of qualified immunity asserted by defendants.

<u>Conclusion</u>

For the foregoing reasons, defendants' motion for summary judgment is granted in full.

The Clerk of Court is directed to enter judgment accordingly and to close this case.

So ordered.

Dated: Brooklyn, New York
       August 29, 2023

/s/ Eric N. Vitaliano
_____
ERIC N. VITALIANO
United States District Judge

17