# 23-1315

## United States Court of Appeals

*for the*

## Second Circuit

———

Rashaun Ferguson,

*Plaintiff-Appellant,*

v.

City of New York, Michael Gildea, Detective Jaeger,

*Defendants-Appellees,*

Unidentified Members of the NYPD, all sued herein in their individual capacities,

*Defendant.*

———

On Appeal from a Judgment of the United States District Court, Eastern District of New York

## JOINT APPENDIX
### Vol. II of II (pages 301-495)

| | | |
|---|---|---|
| Corporation Counsel of the City of New York 100 Church Street, Third Floor New York, N.Y. 10007 (212) 356-2409 | Bergstein & Ullrich 5 Paradies Lane New Paltz, New York 12561 (845) 469-1277 Counsel for Plaintiff-Appellant | Fred B. Lichtmacher 159 West 25th St, Room 510 New York, New York 10001 (212) 922-9066 Counsel for Plaintiff-Appellant |

# Table of Contents

Docket entries . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Defendants notice of motion for summary judgment . . . . . . . . . . . . . . . . . . . . . 20

Declaration of Geoffrey M. Stannard in support of motion
for summary judgment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Exhibit A: portions of the trial testimony of Reginald Evans . . . . . . . . . . . . . . 27

Exhibit B: portions of the DD5 File . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

Exhibit C: portions of Detective Jaeger's deposition transcript . . . . . . . . . . . . . 62

Exhibit D: portions of Police Officer Alfonso Vargas's deposition
transcript . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67

Exhibit E: copy of Sprint Report # F14151 . . . . . . . . . . . . . . . . . . . . . . . . . . . . 74

Exhibit F:  portions of Detective Gildea's testimony at a pre-trial
Wade hearing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 80

Exhibit G: portions of Detective Gildea's deposition transcript . . . . . . . . . . . . 108

Exhibit H: portions of plaintiff Rashaun Ferguson's deposition
transcript . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 114

Exhibit I: documents related to the photo array presented to Wheeling
on May 4, 2013 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 120

Exhibit J: portions of the trial testimony of Angela Logan Smith. . . . . . . . . . . 133

Exhibit K: documents related to the lineup presented to Wheeling on
May 7, 2013 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 144

Exhibit L: documents related to the photo array presented to Reginald
Evans on May 9, 2013 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 152

Exhibit M: documents related to the lineup presented to Evans on January 27, 2014. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 163

Exhibit N: Arrest Report # Q14605601-K. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 171

Exhibit O: Criminal Court Complaint . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 175

Exhibit P: cover page of the grand jury minutes . . . . . . . . . . . . . . . . . . . . . . . . 178

Exhibit Q:  portions of Assistant District Attorney Timothy Regan's deposition transcript. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 180

Exhibit R: Queens County Supreme Court Indictment # 2723/2014 . . . . . . . . . 183

Exhibit S is a copy of the Certificate of Disposition . . . . . . . . . . . . . . . . . . . . . 190

Defendant's Rule 56.1 Statement. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 191

Lichtmacher Affirmation in opposition to motion for summary judgment. . . . . 200

Exhibit l: Felony Complaint sworn to by Detective Jaeger  . . . . . . . . . . . . . . . . 205

Exhibit 2: the Indictment in Plaintiffs criminal case . . . . . . . . . . . . . . . . . . . . . 207

Exhibit 3: Notice of Claim Plaintiff filed on November 22, 2017  . . . . . . . . . . . 212

Exhibit 4: Federal complaint filed in the instant matter  . . . . . . . . . . . . . . . . . . 215

Exhibit 5: Sprint Report generated during the police investigation  . . . . . . . . . . 230

Exhibit 6: excerpts from Police Officer Alfonso Vargas' deposition  . . . . . . . . . 248

Exhibit 7: excerpts from Defendant Police Officer Alfonso Vargas' memo book . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 255

Exhibit 8: Detective Jaeger's notes applicable to his interview of Reginald Evans  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 259

Exhibit 9: Defendant Detective Quinn Jaeger's deposition . . . . . . . . . . . . . . . . 268

Exhibit l0: Defendant Police Officer Gildea's deposition . . . . . . . . . . . . . . . . . 284

Exhibit 11: Plaintiff Rashaun Ferguson's deposition. . . . . . . . . . . . . . . . . . . . . 298

Exhibit 12: excerpts from the trial transcript in the criminal proceedings . . . . . 303

Exhibit 13: Preliminary Investigation Report . . . . . . . . . . . . . . . . . . . . . . . . . . 320

Exhibit 14: Ortiz' Mugshot. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 330

Exhibit 15: Plaintiff Rashaun Ferguson's mugshot . . . . . . . . . . . . . . . . . . . . . . 335

Exhibit 16: Certificate of Disposition . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 336

Exhibit 17: Certified copy of the Omniform Complaint Report . . . . . . . . . . . . 337

Exhibit 18: Excerpts from non-party witness Henry McCummings'
deposition . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 342

Exhibit 19: non-party witness, Principal Logan Smith's deposition . . . . . . . . . 371

Exhibit 20: Exhibit 3 from Defendant Police Officer Gildea's deposition . . . . . 376

Exhibit 21: Investigator DeLeon' s Report. . . . . . . . . . . . . . . . . . . . . . . . . . . . 377

Exhibit 22: DD5's contained in the DAs file pursuant to the prosecution
of Rashaun Ferguson . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 379

Exhibit 23: excerpts from ADA Regan's deposition . . . . . . . . . . . . . . . . . . . . . 439

Exhibit 24: Photo Array Viewing Report. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 442

Exhibit 25: Search Warrant Affidavit for Wheeling signed by Christopher
Velsor . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 443

iv

Exhibit 26: exerpts from non-party witness, Orris Wheeling's deposition . . . . . 444

Exhibit 27: Lineup Information Report . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 446

Declaration of Madeline Arnoldy . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 452

Declaration of Elpidio DeLeon . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 454

Plaintiff's response to defendants' Rule 56.1 statement . . . . . . . . . . . . . . . . . . 456

Second declaration of Geoffrey M. Stannard . . . . . . . . . . . . . . . . . . . . . . . . . . 473

Exhibit T: Excerpts from Jaeger deposition . . . . . . . . . . . . . . . . . . . . . . . . . . . 475

Exhibit U: Excerpts from deposition of Winter Carter . . . . . . . . . . . . . . . . . . . . 478

Defendants' reply to plaintiff's statement pursuant to Rule 56.1 . . . . . . . . . . . . 483

Judgment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 494

Notice of Appeal . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 495

R. FEI GUSON

1    A.    No.

2                   MR. ROSENKILDE:  You have to wait for me to

3              finish the question.

4    Q.    When did your mom ge: that car?

5    A.    I don't recall.

6    Q.    Do you recall if that was leased or owned?

7    A.    I don't recall.

8    Q.    Did you have permission from your mother to drive

9    that vehicle?

10   A.    Yes.  You saying on that date or what you saying?

11   Q.    No.  I'm saying, generally speaking, did your mom

12   give you her permission to drive the car?

13   A.    I have to ask her before.  I just can't wake up

14   and say I'm going to drive the car.

15   Q.    But if you asked her, generally speaking, she

16   could grant you permission?

17   A.    Yes.

18   Q.    Do you know if you were covered by insurance to

19   drive that car?

20   A.    I don't -- no.  It was never my car.  I don't

21   know about insurance at that time so no.

22   Q.    How many times would you say you have driven that

23   car?

24   A.    I don't recall.

25   Q.    Is it fair to say you've driven it over 50 times?

R. FERGUSON

1    Q.    And --

2    A.    2013.

3    Q.    The second was 2013 not 2012?

4    A.    Yes.

5    Q.    And when was the last time that you had an

6    interaction with him?

7    A.    2014.

8    Q.    When you interacted with him in 2004 where did

9    that interaction take place?

10   A.    Precinct.

11   Q.    Was that the 101 precinct?

12   A.    Yes.

13   Q.    How did Detective Gildea treat you?

14   A.    What you mean by that?

15   Q.    How would you describe the way that he was acting

16   toward you?

17   A.    Aggressive.

18   Q.    In what way was he aggressive?

19             MR. LICHTMACHER:  Careful.  You heard the

20             judge's ruling.

21   A.    Aggressive.  Verbally aggressive, I can say that.

22   Verbally aggressive.

23   Q.    Was he threatening you in any way verbally?

24   A.    Yes.

25   Q.    What was he threatening you?

1

```
 1   SUPREME COURT OF THE STATE OF NEW YORK
     COUNTY OF QUEENS: CRIMINAL TERM: PART K-21
 2   ------------------------------------------x
     THE PEOPLE OF THE STATE OF NEW YORK     : Indictment
 3                                           : 2723-2014
                                             :
 4        -against-                          : TRIAL PRELIMINARIES
                                             :
 5   RASHAUN FERGUSON                        :
                        Defendant            :
 6   ------------------------------------------x

 7                      265 East 161st Street
                        Bronx, New York 10451
 8
                        SEPTEMBER 12, 13, 14, 18,
 9                      19, 20, 21, 22, 28, 29, 2017
                        OCTOBER 2, 3, 4, 5, 6, 10, 11,
10                      12, 13, 14, 15, 16, 2017

11

12   B E F O R E:   HONORABLE CHARLES S. LOPRESTO

13

14   A P P E A R A N C E S:

15   FOR THE PEOPLE:

16   RICHARD BROWN, ESQ.
     District Attorney, Queens County
17   BY:  TIMOTHY REGAN, ESQ.
     Assistant District Attorney
18

19   FOR THE DEFENDANT:

20   ROBERT DIDIO, ESQ.
     80-02 Kew Gardens Road
21   Kew Gardens, New York

22

23

24

25                      Joan Schaefer
                        Senior Court Reporter
```

jms

JA-303

PROCEEDINGS                                    20

1    find out either, whether some detective looked at it and it

2    doesn't show anything or it was just never recovered, but

3    I'll endeavor to find that out as soon as possible.

4              THE COURT:  Okay.

5              MR. DIDIO:  That's all from the defense for today,

6    Judge.

7              THE COURT:  Okay.  So Counsel, please be here at

8    9:30 tomorrow morning.

9              MR. REGAN:  Yes.

10             THE COURT:  And -- and please try to fill in the

11   blanks with respect to the Sandoval issues, the gang

12   affiliations and that underlying case, if -- in that

13   underlying case, if any.  And let's look into this McCummings

14   issue and the surveillance cameras as well.  And I'll see

15   everyone back here at 9:30 tomorrow.

16             MR. REGAN:  Thank you.

17             (Whereupon, the case is adjourned to Wednesday,

18   September 13, 2017 at 9:30 a.m.)

19

20

21

22

23

24

25

                                                          jms

1   that they gave up the prosecution of -- of a culpable

2   codefendant acting in concert with a shooter, it just doesn't

3   -- it doesn't sit well with me. That's for sure. And it

4   doesn't meet the test of logic.

5              THE COURT: Well, they give you a lot of ammunition

6   for your defense. That's all I can say. Listen, they choose

7   to call whatever they would like to call. They may have an

8   obligation to call Mr. McCummings in this case.

9              MR. REGAN: Judge, I don't understand how I would

10  be obligated to call Mr. McCummings.

11             THE COURT: He's a material witness to a crime.

12             MR. REGAN: I have no --

13             THE COURT: He's -- the testimony is going to --

14  his name is going to come out.

15             MR. REGAN: Correct. Right. Yes.

16             THE COURT: And he was a suspect. He is available.

17  He was last seen with, allegedly, this defendant in the

18  commission of a crime, in the getaway car. How is he not a

19  material witness to the crime in question?

20             MR. REGAN: How is he under my control? And would

21  be -- is expected to testify. That supports my case.

22  There's no --

23             THE COURT: He potentially could finger the

24  defendant. How --

25             MR. REGAN: If you are going to accept the

                                                                              jms

1    A.    As a detective we would investigate any open crimes that

2  patrol couldn't solve or any significant crimes, felonies,

3  assaults, burglaries, shootings, homicides.

4    Q.    And were you working in that capacity on that day, May

5  3, 2013?

6    A.    Yes, I was.

7    Q.    Directing you're attention to that evening, some time

8  shortly after 8:00 p.m., do you remember where you were?

9    A.    Yes.

10   Q.    Where were you?

11   A.    I was sitting in the 101 Detective Squad.

12   Q.    And that's at the 101st Precinct?

13   A.    Yes, second floor.

14   Q.    Where is that located?

15   A.    The precinct's located at 16-12 Mott Avenue.  The

16  detective squad is on the second floor of the -- of the building.

17   Q.    And as part of your assignment that evening were you

18  monitoring the radio?

19   A.    Yes.

20   Q.    Did you receive a radio communication some time that

21  evening that directed you to a specific location?

22   A.    Yes.

23   Q.    What was the substance of that radio transmission?

24   A.    If I remember correctly, I believe transmission came

25  over as shots fired and I think the address was 54-30 Beach

jms

1   responding to the scene?

2       A.   Yes.

3       Q.   As a result of that preliminary investigation you

4   conducted, did you develop a suspect?

5       A.   Yes, I did.

6       Q.   What was the name of the suspect?

7       A.   Rashaun Ferguson.

8            THE COURT:  All right.  Ladies and gentlemen, I

9   want to give you this specific limited instruction.  The

10      testimony you just heard is hearsay.  It's being introduced

11      for a limited purpose of explaining what actions the police

12      took and not for the truth of the matter.  You are not to

13      speculate as to how he became a suspect.  It's just being

14      introduced as general background evidence as to what actions

15      the police took in this matter.

16           Go ahead.

17      Q.   Were you familiar with that name, Rashaun Ferguson?

18      A.   Yes, I was.

19      Q.   Did you know that person?

20      A.   Yes, I did.

21      Q.   Do you see that person in the courtroom here today?

22      A.   Yes.

23      Q.   Could you point that person out and tell us what they

24  are wearing?

25      A.   Yes, the male in the front row, white shirt and tie.

                                                            jms

M. GILDEA - PEOPLE - DIRECT                    1241

1    Detective Thompson, and requested that they now, again, initiate

2    another investigation into locating and apprehending Rashaun

3    Ferguson.

4        Q.   Now, that was around May 9, 2013?

5        A.   Yes.

6        Q.   Okay.  How long after that were you still at the 101st

7    Precinct Detective Squad?

8        A.   I got transferred, I believe, at the end of August, to

9    the Major Case Squad.

10       Q.   So between May -- around May 9th and August, 2013, had

11   Rashaun Ferguson been apprehended again?

12       A.   No.

13       Q.   And after you left the detective squad what happened to

14   the case?

15       A.   The case was reassigned to my partner, Detective Jaeger.

16   The investigation continued.  And I understand an arrest was made

17   once I was already assigned to the Major Case Squad.

18       Q.   You are -- but you were not involved with that arrest;

19   correct?

20       A.   No.  No, I was not.

21            MR. REGAN:  I have no further questions for the

22       witness at this time.

23            THE COURT:  You may cross examine.

24            MR. DIDIO:  Thank you, Judge.

25   CROSS EXAMINATION BY

                                                        jms

JA-308

1    Q.   Yeah, that you actually went to the school there?

2    A.   I did go to the school.

3    Q.   All right.  Was that on the follow-up where there was a

4    viewing of the camera angle?

5    A.   No.

6    Q.   And the footage?

7    A.   No.

8    Q.   So you were not present during that viewing, actual

9    viewing of the footage; correct?

10   A.   No.

11   Q.   All right.  Did you tell the prosecutor that you were at

12   some point?

13   A.   I don't believe so.

14   Q.   No.  All right.  So did you speak to the prosecutor

15   about the viewing of the footage a few days later during the

16   investigation?

17   A.   During the investigation?

18   Q.   Did you speak to Mr. Regan recently, within the last few

19   weeks, about viewing the footage a few days after the shooting,

20   whether it was you or Detective Jaeger --

21   A.   Yes.

22   Q.   -- that did the viewing?  All right.  And you didn't

23   tell him you did the viewing, it was Detective Jaeger, that's

24   what you told Mr. Regan?

25   A.   I believe so, yes.

                                                              jms

1   generator.  And the other reason was that the camera was recessed

2   in such a manner that it would be impossible to shoot out to the

3   street and then shoot back up the street to capture the area that

4   was critical to our investigation.

5        Q.   Now, let's just be clear, Detective.  You did not

6   actually view the footage; correct?

7        A.   No, I did not view the footage.

8        Q.   This was your understanding of what was viewed by your

9   partner, your former partner, Detective Jaeger; correct?

10       A.   It's that and coupled with the fact that I've downloaded

11  hundreds of video cameras, looked at numerous systems, been

12  trained in this and that when I look at a camera, when they are

13  exposed like that, you can determine with a great deal of

14  certainty what they're capable of capturing.  And where this

15  camera was placed, in a recessed position of the courtyard of the

16  school, it could not have shot out to then capture up the block

17  of the -- of the same, you know, area.

18       Q.   That -- that's based upon your general knowledge of

19  having downloaded footages in other investigations; correct, what

20  you just testified to?

21       A.   It's based upon that and line of sight.  I mean, it -- a

22  camera can only capture what it can see.  So if I'm standing at a

23  doorway and I can't see the area that I want to gain footage on,

24  I mean, it's -- I don't know another way to explain it.  If I

25  can't see something where I'm standing and I'm standing with the

jms

A. LOGAN SMITH - DEFENSE - DIRECT                    1321

1            THE COURT OFFICER:  Step right in.  Remain

2       standing.  Raise your right hand and face the clerk of the

3       courtroom right over there.

4            THE CLERK:  Do you swear or affirm to tell the

5       truth, the whole truth and nothing but the truth so help you

6       God?

7            THE WITNESS:  Yes.

8            THE CLERK:  Have a seat.

9  A N G E L A   L O G A N   S M I T H, called by and on behalf of

10      the Defendant, having been first duly sworn, was examined and

11      testified as follows:

12           THE COURT OFFICER:  The defense calls its first

13      witness, Angela Logan Smith.  First name, A-N-G-E-L-A.

14      Middle name, L-O-G-A-N.  Last name, S-M-I-T-H.

15           THE COURT:  You may inquire.

16           MR. DIDIO:  Yes, Judge.  Thank you.

17  CROSS EXAMINATION BY

18  MR. DIDIO:

19      Q.   Good afternoon.

20      A.   Afternoon.

21      Q.   State your full name.

22      A.   Angela Lynnette Logan Smith.

23      Q.   And Ms. Smith, is it all right if I call you Ms. Smith?

24      A.   Yes.

25      Q.   Ms. Smith, how are you employed?

                                                          jms

1    A.    I work for the Department of Education.

2    Q.    And where is it that you specifically work at this time?

3    A.    Goldie Maple Academy.

4    Q.    What's your title there?

5    A.    Principal.

6    Q.    And how long have you been principal of that academy?

7    A.    Fourteen years.

8    Q.    All right.  And where is that located?  What's the

9    address of the academy there?

10   A.    365 Beach 56th Street, Arverne, New York 11692.

11   Q.    And just generally, what are your responsibilities at

12   the school as the principal of the last 13 years?

13   A.    Fourteen.

14   Q.    Fourteen years?

15   A.    Uh, huh.  Supervise the staff, to provide instructions,

16   oversee the budget, to work with the community members, to engage

17   the parents, make them aware of what's occurring in the school,

18   address any of their issues, questions or concerns.

19   Q.    And in terms of your experience at the school over those

20   14 years, are you familiar with the layout of the building and

21   all the various portions of the building, so to speak?

22   A.    Yes.

23   Q.    And would that include surveillance cameras on -- in and

24   around the building?

25   A.    Yes.

jms

JA-312

A. LOGAN SMITH - DEFENSE - DIRECT                    1324

1   Q.   All right.  Where it says P.S., is that the school?

2   A.   Yes, where it says P.S.

3   Q.   Okay.  Now, does the school abut Beach 56th Street?

4   A.   Yes.

5   Q.   And what portion of the school is that, is that the
6   front, the back, the side?

7   A.   It's the side.

8   Q.   And is there an entranceway at that point, entrance and
9   exit way into the building on Beach 56th Street?

10  A.   Yes

11  Q.   And where would that be, if you could point for the
12  jury?

13  A.   It would be in this section here where the building goes
14  in.

15  Q.   Okay.  Are there any surveillance cameras in and around
16  that area?

17  A.   Yes.

18  Q.   And what -- where would that camera be or cameras be as
19  you recall?

20  A.   The camera is right at this point.

21  Q.   And do you recall the camera number?

22  A.   It's Camera 16.

23  Q.   And you are familiar with that camera and that location
24  because of your employment as the principal; is that correct?

25  A.   Yes.

jms

A. LOGAN SMITH - DEFENSE - DIRECT                    1325

1    Q.    You can be seated.  Thank you.

2    A.    Uh, huh.

3    Q.    Now, I just want to make it clear, the answers to the

4  questions that you just gave, they related back to 2013; would

5  that be correct?

6    A.    Yes.

7    Q.    Where the camera was, the entrance, the building?

8    A.    Yes.

9    Q.    Yes.  Okay.  Has any of that changed at this point?

10   A.    No.

11   Q.    Okay.  Did there come a time, and I'll direct your

12 attention to May 6, 2013, that you had a conversation with some

13 law enforcement officers at the school?

14   A.    Yes.

15   Q.    And based upon that conversation that you had with them,

16 did you show them anything?

17   A.    Yes.

18   Q.    What did you show them?

19   A.    The footage for the Camera 16.

20   Q.    Okay.  And were you physically present when the footage

21 was shown to them?

22   A.    Yes.

23   Q.    And can you just describe, was it on a monitor, on a

24 flat screen, what was the mechanism that you showed it to them?

25   A.    In my office there's a big T.V. and the T.V. has all 16

                                                              jms

A. LOGAN SMITH - DEFENSE - DIRECT                                    1327

1    A.    Yes.

2    Q.    And is it color?

3    A.    Yes.

4    Q.    And an up to date screen.  All right.

5          How many officers were there in your office when -- when

6    you showed them the footage?

7    A.    Two.

8    Q.    Do you recall their names?

9    A.    No.

10   Q.    Okay.  But they identified themselves as officers; is

11   that correct?

12   A.    Yes.

13   Q.    All right.  And now, did you play that footage for them?

14   A.    Yes.

15   Q.    And when you played the footage for them can you

16   describe to the jury what you could see in that footage?

17   A.    You could see a person run by and a few seconds later a

18   car went by.

19   Q.    And when you say a person, can you describe what the

20   person looked like in terms of their race, initially?

21   A.    It was someone, I would assume, would be black.  They

22   had dark clothes on and it -- it would -- looked like a male.

23   Q.    All right.  So male black, dark clothes?

24   A.    Yes.

25   Q.    Now, was the image close enough where you could

DO1876

jms

JA-315

98

Det. Gildea - People - Cross

1      Q      Good afternoon, Detective.

2      A      Good afternoon.

3      Q      Just briefly, there was some indication in DD5 number

4    19 that there was potential video surveillance footage that

5    could have captured the incident.

6             Do you have access to that DD5?

7      A      No, sir -- actually, I may have it here.

8      Q      I'm sorry?

9      A      I may have it here.

10     Q      It's number 19.

11            (Short pause.)

12     A      Okay.

13     Q      Were you involved in any way in either the

14   identification or the recovery of any video surveillance footage

15   regarding this case?

16     A      No, sir.

17     Q      Are you aware now that you have reviewed all of the

18   materials whether there is any surveillance video in regards to

19   this case?

20     A      There was no surveillance video in regards to this

21   case, sir.

22     Q      Do you know whether there was video surveillance that

23   was retrieved by police that was discarded or lost or misplaced

24   in any way?

25     A      Up until the time where I was assigned this case and

99

Det. Gildea - People - Cross

```
 1    reassigned to a new unit, there was no surveillance footage of

 2    any sort in regards to --

 3       Q    Since that time have you learned of any video

 4    surveillance of any type?

 5       A    No, sir.

 6       Q    Thank you.

 7            During that initial interview of witness number two --

 8    that's the civilian witness that we've been discussing by the

 9    vehicle.

10       A    Yes, sir.

11       Q    You said that he was reluctant -- it seemed as though

12    he was reluctant to speak to you out on the street because he

13    didn't want people to sort of see him conversing with the

14    police, correct?

15       A    That's correct.

16       Q    That was your impression as to why, perhaps, he didn't

17    give a full description of the perpetrator, because of his

18    discomfort in that regard?

19       A    Yes, sir.

20       Q    Now, if you could take a look at DD5 number four.  I

21    think you referred to it earlier?

22       A    Yes, sir.

23       Q    Now, reviewing that DD5, the second line in paragraph

24    one, if you could just take a look at that for a moment?

25       A    Second line, paragraph one?
```

dc

                                          D000235

R. EVANS - PEOPLE - CROSS                                    1112

1      Q.    Well, when you went downstairs with your daughters you

2  don't recall if you had your glasses on --

3      A.    Glasses on, yes.

4      Q.    -- right?  And then how about when the shooting

5  occurred, do you recall whether you had your glasses on?

6      A.    No, if I did or I didn't, but back then I could see way

7  better then what I could see now.

8      Q.    But what I'm asking you is as you sit here now do you

9  recall one way or another?

10      A.    No, I don't recall having my glasses on.

11      Q.    Okay.  But you -- you said that you could see better,

12  but you did still utilize glasses; is that correct --

13      A.    Yes.

14      Q.    -- at that time?

15      A.    Yes.

16      Q.    All right.  Just let me finish the question and then you

17  could respond because it will be easier for the reporter to take

18  everything down; is that okay?

19      A.    Uh, huh.

20      Q.    All right.  Thank you.  So when you went downstairs

21  initially you said that it was still light out; correct?

22      A.    Yeah.  Yes.

23      Q.    Would you agree that none of the overhead lights in the

24  area, streetlights were on; correct?

25      A.    Yes.

                                                               jms

1    Q.    And your children were playing --

2          MR. DIDIO:  Withdrawn.

3    Q.    You didn't go across Beach Channel Drive; is that

4    correct?

5    A.    Yes.

6    Q.    And what was the reason you didn't do that?

7    A.    Because at the time when we came out the building it was

8    nobody outside, so I figure I let them play for a little while in

9    that little playground that we have in front of the building.

10   Q.    Okay.  And that would be in front of -- of 54-30 --

11   A.    Yes.

12   Q.    -- Beach Channel Drive?

13   A.    Yes.

14   Q.    All right.  And I believe you indicated on direct that

15   it was still light out so you want to let them play as long as

16   possible?

17   A.    Yes.

18   Q.    Was that your intention also?

19   A.    Yes.

20   Q.    To stay closer to the building?

21   A.    Yes, let them play for a little while and when the sun

22   start going down, take them back in the house.

23   Q.    Okay.  So, now, you indicated while the children were

24   playing you eventually saw Keith?

25   A.    Yes.

jms

<u>PRELIMINARY INVESTIGATION WORKSHEET</u>

From:   **Sergeant Juan A. Lopez, 101 BRAM SGT**

To:     **Chief of Detectives**

Subject/Type of Incident: **Significant Cases (e.g. homicide / non-fatal shooting / rape / hate crime /, etc.): HOMICIDE AND A NON FATAL SHOOTING WITHIN THE CONFINES OF THE 101ST PRECINCT.**

1. <u>**Precinct and, If Applicable, PSA and TD of Occurrence:**</u> 101 PCT

2. <u>**Day / Date / Time of Report:**</u> Saturday / May 4, 2013 / 0300 hours

3. <u>**Day / Date / Time of Occurrence:**</u> Friday / May 3, 2013 / 2008 hours

4. <u>**Location of Occurrence:**</u>
   a. Address: Front of 54-30 Beach Channel Drive Arverne, NY 11692
   b. Cross streets: Beach 54th Street to Beach 56th Street
   c. Type of location (e.g. private home, multiple dwelling, commercial, office building, apartment building, club, bar, bodega, transit station, subway train, school): Apartment Building
   d. If commercial, then describe the business, e.g., club, bodega, check cashing, jewelry, bar, clothing, automobile): None
   e. Housing development and name: Ocean Bay (Edgemere) (NYCHA)
   f. Transit line and / or transit station name: None
   g. School type and name: None
   h. Narcotics Kite(s), including total number of Narcotics Kites, and for each Narcotics Kite specify the date, allegation and whether active or closed (List Narcotics Kites vertically starting with the most recent):
      1. 2/10/11 – Narcotics Sales – Closed
      2. 11/24/10 – Narcotics Sales – Closed
      3. 7/07/07 – Narcotics Sales – Closed
   i.

5. <u>**Motive (preliminary & subject to change):**</u> Unknown

6. <u>**Incident Identifiers:**</u>
   a. Complaint number: 2013 – 101 – 1689 / 2013 – 101 – 1690
   b. Case number: 2013 – 642 / 2013 – 643
   c. RTCC number: 13 – 2335
   d. ECT / CSU run number: CSU run number# 2013 – 324
   e. Assigned Detective: Detective Gildea

1 of 10

002278

JA-320

7. **Victim(s) Information:** (Deceased)
   a. Name: Keith Gulley
   b. Age: ▮
   c. Nickname: "Bunky"
   d. Gender / Ethnicity / Nationality: Male / Black / American
   e. DOB: ▮
   f. Address, including precinct and, if applicable, housing development name and PSA: ▮

   g. Employment: Unemployed
   h. Relationship to perpetrator: Unknown
   i. NYSID number: ▮
   j. Arrest history, including total number of arrests, and for each arrest specify the date, precinct and name of charge (list arrests vertically starting with the most recent): 17 Total Arrests (9 Sealed & 3 Voided)
      1. 5/1/10 – 101 PCT – Attempted Murder 2nd Degree
      2. ▮
      3. 8/22/06 – 101 PCT – Robbery 1st Degree (Firearm)
      4. ▮
      5. ▮
   k. DNA on file (appears on 1st page of eJustice printout): Yes
   l. Order of protection (appears on eJustice printout): None
   m. Juvenile arrest history, including total number of arrests, and for each arrest specify the date, precinct and name of charge (list arrests vertically starting with the most recent): 4 Total Juvenile Arrests (1 Sealed)

   n. Known periods of incarceration: 5 periods of incarceration
      1. 7/23/10 to 4/29/13
      2. 5/02/10 to 7/23/10
      3. 1/14/10 to 1/28/10
      4. 12/09/08 to 4/07/09
      5. 11/06/08 to 11/13/08
   o. Parole, including the crime individual is on parole for and expiration date: None
   p. Probation, including the crime individual is on probation for and expiation date: None
   q. Active warrants, including crime that warrant was issued for:
      1. Yes; Criminal Trespass from 2010
   r. Gang member, including gang name and whether in IDS: Bloods Gang
   s. Crew member, including name of crew: Flock

002279

JA-321

    t.  DJR history, including for each DIR the date, precinct, offense, name of victim and name of offender (list DIRs vertically starting with the most recent): None

    u.  Prior victim of non-fatal shooting, including date and Precinct / PSA / TD: Yes; 2/01/10 – 101 Precinct – Victim of a non fatal shooting

    v.  Arrested for previous homicide or non-fatal shooting, including date and Precinct / PSA / TD: Yes; 2 Arrests for non fatal shooting
       1.  5/01/10 – 101 Precinct – Perpetrator
       2.  8/22/06 – 101 Precinct – Perpetrator

    w.  Other noteworthy facts (e.g., elected official, federal / state / municipal employee, relative of prominent member of the community): None

## 8. Victims Condition / Property / Evidence:

    a.  Type of injury: 2 Gunshot wounds
       1.  One gunshot wound to the left flank
       2.  One gunshot wound to the left thigh in and out through his right thigh

    b.  Condition of victim: Deceased

    c.  Hospital, including status (e.g. admitted, surgery, treated / released, etc.) Saint John's Hospital / Deceased

    d.  Victim interviewed by Detectives: None

    e.  Evidence recovered from victim: None

    f.  Property, if any, recovered from victim: None

    g.  Property, if any, removed from victim by perpetrator: None

    h.  Was victim's cell phone(s) stolen: None

    i.  Was victim's credit / debit card(s) stolen: None

## 9. Victim(s) Information: (Non Fatal)

    a.  Name: Reginald T. Evans
    b.  Age: ██
    c.  Nickname: Reggie
    d.  Gender / Ethnicity / Nationality: Male / Black / American
    e.  DOB: ██
    f.  Address, including precinct and, if applicable, housing development name and PSA: ██████████████████████████████
    g.  Employment: Unemployed
    h.  Relationship to perpetrator: Unknown
    i.  NYSID number: ██████
    j.  Arrest history, including total number of arrests, and for each arrest specify the date, precinct and name of charge (list arrests vertically starting with the most recent): 9 Total Arrests (7 Sealed & 1 Voided) ██████████████
    k.  DNA on file (appears on 1st page of eJustice printout): None
    l.  Order of protection (appears on eJustice printout): None

002280

JA-322

m. Juvenile arrest history, including total number of arrests, and for each arrest specify the date, precinct and name of charge (list arrests vertically starting with the most recent): None
n. Known periods of incarceration: None
o. Parole, including the crime individual is on parole for and expiration date: None
p. Probation, including the crime individual is on probation for and expiation date: None
q. Active warrants, including crime that warrant was issued for: None
r. Gang member, including gang name and whether in IDS: None
s. Crew member, including name of crew: None
t. DIR history, including for each DIR the date, precinct, offense, name of victim and name of offender (list DIRs vertically starting with the most recent): 3 Total Domestic Incident Reports



u. Prior victim of non-fatal shooting, including date and Precinct / PSA / TD: None
v. Arrested for previous homicide or non-fatal shooting, including date and Precinct / PSA / TD: None
w. Other noteworthy facts (e.g., elected official, federal / state / municipal employee, relative of prominent member of the community): None

## 10. Victims Condition / Property / Evidence:

a. Type of injury: 3 Gunshot wounds
   1. 3 Gunshot wounds to the right flank
b. Condition of victim: Stable Condition
c. Hospital, including status (e.g. admitted, surgery, treated / released, etc.) Jamaica Hospital / Admitted in Stable Condition.
d. Victim interviewed by Detectives: Yes
e. Evidence recovered from victim: None
f. Property, if any, recovered from victim: None
g. Property, if any, removed from victim by perpetrator: None
h. Was victim's cell phone(s) stolen: None
i. Was victim's credit / debit card(s) stolen: None

## 11. Narrative of Facts:

On Friday, May 3, 2013 at approximately 2008 hours members of the 101st Detective Squad were notified via Department radio of two (2) males shot (likely to die) in front of 54-30 Beach Channel Drive within the confines of the 101st Precinct.

002281

JA-323

Upon arrival Detectives were met by Police Officers Velotti and Hawkins assigned to 101 Sector G who stated that when they arrived they observed two (2) males lying on the ground approximately 10 feet from each other both suffering from gunshot wounds. Victim# 1 was identified as Keith Gulley M/B▮▮Nysid#▮▮▮▮▮▮ was removed by EMS to Saint John's Hospital and pronounced DOA at 2105 hours by Doctor Frankel. Victim# 2 was identified as Reginald T. Evans M/B▮▮ Nysid#▮▮▮▮▮▮ who was removed by EMS to Jamaica Hospital and is in stable condition. A crime scene was established and an evidence search was conducted where five (5) .380 caliber shell casings were recovered in the walkway between 54-30 Beach Channel Drive and 54-22 Beach Channel Drive. While conducting a witness canvass Detectives discovered a witness who heard the shots and observed a M/B wearing a navy blue t-shirt and dark colored sweatpants running down the walkway towards Beach Channel Drive. The M/B continued running to the corner of Beach 56th Street and Beach Channel Drive to an awaiting grey SUV with tinted windows. The SUV then fled Southbound on Beach 56th Street towards Arverne Boulevard.

Detectives conducted a video surveillance canvass and found a security camera belonging to the New York City Board of Education which is on the rear of Public School 333 which is located at 365 Beach 56th Street. Detectives were unable to view the video at this time but will respond in the morning to view said video to determine if it is probative.

Detectives responded to Jamaica Hospital and were able to interview Mr. Evans who stated that he was outside his building with his three (3) daughters ▮▮▮ ▮▮▮▮, and his Brother (Keith Gully) who was recently released from prison on April 29, 2013, when he observed a M/B walk past him and his daughters. Shortly after this M/B passed Mr. Evans, Mr. Evans heard multiple shots being fired and saw his Brother lying on the ground. Mr. Evans then shielded his daughters with his own body and as the perpetrator fled down the walkway he stopped and shot Mr. Evans three (3) times in the right flank then continued to flee towards Beach Channel Drive. Immediately after the shooting the victim's family exited the building secured the three (3) children who were unharmed and called 911 for assistance.

While in Jamaica Hospital Detectives were able to interview the treating physician Doctor Sulja who stated that Mr. Evans was shot three (3) times in the right flank but was in stable condition and would be admitted for further treatment.

12. **Perpetrator(s) Information:** (Shooter)
   a. Name: Unknown
   b. Age: Unknown
   c. Nickname: Unknown
   d. Gender / Ethnicity / Nationality: Male / Black / Unknown
   e. DOB: Unknown
   f. Description, including height, weight, facial hair, clothing, tattoos, body piercings, scars, etc.: M/B, wearing a navy blue t-shirt and dark colored sweatpants, 5'09", thin build.

002282

g.  Address, including precinct and, if applicable, housing development name and PSA: Unknown
h.  Employment: Unknown
i.  Relationship to victim: Unknown
j.  NYSID number: Unknown
k.  Arrest history, including total number of arrests, and for each arrest specify the date, precinct and name of charge (list arrests vertically starting with the most recent): Unknown
l.  DNA on file (appears on 1st page of eJustice printout): Unknown
m.  Order of protection (appears on eJustice printout): Unknown
n.  Juvenile arrest history, including total number of arrests, and for each arrest specify the date, precinct and name of charge (list arrests vertically starting with the most recent): Unknown
o.  Known periods of incarceration: Unknown
p.  Parole, including the crime individual is on parole for and expiration date: Unknown
q.  Probation, including the crime individual is on probation for and expiration date: Unknown
r.  Active warrants, including crime that warrant was issued for: Unknown
s.  Gang member, including gang name and whether in IDS: Unknown
t.  Crew member, including name of crew: Unknown
u.  DIR history, including for each DIR the date, precinct, offense, name of victim and name of offender (list DIRs vertically starting with the most recent): Unknown
v.  Prior victim of non-fatal shooting, including date and Precinct / PSA / TD: Unknown
w.  Arrested for previous homicide or non-fatal shooting, including date and Precinct / PSA / TD: Unknown
x.  Other noteworthy facts (e.g., elected official, federal / state / municipal employee, relative of prominent member of the community): Unknown

## 13. Perpetrators Condition / Property / Evidence:

a.  Type of injury: Unknown
b.  Condition of perpetrator: Unknown
c.  Hospital, including status (e.g. admitted, surgery, treated / released, etc.): Unknown
d.  Perpetrator interviewed by Detectives: None
e.  Evidence, if any, recovered from perpetrator: None
f.  Property, if any, recovered from perpetrator: None
g.  Cell phone(s) recovered from perpetrator: None
h.  Credit / debit card(s) recovered from perpetrator: None

## 14. Perpetrator(s) Information: (Driver of Vehicle)

a.  Name: Unknown
b.  Age: Unknown
c.  Nickname: Unknown

002283

JA-325

    d.  Gender / Ethnicity / Nationality: Unknown
    e.  DOB: Unknown
    f.  Description, including height, weight, facial hair, clothing, tattoos, body piercings, scars, etc.: Unknown
    g.  Address, including precinct and, if applicable, housing development name and PSA: Unknown
    h.  Employment: Unknown
    i.  Relationship to victim: Unknown
    j.  NYSID number: Unknown
    k.  Arrest history, including total number of arrests, and for each arrest specify the date, precinct and name of charge (list arrests vertically starting with the most recent): Unknown
    l.  DNA on file (appears on 1st page of eJustice printout): Unknown
    m.  Order of protection (appears on eJustice printout): Unknown
    n.  Juvenile arrest history, including total number of arrests, and for each arrest specify the date, precinct and name of charge (list arrests vertically starting with the most recent): Unknown
    o.  Known periods of incarceration: Unknown
    p.  Parole, including the crime individual is on parole for and expiration date: Unknown
    q.  Probation, including the crime individual is on probation for and expiration date: Unknown
    r.  Active warrants, including crime that warrant was issued for: Unknown
    s.  Gang member, including gang name and whether in IDS: Unknown
    t.  Crew member, including name of crew: Unknown
    u.  DIR history, including for each DIR the date, precinct, offense, name of victim and name of offender (list DIRs vertically starting with the most recent): Unknown
    v.  Prior victim of non-fatal shooting, including date and Precinct / PSA / TD: Unknown
    w.  Arrested for previous homicide or non-fatal shooting, including date and Precinct / PSA / TD: Unknown
    x.  Other noteworthy facts (e.g., elected official, federal / state / municipal employee, relative of prominent member of the community): Unknown

**15. Perpetrators Condition / Property / Evidence:**
    a.  Type of injury: Unknown
    b.  Condition of perpetrator: Unknown
    c.  Hospital, including status (e.g. admitted, surgery, treated / released, etc.): Unknown
    d.  Perpetrator interviewed by Detectives: None
    e.  Evidence, if any, recovered from perpetrator: None
    f.  Property, if any, recovered from perpetrator: None
    g.  Cell phone(s) recovered from perpetrator: None
    h.  Credit / debit card(s) recovered from perpetrator: None

002284

JA-326

16. **Perpetrator's Current Arrest Charges (specify the date, precinct, name of charge including subdivision):** None

17. **Ballistic Evidence Recovered:**
    a. List items recovered and recovery location:
       1. 5 - .380 caliber shell casings recovered from the walkway between 54-30 Beach Channel Drive and 54-22 Beach Channel Drive.

18. **Firearm Recovered:**
    a. List firearm(s) recovered and recovery location: None

19. **Other Evidence Recovered:**
    a. List evidence recovered and recovery location: None

20. **911 Calls:**
    a. Total number of 911 callers: 21 Total 911 callers



      1.    – heard shots and saw victims on the floor.
      2. – Message left.
      3.    – heard shots but didn't see shooter.
      4. – Message left.
      5. – Message left.
      6. – Message left. (Duplicate caller)
      7. – 911 only phone.
      8. – Message left. (Duplicate caller)
      9.    – said she was too busy to talk.
    10. – Message left.
    11. – Message left.
    12. – 911 only phone.
    13. – Female Refused name – heard 5 shots saw nothing.
    14.    – heard shots but didn't see anything.
    15.    – stated no one called 911.
    16.    – heard shots and saw victims on floor.
    17. – Message left.
    18. – Message left.
    19. – Message left.
    20. – Message left.
    21. – Message left.

    b. Number of callers interviewed by detectives: 7 callers interviewed.

The phone numbers of the 911 callers where contact was not made were called into the Real Time Crime Center in an attempt to receive contact information to assist in locating these possible witnesses.

21. **Witnesses:**
    a. Total number of witnesses: 17 total witnesses

002285

JA-327

b. Number of eyewitnesses, including what they specifically saw and if they can ID: 1 eyewitness; observed a M/B running from the walkway between the buildings then enter a grey SUV with tinted windows which was parked on Beach 56th Street near the corner of Beach Channel Drive. The vehicle then fled Southbound on Beach 56th Street towards Arverne Boulevard.

c. Number of ear witnesses: 16 earwitnesses

d. Statements of important witnesses: Important witness heard the shots and observed a M/B running from the walkway between the buildings then enter a grey SUV with tinted windows which was parked on Beach 56th Street near the corner of Beach Channel Drive. The vehicle then fled Southbound on Beach 56th Street towards Arverne Boulevard.

## 22. Video:

a. Location(s) of probative video: Rear of 365 Beach 56th Street PS 333 .

b. Type of video (e.g. Argus, Viper, commercial location, etc): New York City Public School security video.

c. Content of video(s): Unknown at this time

d. Video(s) seized: Not at this time

e. TARU assistance: Not at this time

## 23. NON-NYPD Agencies Involved:

1. New York City Housing Authority (NYCHA)
2. New York City Board of Education (NYCBOD)

## 24. Investigative Steps Taken:

Notification and Response to Scene
Response to Hospital
Canvassed for witnesses
Canvassed for video
Searched for Evidence
Interviewed 1st officers
Interviewed Victim (Reggie Evans)
Interviewed Victim's Family
Interviewed Treating Physician
Reviewed Sprint Printouts
Interviewed 911 callers

## 25. Additional Investigative Steps Required To Be Taken:

Attend Autopsy
Recanvass for additional witnesses
Interview 911 callers not spoke to
Notify School Safety Division for video retrieval
Re interview Reggie Evans
Day light canvass for additional evidence

002286

JA-328

26. <u>Notifications:</u>
Deputy Chief Molloy – Commanding Officer, Detective Borough Queens
Deputy Inspector Henry – Operations Commander, Queens South
Deputy Inspector Dee – Executive Officer, Gang Division
Captain Zanfardino – Detective Duty Captain
Captain Lapollo – Commanding Officer, Zone 16
Lieutenant Masterson – Commanding Officer, 101st Detective Squad
Lieutenant Perdoch – Commanding Officer, Queens Homicide
Sergeant Dublessis – Queens Narcotics
Detective Omara – Real Time Crime Center
Detective Joshi – Crime Scene Unit
Detective Keary – Chief of Detective's Office
Police Officer Ates – Detective Borough Queens Wheel
ADA Papadopoulos – Riding Homicide ADA
MLI Capellupo – Medical Examiners Offices

27. <u>Will Incident Generate Media Coverage / Attention:</u>
At this time this case will not generate media coverage / attention.

**The Information Being Transmitted Is Preliminary And Is Subject
To Change As Additional Facts Are Discovered During The On-
Going Investigation.**

*Juan A. Lopez*

Juan A. Lopez
Sergeant

10 of 10

002287

JA-329

MUGSHOT PROFILE



# NY/NJ HIDTA
## MUGSHOT PROFILE

Photo Ref #:          29000041



| | |
|---|---|
| NAME: | ORTIZ, MARCUS |
| AKA: | NO NICKNAME |
| SSN: | 0 |
| SID#: | ▇▇▇▇▇ |
| FBI#: | |
| USMS#: | |
| | |
| DOB: | ▇▇▇▇▇ |
| SEX: | MALE |
| RACE: | BLACK HISPANIC |
| HEIGHT: | 510 |
| WEIGHT: | 160 |
| HAIR COLOR: | BLACK |
| HAIR LENGTH: | SHORT |
| EYE COLOR: | BROWN |
| SMT: | TATTOO WITH, FACE |



ADDRESS:

PHONE:

| | |
|---|---|
| ARREST#: | Q2012667114 |
| ARREST DATE: | 12-05-2012 |
| AGENCY: | NYPD |
| CHARGE CODE: | PL 2211500 |
| CHARGE DESC: | |



HIDTA          CONFIDENTIAL FOR LAW ENFORCEMENT USE ONLY          8/2/2017

Single Image                                                    Page 1 of 1



# NY/NJ HIDTA



HIDTA          CONFIDENTIAL FOR LAW ENFORCEMENT USE ONLY          8/2/2017

https://www.ejustice.ny.gov/WebUniversalPlusStart/UniversalReport.aspx

000108
8/2/2017

**D02431**

JA-331

Case 23-1315, Document 42, 11/25/2024, 3637564, Page37 of 200



# NY/NJ HIDTA



HIDTA                    CONFIDENTIAL FOR LAW ENFORCEMENT USE ONLY                    8/2/2017

**D02432**

JA-332

Single Image

Page 1 of 1

 # NY/NJ HIDTA



HIDTA     CONFIDENTIAL FOR LAW ENFORCEMENT USE ONLY     8/2/2017

 **NY/NJ HIDTA**



HIDTA          CONFIDENTIAL FOR LAW ENFORCEMENT USE ONLY          8/2/2017

https://www.ejustice.ny.gov/WebUniversalPlusStart/UniversalReport.aspx          000111
8/2/2017

**D02434**

JA-334

.MUGSHOT PROFILE.                                                    Page 1 of 1



# NY/NJ HIDTA
# MUGSHOT PROFILE

Photo Ref #:  -      **29000031**



NAME:          **FERGUSON, RASHAUN**
AKA:
SSN:           **0**
SID#:          **02815035H**
FBI#:
USMS#:

DOB:           **02-10-1994**
SEX:           **MALE**
RACE:          **BLACK**
HEIGHT:        **601**
WEIGHT:        **170**
HAIR COLOR:    **BLACK**
HAIR LENGTH:   **SHORT**
EYE COLOR:     **BROWN**
SMT:

ADDRESS:       **155-01 71 AVENUE**
               **QUEENS, NEW YORK**
               **0**

PHONE:

ARREST#:       **Q2014605601**
ARREST DATE:   **01-27-2014**
AGENCY:        **NYPD**
CHARGE CODE:   **PL 1252501**
CHARGE DESC:   **HOMICIDE**





HIDTA               CONFIDENTIAL FOR LAW ENFORCEMENT USE ONLY              6/16/2014
                                        6

SUPREME COURT OF THE STATE OF NEW YORK      NO FEE
QUEENS COUNTY
125-01 QUEENS BOULEVARD
KEW GARDENS, NY 11415

CERTIFICATE OF DISPOSITION ACQUITTAL

DATE: 01/17/2018                    CERTIFICATE OF DISPOSITION NUMBER: 31327

PEOPLE OF THE STATE OF NEW YORK           CASE NUMBER:              02723-2014
                        VS.               LOWER COURT NUMBER(S): 2014QN005128
                                          DATE OF ARREST:          01/27/2014
                                          ARREST #:                Q14605601
                                          NYSID #:                 2815035H
                                          DATE OF BIRTH:           02/10/1994
FERGUSON,RASHAUN                          DATE FILED:              11/20/2014

                    DEFENDANT

I HEREBY CERTIFY THAT IT APPEARS FROM AN EXAMINATION OF THE RECORDS
ON FILE IN THIS OFFICE THAT ON 10/16/2017 THE ABOVE NAMED
DEFENDANT WAS TRIED AND FOUND NOT GUILTY OF ALL PENDING CRIMINAL
CHARGES AS TO THIS CRIMINAL ACTION BEFORE THE HONORABLE
LOPRESTO,CHARLES    THEN A JUDGE OF THIS COURT.

THE DEFENDANT WAS DISCHARGED FROM THE JURISDICTION OF THE COURT.

THE ABOVE MENTIONED ACQUITTAL IS A TERMINATION OF THE CRIMINAL
ACTION IN FAVOR OF THE ACCUSED AND PURSUANT TO SECTION 160.60 OF
THE CRIMINAL PROCEDURE LAW "THE ARREST AND PROSECUTION SHALL BE
DEEMED A NULLITY AND THE ACCUSED SHALL BE RESTORED, IN
CONTEMPLATION OF LAW, TO THE STATUS OCCUPIED BEFORE THE ARREST
AND PROSECUTION".

PURSUANT TO SECTION 160.50(1C) OF THE CRIMINAL PROCEDURE LAW, ALL
OFFICIAL RECORDS AND PAPERS RELATING TO THIS CASE ARE SEALED.

IN WITNESS WHEREOF,I HAVE HEREUNTO SET MY HAND AND AFFIXED MY
OFFICIAL SEAL ON THIS DATE 01/17/2018.

                                        QUEENS COUNTY CLERK
                                   _____
                                        COURT CLERK

Complaint# 2013-101-01690

**D000018**

# New York City Police Department
## Omniform System - Complaints

| RECORD CONTAINS SEALED INFORMATION. |
|---|
| THIS RECORD MAY NOT BE MADE AVAILABLE TO ANY PERSON |
| OR PUBLIC OR PRIVATE AGENCY OUTSIDE THE POLICE DEPARTMENT. |

| Report Cmd: 101 | Jurisdiction: N.Y.C. HOUSING AUTHORITY | Record Status: Final, No Arrests | Complaint #: 2013-101-01690 | Legacy Blue Versions: 1 | No Other Complaint Revisions |
|---|---|---|---|---|---|

| Occurrence Location: | **FRONT OF 54-30 BEACH CHANNEL DRIVE** | **NYC Parks Dept. Property** Did this offense occur on NYC Parks Dept. Property? | Precinct: 101 Sector: G Beat: Post: 44 |
|---|---|---|---|
| Name Of Premise: | | Command: | |
| Premises Type: RESIDENCE - PUBLIC H | | NYC Parks Dept. Property Name: | |
| Location Within Premise: | | | |
| Visible By Patrol?: YES | | | |

**Occurrence From: 2013-05-03 20:08 FRIDAY**

| Occurrence thru: 2013-05-03 | 20:10 | Aided # 000000465 |
|---|---|---|
| Reported: 2013-05-03 | 21:00 | Accident # |
| | | O.C.C.B. # |

Complaint Received: RADIO

| SEALED | | SEALED |
|---|---|---|

| **Classification: ASSAULT** | **Case Status: OPEN** |
|---|---|
| Attempted/Completed: COMPLETED | Unit Referred To: P.D.U. |
| Most Serious Offense is: FELONY | Clearance Code: |
| PD Code: 109 ASSAULT 2,1 UNCLASSIFIED | Log/Case #: 0 |
| PL Section: 12005 | Clearance Arrest Id: |
| Keycode: 106 ASSAULT-FELONIOUS | Clearance AO Cmd: |
| | File #: 6 |
| | Prints Requested? NO |

| Is This Related To Stop And Frisk Report NO | SQF Number: 0000-000-00000 | Was The Victim's Personal Information Taken Or Possessed? NO | Was The Victim's Personal Information Used To Commit A Crime? NO |
|---|---|---|---|
| Gang Related? NO | OCCB FOD Log #: | Name Of Gang: | Child Abuse Suspected? NO |
| DIR Required? NO | Child In Common? NO | Intimate Relationship? NO | Officer Body Worn Camera: |

| SEALED | | SEALED |
|---|---|---|

| **If Burglary:** | **Alarm:** | **If Arson:** | **Taxi Robbery:** |
|---|---|---|---|
| Forced Entry? | Bypassed? | Structure: | Partition Present: |
| Structure: | Comp Responded?: | Occupied?: | Amber Stress Light Activated: |
| Entry Method: | Company Name/Phone: | Damage by: | Method of Conveyance: |
| Entry Location: | Crime Prevention Survey Requested?: | | Location of Pickup: |
| | Complaint/Reporter Present?: | | |

| Supervisor On Scene - Rank / Name / Command : | Canvas Conducted: NO | Translator(If used): |
|---|---|---|

**D000018**

JA-337

| SGT WALSH 101 | | | |
|---|---|---|---|

**NARRATIVE:**
AT TPO CV WAS STANDING IN FRONT OF LOCATION WHEN UNKNOWN SUSPECT DID FIRE 3 SHOTS IN CV'S BACK FROM WALKWAY. SUSPECT FLED ON FOOT A GRAY FORD ESCAPE PARKED ON BEACH 56 STREET AND LEFT SCENE WITH ANOTHER UNKNOWN PERP. A TOTAL OF 6 SHELL CASING WERE FOUND IN WALKWAY. CANVASS CONDUCTED NEG RESULTS SGT WALSH ON SCENE NO WORKING CAMERAS IN AREA.

| SEALED | SEALED |
|---|---|

## No NYC TRANSIT Data for Complaint # 2013-101-01690

| SEALED | SEALED |
|---|---|

| N.Y.C.H.A: | Complaint # 2013-101-01690 | | | |
|---|---|---|---|---|
| **Development Name:** EDGEMERE | **Housing Report #:** 999 | **PSA #:** 999 | **Field Report Prepared:** NO | **Field Report Number:** |

| SEALED | SEALED |
|---|---|

| Total Victims: 1 | Total Witnesses: 0 | Total Reporters: 1 | Total Wanted: 2 |
|---|---|---|---|

| VICTIM: # 1 of 1 | Name: | Complaint#: 2013-101-01690 |
|---|---|---|

| | |
|---|---|
| Nick/AKA/Maiden: | Gang/Crew Affiliation: NO |
| UMOS: NO | Name: |
| Sex/Type: MALE | Identifiers: |
| Race: BLACK | |
| Age: ▇ | |
| Date Of Birth: ▇▇▇▇▇ | |
| Disabled? NO | Will View Photo: YES |
| Is this person not Proficient in English?: NO | Will Prosecute: YES |
| If Yes, indicate Language: | Notified Of Crime Victim Comp. Law: YES |
| N.Y.C.H.A Resident? NO | |
| Is Victim fearful for their safety / life? NO | |
| Escalating violence / abuse by suspect? NO | |
| Were prior DIR's prepared for C/V? NO | |

| LOCATION | ADDRESS | CITY | STATE/COUNTRY | ZIP | APT/ROOM |
|---|---|---|---|---|---|
| HOME-PERMANENT | | | | | |

| Phone #: |
|---|

| Action against Victim: | Actions Of Victim Prior To Incident: NA |
|---|---|

| Victim Of Similar Incident: | If Yes, When And Where |
|---|---|

| SEALED | SEALED |
|---|---|

| REPORTER: # 1 of 1 | Name: | Complaint #: 2013-101-01690 |
|---|---|---|

| | |
|---|---|
| Nick/AKA/Maiden: | Gang/Crew Affiliation: NO |
| Sex/Type: MALE | Name: |
| Race: BLACK | Identifiers: |
| Age: ▇ | |
| Date Of Birth: ▇▇▇▇▇ | |
| Is this person not Proficient in English?: NO | Relationship To Victim: |
| If Yes, indicate Language: | |

| Location | Address | City | State/Country | Zip | Apt/Room |
|---|---|---|---|---|---|
| HOME-PERMANENT | | | | | |

Complaint# 2013-101-01690
**D000020**

| Phone #: | |
|---|---|
| **SEALED** | **SEALED** |

| **WANTED: # 1 of 2** | Name: UNK, UNK | Complaint#: 2013-101-01690 | Arrested: |
|---|---|---|---|

| | |
|---|---|
| Nick/AKA/Maiden: | Height: FT/IN |
| Sex: MALE | Weight: 0 |
| Race: BLACK | Eye Color: UNKN |
| Age: | Hair Color: UNKNWN |
| Date Of Birth: UNKNOWN | Hair Length: |
| U.S. Citizen: NO | Hair Style: UNKNOWN |
| Place Of Birth: UNKNOWN | Skin Tone: DARK |
| Is this person not Proficient in English?: NO | Complexion: CLEAR |
| If Yes, Indicate Language: | |
| Accent: NO | S.S. #: 0 |

Order Of Protection: NO
Issuing Court:
Docket #:
Expiration Date:
Order of Protection Violated?
Does Suspect abuse Drugs / Alcohol? NO
Suspect threatened /attempted suicide? NO
Is the suspect Parole / Probation? NO
Relation to Victim: UNKNOWN/NONE
Living together: NO
Can be Identified: NO

Gang/Crew Affiliation: NO
Name:
Identifiers:

**LOCATION ADDRESS CITY STATE/COUNTRY ZIP APT/ROOM HOW LONG? RES. PCT**

Phone #:

N.Y.C.H.A. Resident: NO  N.Y.C. Housing Employee: NO  On Duty: NO
Development:    N.Y.C. Transit Employee: NO

**Physical Force: NONE**

**Weapons:**

| | | |
|---|---|---|
| Gun: HANDGUN | | |
| Weapon Used/Possessed: USED/DISPLAYED | Make: | Recovered: NO |
| Non-Firearm Weapon: | Caliber: | Serial Number Defaced: |
| Other Weapon Description: | Color: | Serial Number: |
| | Type: | |
| | Other/Gun Specify: | |
| | Discharged: NO | |

Used Transit System:
Station Entered:
Time Entered:
Metro Card Type:
Metro Card Used/Poses:
Card #:

| CRIME DATA | DETAILS |
|---|---|
| MODUS OPERANDI | UNKNOWN |
| ACTIONS TOWARD VICTIM | FIRED SHOT |
| CLOTHING | FOOTWEAR -BAREFOOTED -UNKNOWN COLOR |
| CLOTHING | OUTERWEAR -T-SHIRT OR TANK TOP -BLUE |
| CLOTHING | ACCESSORIES -UNK -UNKNOWN COLOR |
| CLOTHING | HEADGEAR -UNK -UNKNOWN COLOR |
| CHARACTERISTICS | UNKNOWN |
| BODY MARKS | -UNKNOWN |
| BODY MARKS | -UNKNOWN |
| IMPERSONATION | UNKNOWN |

**D000021**

| SEALED | | | | SEALED |
|---|---|---|---|---|
| **WANTED: # 2 of 2** | | Name:<br>UNKNOWN,<br>UNKNOWN | Complaint#:<br>2013-101-01690 | Arrested: |

| | |
|---|---|
| Nick/AKA/Maiden:<br>Sex: UNKNOWN<br>Race: UNKNOWN<br>Age:<br>Date Of Birth: UNKNOWN<br>U.S. Citizen: NO<br>Place Of Birth: UNKNOWN<br>Is this person not Proficient in English?: NO<br>If Yes, Indicate Language:<br>Accent: NO | Height: FTIN<br>Weight: 0<br>Eye Color: UNKN<br>Hair Color: UNKNWN<br>Hair Length:<br>Hair Style: UNKNOWN<br>Skin Tone: UNKN<br>Complexion: UNKNOWN<br><br>S.S. #: 0 |

Order Of Protection: NO
Issuing Court:
Docket #:
Expiration Date:
Order of Protection Violated?
Does Suspect abuse Drugs / Alcohol? NO
Suspect threatened /attempted suicide? NO
Is the suspect Parole / Probation? NO
Relation to Victim: UNKNOWN/NONE
Living together: NO
Can be Identified: NO

Gang/Crew Affiliation: NO
Name:
Identifiers:

LOCATION ADDRESS CITY STATE/COUNTRY ZIP APT/ROOM HOW LONG? RES. PCT

Phone #:

N.Y.C.H.A. Resident: NO N.Y.C. Housing Employee: NO On Duty: NO
Development: N.Y.C. Transit Employee: NO

**Physical Force:NONE**

**Weapons:**

Gun:
Weapon Used/Possessed: NONE          Make:          Recovered: NO
Non-Firearm Weapon:          Caliber:     Serial Number Defaced:
Other Weapon Description:          Color:          Serial Number:
          Type:
          Other/Gun Specify:
          Discharged: NO

Used Transit System:
Station Entered:
Time Entered:
Metro Card Type:
Metro Card Used/Poses:
Card #:

| CRIME DATA | DETAILS |
|---|---|
| MODUS OPERANDI | UNKNOWN |
| ACTIONS TOWARD VICTIM | UNK |
| CLOTHING | ACCESSORIES -UNK -UNKNOWN COLOR |
| CLOTHING | FOOTWEAR -UNK -UNKNOWN COLOR |
| CLOTHING | HEADGEAR -UNK -UNKNOWN COLOR |
| CLOTHING | OUTERWEAR -UNK -UNKNOWN COLOR |
| CHARACTERISTICS | UNKNOWN |
| BODY MARKS | -UNKNOWN |
| BODY MARKS | -UNKNOWN |
| IMPERSONATION | UNKNOWN |

Complaint# 2013-101-01690
**D000022**

| SEALED | | SEALED |
|---|---|---|

| **ARRESTS:** | Complaint # 2013-101-01690 |
|---|---|

| Arrest ID | Status | Defendant Name | Sex | Race | AGE | Arrest Date |
|---|---|---|---|---|---|---|
| Q14605604 | SEALED | FERGUSON, RASHAUN | MALE | BLACK | 19 | 01/27/2014 |

| SEALED | SEALED |
|---|---|

**No IMEI Data for Complaint # 2013-101-01690**

| SEALED | SEALED |
|---|---|

| **NOTIFICATIONS / ADDITIONAL COPIES:** | Complaint # 2013-101-01690 |
|---|---|

Notifications to:

| Rank/Title | Name | Unit/Agency | Log # |
|---|---|---|---|
| DI | MALONEY | CO | |
| SGT | LOPEZ | SQD | |
| DT | CLIFFARD | ESU | |
| DT | WALKER | NBQ | |
| DT | JOSHI | CSU | |

| SEALED | SEALED |
|---|---|

| Reporting/Investigating M.O.S. Name:<br>POM VARGAS ALFONSO | Tax #:<br>945073 | Command:<br>101 PCT | Rep.Agency:<br>NYPD |
|---|---|---|---|
| Supervisor Approving Name:<br>SGT WALSH VALERIE | Tax #:<br>919908 | Command:<br>101 PCT | Rep.Agency:<br>NYPD |
| Complaint Report Entered By:<br>PAA SMITHGRAY | Tax #:<br>317937 | Command:<br>101 PCT | Rep.Agency:<br>NYPD |
| Signoff Supervisor Name:<br>SGT SPANOS | Tax #:<br>943839 | Command:<br>101 PCT | Rep.Agency:<br>NYPD |

| SEALED | SEALED |
|---|---|

| END OF COMPLAINT REPORT<br># 2013-101-01690 |
|---|

Print this Report

1

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF NEW YORK

------------------------------------------X

RASHAUN FERGUSON,

                    PLAINTIFF,

     -against-      Index No:

                1:17-cv-06871-ENV-SJB

THE CITY OF NEW YORK, DETECTIVE JAEGER,

DETECTIVE MICHAEL GILDEA, SHIELD #465,

and Unidentified Members of NYPD, all

sued herein in their individual

capacities,

                   DEFENDANTS.

------------------------------------------X

          DATE:  August 16, 2018

          TIME:  12:15 p.m.

    DEPOSITION of a Non-Party Witness,

HENRY McCUMINGS, taken by the Respective

Parties, pursuant to a Subpoena, held at

THE LAW OFFICES of FRED LICHTMACHER, P.C.,

116 West 23rd Street, New York, New York

10011, before Marleine Lamey, a Notary

Public of the State of New York.

```
 1                    McCumings                3

 2     H E N R Y   M c C U M I N G S, called as a

 3     witness, having been first duly sworn by a

 4     Notary Public of the State of New York, was

 5     examined and testified as follows:

 6     EXAMINATION BY

 7     MR. LICHTMACHER:

 8         Q.      Please state your name for the record.

 9         A.      Henry McCumings.

10         Q.      What is your current home address?

11         A.      ███ ████ ████ █████ ███ ██████

12     ██ ██ █████

13         Q.      Mr. McCumings, thank you for coming.

14     I know no one likes to be subpoenaed.  I've been

15     subpoenaed lately.  I can't say I enjoyed the

16     experience.

17              Sir, I am giving you on the record $40

18     in cash which is part of the legal requirement

19     subpoena fee.  I don't know what the travel

20     assessment is.  We'll determine that if there's

21     a travel fee involved from Far Rockaway and I

22     will send you that in a check.  This is not a

23     bribe.  I am doing it legally on the record in

24     front of my adversary so you know.  Thank you

25     for appearing today.
```

Case 23-1315, Document 42, 11/25/2024, 3637564, Page49 of 200

```
 1                    McCumings           6
 2   it out to you.  I have someone from my office to
 3   run it out to you for you to take a look at it
 4   and, again, I thank you.
 5             Now, sir, you put your address on the
 6   record.  Where did you live on May 3, 2013?
 7        A.    The same address.
 8        Q.    That you described as Far Rockaway?
 9        A.    Yes, sir.
10        Q.    How long have you been in that area?
11        A.    Now eight years.
12        Q.    Before that where did you live or just
13   the area?
14        A.    Jamaica, Queens.
15        Q.    Before that did you live in Far
16   Rockaway?
17        A.    No.
18        Q.    So, you went from Jamaica, Queens to
19   Far Rockaway?
20        A.    Yes.
21        Q.    About eight years and you have been
22   there pretty much since?
23        A.    Yes.
24        Q.    Now, did there come a point in time
25   in, and I know this may be a painful experience,
```

1                    McCumings                7

2    in May of 2013 when members of the 101st

3    Precinct picked you up?

4        A.    Yes.

5        Q.    Did they bring you to the 101st

6    Precinct?

7        A.    Yes.

8        Q.    Do you remember what they spoke to you

9    about?

10       A.    A murder.

11       Q.    Now, did you know anything about it?

12       A.    No.

13       Q.    Now, let's talk about what, if

14   anything, they said to you.  First of all, were

15   you handcuffed when you were picked up?

16       A.    Yes.

17       Q.    Were you picked up by people in

18   uniform or out of uniform?

19       A.    Both.

20       Q.    Did they pick you up and when they

21   picked you up, did they tell you why they were

22   picking you up?

23       A.    No, they didn't.  When I asked them,

24   they told me that the detective wanted me and

25   that they would talk to me at the precinct and

```
 1                    McCumings              8
 2   they came like it was the Swat.
 3        Q.     They came into your house?
 4        A.     No.   They caught me outside walking to
 5   the front toward the store of my complex and I
 6   was on the phone and I just heard doors opening
 7   and they swarmed me.
 8        Q.     Scary?
 9        A.     Yeah.
10        Q.     Did you know any of the cops?
11        A.     No.
12        Q.     Do you know what time it was that they
13   picked you up?
14        A.     Yes, it was about 9:30, 10:00.
15        Q.     In the morning?
16        A.     In the morning.
17        Q.     What were you doing at that time?
18        A.     Going to get some coffee.
19        Q.     So, they picked you up and they didn't
20   tell you why?
21        A.     No.
22        Q.     Did they place you in handcuffs?
23        A.     Yes, they did.
24        Q.     Did they do this in front of your
25   neighbors?
```

Case 23-1315, Document 42, 11/25/2024, 3637564, Page52 of 200

```
 1                    McCumings              9
 2      A.      Yes.
 3      Q.      When they picked you up, did they put
 4   you in a vehicle?
 5      A.      Yes.
 6      Q.      Where, if anywhere, did they bring
 7   you?
 8      A.      To the 101st Precinct.
 9      Q.      When you got to the 101st Precinct,
10   were you on the ground floor, upstairs or
11   something else?
12      A.      Upstairs.
13      Q.      Upstairs I take it is the detective
14   squad?
15      A.      Yes.
16      Q.      What happened when you got upstairs?
17      A.      They told me I was accessory to a
18   murder, that I was the driver of if I am not
19   mistaken a Ford Focus.
20      Q.      Was it an Escape?
21      A.      Yes.  It was an escape vehicle.
22      Q.      No, was it a Ford Escape they were
23   accusing you of being the driver?
24      A.      Yes, that was the truck, yes.
25      Q.      What color was it supposed to be?
```

```
1                    McCumings          10
2      A.     I think gray.
3      Q.     Who spoke to you specifically about
4  this?
5      A.     I don't remember their name.
6      Q.     Would you remember if I showed you a
7  picture what the gentleman looked like?
8      A.     Yes.
9      Q.     I am not telling you but I am asking
10 you.
11            MR. LICHTMACHER:  Let's mark this
12        for identification as Plaintiff's Exhibit
13        1.
14            (Whereupon, photo was marked as
15        Plaintiff's Exhibit Number 1 for
16        Identification as of this date by the
17        court reporter.)
18     Q.     I am handing you a document marked for
19 identification as Plaintiff's Exhibit 1.  Do you
20 recognize it?
21     A.     Yes, I do.
22     Q.     Who do you recognize?  There are three
23 people in the center of that picture, do you
24 recognize one of them?
25     A.     The one in the middle.
```

Case 23-1315, Document 42, 11/25/2024, 3637564, Page54 of 200

```
 1                    McCumings          11
 2       Q.      So, it's the gentleman, it's not the
 3   guy in the weird outfit, it's the guy in the
 4   middle?
 5       A.      Yes, sir.
 6       Q.      Where do you recognize him from?
 7       A.      On the detective squad.
 8       Q.      By the way, do you know the exact date
 9   they picked you up?
10       A.      No, not the exact day.
11       Q.      Do you know the month?
12       A.      I think it was May.
13       Q.      Of what year?  Was it the year of the
14   murder if you know?
15       A.      Yeah.  It had to be the year of the
16   murder.
17       Q.      So, May of 2013?
18       A.      Yes.
19       Q.      So, you recognize the person in the
20   middle?  Can you tell me what he is wearing?
21       A.      He is wearing a suit with a green tie
22   and a white shirt.
23       Q.      Now, where did you meet him?
24       A.      101st Precinct.
25       Q.      What, if anything, did he say to you?
```

```
1                    McCumings              12
2        A.      He told me that he knew and that he
3    had witnesses saying that they could put me as
4    the driver.
5        Q.      Of the murder?
6        A.      Yes.
7        Q.      Was that true?
8        A.      No, it was not.
9        Q.      Where were you if you know the night
10   of the murder?
11       A.      In the house with my kids.
12       Q.      Did you tell him that there would be
13   some proof of the fact that you were in the
14   house with your kids?
15       A.      Yes, I did and I think that is why
16   they -- the reason why they released me from the
17   precinct.
18       Q.      What proof did you tell him existed?
19       A.      Because I am always on camera where I
20   live at, my complex, you see me on camera all
21   day until the night with my kids picking them up
22   from school, bringing them home, taking them to
23   the store, that is it, you don't see me leave
24   the complex, you don't see me go toward
25   Edgemere, you don't see me go nowhere, I am
```

McCumings                                    15

    Q.    The guy in the picture?

    A.    Yes.

    Q.    Did you know his name is Michael
Gildea?

    A.    Now I knew.

    Q.    Before I told you you didn't know?

    A.    Right.

    Q.    You know who he is from the photo?

    A.    Yes.

    Q.    Did you ever see him after that day?

    A.    Yes.

    Q.    When did you see him again?

    A.    Raided my house.

    Q.    He raided your house?

    A.    Yes, a couple of times and found
nothing.

    Q.    Let's talk about the first time.  Do
you remember what year it was?

    A.    I believe it was 2013 -- no, 2014.

    Q.    Can you tell me briefly what happened?

    A.    My wife she had caught pneumonia and I
had called the ambulance.  When I called the
ambulance, they rushed my house, the police was
rushing my house.

```
 1                    McCumings            16

 2      Q.     And Gildea was one of the cops that

 3  rushed your house?

 4      A.     Yes, saying I had a gun which was when

 5  I called back the operator and I asked them how

 6  could you send police to my house when I asked

 7  for an ambulance?  She told me that there was an

 8  incident across the street on 56th Place -- no,

 9  street, and I am on 56th Place but they said he

10  was on the street and I was in the building at

11  my door, so I told her I don't understand how

12  that could have got confused.

13      Q.     Did you see that same officer actually

14  come into your house that day?

15      A.     Yes.

16      Q.     What, if any, interaction did you have

17  with him?

18      A.     He was looking for guns.

19      Q.     How do you know that?

20      A.     That is what he said he was looking

21  for.

22      Q.     He, himself, came into the house?

23      A.     Yes.

24      Q.     You recognized him from the 101st

25  Precinct?
```

```
1                    McCumings              17
2       A.      Yes.
3       Q.      What, if anything, did he do to your
4    apartment?
5       A.      Tore it up.
6       Q.      Did anybody get arrested?
7       A.      I did.
8       Q.      For what?
9       A.      My wife had a belt buckle that was the
10   shape of brass knuckles.
11      Q.      They arrested you over that?
12      A.      Yes, they did.
13      Q.      Did you spend time in jail?
14      A.      I think I did five days.
15      Q.      What happened after that?
16      A.      I got released from jail, came home,
17   tried to find another job.
18      Q.      Did they dismiss the charges?
19      A.      No.  They just gave me five days.
20      Q.      Now, did there come another time that
21   he came into your house?
22      A.      Yes.  It was about 5:00 in the morning
23   I was up playing a game, I was about to go
24   fishing, I was about to get my son up and I
25   heard my door, I heard like a noise, like a
```

1                    McCumings              20

2       A.      Yes.

3       Q.      They never found the alleged gun,

4   correct?

5       A.      No, they never found nothing.

6       Q.      Let's go back to when you were in the

7   101st Precinct upstairs in May of 2013.  You get

8   picked up on the street and questioned about the

9   murders.  Did you get asked to identify anybody

10  as a murderer?

11      A.      Yes, I did.

12      Q.      Do you know the name of the person you

13  were asked to identify?

14      A.      Anthony.

15      Q.      Do you know the name?  You're looking

16  at your subpoena?

17      A.      Yes.

18      Q.      We're going to mark that too.

19      A.      Rashaun Ferguson.

20          MR. LICHTMACHER:  Let's mark this

21      as Plaintiff's Exhibit 3.

22              (Whereupon, subpoena was marked as

23      Plaintiff's Exhibit Number 3 for

24      Identification as of this date by the

25      court reporter.)

```
1                    McCumings          21
2      Q.      Does that refresh your recollection as
3  to what the name of the person was that they
4  asked you to identify?
5      A.      Yes.
6      Q.      Now, were you shown photos of anyone?
7      A.      Yes.
8      Q.      How many photos were you shown?
9      A.      I was shown photos of the deceased guy
10 that was killed.
11     Q.      Did you know him by the way?
12     A.      No, and of Rashaun Ferguson.
13     Q.      How many photos of other people were
14 you shown on that day?
15     A.      About two.
16     Q.      Who were they of?
17     A.      I don't know.  I guess people that had
18 -- that was acquainted with it.
19     Q.      Was acquainted with it, were any of
20 them alleged suspects if you know?
21     A.      They say they was but like I don't
22 know them.  I didn't know them.
23             MR. LICHTMACHER:  Let's mark this
24     as we're up to 4 I think.
25             (Whereupon, photo was marked as
```

McCumings                    22

2    Plaintiff's Exhibit Number 4 for

3    Identification as of this date by the

4    court reporter.)

5    Q.        Take a look at this photo.  We have

6    marked this as Plaintiff's Exhibit 4 for

7    Identification.  Does this photo look familiar?

8    A.        Yes.

9    Q.        What do you recognize this photo to be

10   or who do you recognize it to be a photo of?

11   A.        Rashaun Ferguson.

12   Q.        Do you know Rashaun Ferguson?

13   A.        No, I don't.

14   Q.        So, how did you come to know this is

15   Rashaun Ferguson?

16   A.        Because the police showed me a photo

17   of him.

18   Q.        Let me ask you for clarity how many

19   other people did they ask you to identify?

20   A.        It was two more.  It was a tall, a

21   tall, light skinned one and another short, dark

22   skinned kid.

23   Q.        Now, did they tell you if either of

24   those people had been shot?

25   A.        No.

```
1                    McCumings            25
2      A.      Yes.
3      Q.      Did you feel any pressure to say
4  anything that day?
5      A.      No.
6      Q.      Did you feel that they were pressuring
7  you trying to get you to identify somebody?
8      A.      Yes.
9      Q.      In what way?
10     A.      They were saying that they did have
11  witnesses saying that they could put me on the
12  scene, that I was the driver of the getaway car
13  and that is when I told them that is impossible
14  because you could track my movement from the
15  cameras in my complex.
16     Q.      To your knowledge, did they ever go or
17  did anyone ever go and request cameras from your
18  complex?
19     A.      Not to my knowledge.
20     Q.      Did you ever check management to find
21  out?
22     A.      No.
23     Q.      So, you don't really know either way?
24     A.      No.
25     Q.      So, now, did they have an emotional
```

```
 1                    McCumings        26
 2   reaction when you said you didn't know Rashaun
 3   Ferguson?
 4        A.    They told me I was lying a lot.
 5        Q.    How early in the interview did they
 6   ask you if you knew Rashaun Ferguson?
 7        A.    Almost immediately when they put me in
 8   the room with them.
 9        Q.    The whole time you were there they
10   didn't let you go to the bathroom?
11        A.    No.
12        Q.    When did you ask to go to the
13   bathroom?
14        A.    But they did give me a cigarette and
15   now that I think of it they probably took my DNA
16   off the cigarette.
17        Q.    Well, did you ever get arrested for
18   the murder or as an accessory to the murder of
19   someone named Keith Gulley (phonetic).
20        A.    No.
21        Q.    That is this incident.  Did you ever
22   get arrested pursuant to this incident other
23   than what you're talking about now?
24        A.    No.
25        Q.    So, they never accused you other than
```

```
 1                    McCumings              27
 2   that day in the precinct of being involved?
 3       A.      Yes, but on my way out the precinct
 4   the detective that is in this picture right here
 5   --
 6       Q.      Photo number -- what is that number,
 7   3?  I don't remember what number.  Number 1,
 8   yes, number 1.
 9       A.      On my way out he told me in front of
10   my wife that he know I had something to do with
11   it and he is going to be watching me.
12       Q.      He told you that in front of your
13   wife?
14       A.      Yes.
15       Q.      How did your wife react if you know?
16       A.      She looked at him as if he was crazy.
17       Q.      You were not involved in the murder I
18   take it?
19       A.      No.
20       Q.      Now, did there come a time when you
21   spoke with an attorney who represented Rashaun
22   Ferguson?
23       A.      Yes.
24       Q.      By the way, did you ever speak with me
25   before today?
```

```
1                    McCumings           30

2    across the street.

3        Q.    Were you aware that the principal of

4    that school was a witness in this trial?

5        A.    No.

6        Q.    It wasn't really relevant to you but I

7    thought you would get a kick out of it.

8        A.    Oh yeah?

9        Q.    Yeah.

10            Were you picked up about a month after

11   that initial questioning again?

12       A.    By police.

13       Q.    Yes?  You indicated they came to your

14   house a couple of times?

15       A.    Yes.

16       Q.    Was the first time they came to your

17   house after they brought you to the precinct the

18   first time?

19       A.    Yes.

20       Q.    Was the second time approximately a

21   month after the first time they saw you?

22       A.    Yes.

23       Q.    Do you believe that the entries into

24   your house were related to your not being able

25   to confirm you were involved in the murder of
```

1                    McCumings                33

2       Q.      Photo 1?

3       A.      Yes, came to the cell that I was in

4   and he said today is my lucky day, that he was

5   going to let me go.

6       Q.      How did you feel like you were treated

7   by that detective?

8       A.      Like shit, excuse my language.

9       Q.      It's a good word.

10              The second time how did you feel like

11  you were treated by him?

12      A.      Shit.

13      Q.      The third time?

14      A.      Same way.

15      Q.      The same way?

16      A.      Yes.

17      Q.      The same S word treatment?

18      A.      Yes.

19      Q.      Give me 1 second.

20              How would you describe relationships

21  between the 101st Precinct and the people in

22  your community?

23      A.      They have like zero respect.

24      Q.      Who has zero respect?

25      A.      Police.

McCumings                                    34

1

2     Q.     Police have zero respect for the
3  neighborhood?
4     A.     Yes.
5     Q.     Is it fair to say your neighborhood is
6  predominantly black?
7     A.     Yes, it is.
8     Q.     How about the police department, is it
9  predominantly black?
10    A.     No.
11    Q.     Is it predominantly white?
12    A.     Yes.
13    Q.     Do you specifically have any feelings
14  about the police department, the 101st?
15    A.     Yes.  I feel like they have corrupt
16  cops, that they shouldn't have their job and
17  they abusing their authority.
18    Q.     Give me 1 second.  I am almost done.
19  Thank you.
20           Did you feel like there was a
21  relationship between your not being allowed to
22  go to the bathroom and you're not admitting that
23  you were involved in a crime?
24    A.     Yes.
25    Q.     I am going to be crude, did you make

1                    McCumings              36

2       Q.    You just wanted to get out of there?

3       A.    Yes.

4       Q.    The handcuffs were on you the entire

5  time?

6       A.    Yes.

7       Q.    How did your handcuffs feel?

8       A.    Cold and hard and they had them tight.

9       Q.    Did you ask them to take them off?

10      A.    No.  I asked them to if they could

11  loosen it.

12      Q.    What did they say?

13      A.    No.

14      Q.    They gave you a cigarette to smoke?

15      A.    Yes.

16      Q.    How did you smoke?

17      A.    With one hand changed to a post.

18      Q.    How long did the cops spend looking

19  for a gun in your house the first time?

20      A.    Probably about two hours.

21      Q.    Did anybody repair the damage they did

22  to the apartment?

23      A.    No.  We had to pay for it.

24      Q.    You had to pay for it yourself?

25      A.    Yes.

1                    McCumings            61

2    recorded by your building?

3        A.      Ever?

4        Q.      Yes.

5        A.      Well, when I walk through the front,

6    the camera -- if you walk by the booth, yes, you

7    can see the buildings.

8        Q.      Where exactly are the video cameras at

9    your building?

10       A.      Everywhere.  We got cameras on the

11   first floor, second floor, the roof, in front of

12   my building, on the sides, all over the complex.

13       Q.      At any time did you actually see video

14   from the date that you were picked up by the

15   police for this incident?

16       A.      No.

17       Q.      So, going to when you were with the

18   police for this incident you said that they

19   showed you a picture of Rashaun Ferguson, right?

20       A.      Yes.

21       Q.      So, looking at this was Plaintiff's

22   Exhibit 4 that you saw earlier was it a single

23   photograph like this or --

24       A.      Yes.  It was a single photograph like

25   that.

```
 1                    McCumings              62

 2      Q.      It wasn't, in other words, like

 3  multiple photographs and they asked you to see

 4  if you could identify the person?

 5      A.      No.

 6      Q.      As you were shown the single

 7  photograph was there anything they said?

 8      A.      They told me he was the shooter, he

 9  killed them and that I was the driver and that I

10  knew him and they had witnesses saying I was the

11  driver.  They pointed me out as the driver.

12      Q.      Who exactly was it that said those

13  things?

14      A.      The detective that is in this picture

15  right here (Indicating).

16              MR. LICHTMACHER:  Plaintiff's

17      Exhibit 1.

18      Q.      Was he alone or were there any other

19  officers in the vicinity?

20      A.      He was with another officer but I did

21  not catch his name.

22      Q.      What was that other officer wearing?

23      A.      Regular plainclothes.

24      Q.      Do you recall what that other officer

25  appeared like?
```

```
                        McCumings              67

 1  for a gun and he found a bag of weed.

 2      Q.      You are saying you thought that was in

 3  2014, right?

 4      A.      Yes.

 5      Q.      Then there was a third time as well

 6  you said, right?

 7      A.      Yeah.

 8      Q.      Tell me about the third time, when was

 9  that?

10      A.      When I was standing in front of the

11  building.

12      Q.      What exactly happened this third time?

13      A.      I was standing in front of the

14  building with my boys and they walked around the

15  corner and came straight to me and started

16  searching me.  They didn't search nobody else

17  but me.

18      Q.      What corner was it?

19      A.      What?

20      Q.      Where was it that that happened?

21      A.      In front of my building.

22      Q.      Do you know the approximate date when

23  this third time happened?

24      A.      No.
```

1               McCumings                    68

2        Q.      Do you know the year?

3        A.      It was the summertime of 2014, 2015.

4        Q.      Was Detective Gildea involved in that

5   incident?

6        A.      Yes.

7        Q.      What was his role?  What was he doing?

8        A.      He was going in my pockets too.

9        Q.      Did you ultimately get arrested for

10  anything?

11       A.      No.

12       Q.      So, what happened, the police left and

13  you --

14       A.      They found a little weed in my pocket

15  and put it back.

16       Q.      Did they say why they put it back and

17  let you go?

18       A.      They said they wanted guns.

19       Q.      So, the first time you called 911 was

20  because your wife had a pneumonia attack?

21               MR. LICHTMACHER:  Is that a yes?

22               THE WITNESS:  Yes.

23       Q.      How long was it before the police

24  came?

25       A.      I will say about 10 minutes, 15

```
1                    McCumings              69

2   minutes after that, not even that long.  I put

3   the phone down, I checked on my home room, I

4   checked on my wife, I grabbed my jacket and when

5   I opened, the door, boom, right there.

6       Q.    Did an ambulance ever come?

7       A.    Yes, they did and they turned it away

8   for my wife.

9       Q.    So, your wife did not receive any

10  emergency care?

11      A.    No.  She went through the bookings.

12  They wanted to lock my wife up.

13      Q.    Do you know if she ever got medical

14  care?

15      A.    When she got out, yeah, she went

16  straight to the hospital from central bookings.

17      Q.    Do you know what her diagnosis was?

18      A.    She had pneumonia.

19      Q.    How long were you in central booking

20  for that incident?

21      A.    The night.

22      Q.    So --

23      A.    I didn't go to central booking that

24  night.  My wife went to central booking.

25      Q.    You were arrested though, correct?
```

Case 23-1315, Document 42, 11/25/2024, 3637564, Page74 of 200

```
 1                    McCumings          73

 2      A.  ⸍  I had a whole houseful of police.

 3      Q.     Were they wearing uniforms or

 4 plainclothes or something else?

 5      A.     Some was in uniform, some was in

 6 plainclothes.

 7      Q.     Do you know if they had a warrant of

 8 any kind?

 9      A.     They say they did.  I didn't see no

10 warrant.

11      Q.     Did you ask for a warrant?

12      A.     I asked for a warrant and they never

13 showed me a warrant.

14      Q.     Did Gildea say anything to you about

15 that, about the warrant?

16      A.     No.

17      Q.     What kind of damage was caused on that

18 day?

19      A.     A lot.

20      Q.     Could you describe what happened on

21 that day, what damage was caused?

22      A.     Oh, my daughter dolls was ripped up,

23 dog food, unopened bags of dog food, my food

24 come out the cabinets was all over the floor,

25 bust open, TVs on the floor, it was a bunch.  I
```

```
1                    McCumings              91

2        Q.      Why is that, sir?

3        A.      Because they was trying to I guess get

4   me to admit to something that I didn't do and he

5   was telling me that he had witnesses saying that

6   they had me as the driver which never I guess

7   never had witnesses, I guess it was just kind of

8   scare me or whatever, but, yes, I believe that

9   that has something to do with them running in my

10  house.

11       Q.      Would you describe Detective Gildea as

12  trying to pressure you to say something that was

13  not true?

14       A.      Yes.

15       Q.      That was when you were at the 101?

16       A.      Yes.

17       Q.      How long would you describe that

18  pressure for lasting?

19       A.      For about 5 hours and some change

20  straight.

21       Q.      The CCRB, the Civilian Complaint

22  Review Board, you mentioned that you complained

23  to them about one of the break-ins.  When you

24  complained to them, did you also talk to them

25  about Gildea having you at the 101st Precinct
```



UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF NEW YORK

                    CASE# 1:17-cv-06871

-------------------------------------------x

RASHAUN FERGUSON,

                    Plaintiff,

          -against-

THE CITY OF NEW YORK, DETECTIVE JAEGER, DETECTIVE

MICHAEL GILDEA SHIELD #465 and UNIDENTIFIED

MEMBERS OF THE NYPD all sued herein in their

individual capacities,

                    Defendants.

-------------------------------------------x



                    116 West 23rd Street

                    New York, New York


                    April 4, 2019

                    2:16 p.m.


          Deposition of the Non-Party Witness

ANGELA LOGAN SMITH, pro se, pursuant to Order,

before Robert S. Barletta, a Notary Public of the

State of New York.

```
 1                        Smith
 2    what transpired and did they ask you questions
 3    about the incident?
 4        A.    Yes.
 5        Q.    Were you an eyewitness to an actual
 6    crime?
 7        A.    No.
 8        Q.    Did they ask you to view any video?
 9        A.    Yes.
10        Q.    What if any video footage did you show
11    them?
12        A.    I showed them the footage that is
13    focused on Beach 56th Street.
14        Q.    From that, I take it there was at least
15    one surveillance camera that faced Beach 56th
16    Street?
17        A.    There is one.
18        Q.    Was it obstructed?  The view.
19        A.    No.
20        Q.    No scaffolding was blocking the view of
21    Beach 56th Street?
22        A.    No.
23        Q.    Was there anything blocking the view of
24    Beach 56th Street?
25        A.    No.
```

```
 1                        Smith
 2        Q.   You showed them the footage; correct?
 3        A.   Yes.
 4        Q.   Did you watch the footage along with
 5   them?
 6        A.   Yes.
 7        Q.   What do you remember about the footage?
 8        A.   I remember there was a gentleman running
 9   down the street and then there was a car that
10   followed and surpassed him as he was going down
11   the street.  That is all that you saw in the shot.
12        Q.   That was unobstructed?  The view of
13   that?
14        A.   Yes.
15        Q.   Let's talk about the car.  Was it a
16   sedan, SUV, a sport car something else?
17        A.   Sedan.
18        Q.   Are you certain?
19        A.   Yes.
20        Q.   Approximately what color was it?
21        A.   Dark.  Either dark blue or black.
22        Q.   Would it have been a gray color?
23        A.   No.
24        Q.   Are you certain of that?
25        A.   I am positive.
```

```
 1                    Smith
 2      Q.   The gentleman you saw, I believe you
 3  said he was running?
 4      A.   Yes.
 5      Q.   Approximately how tall are you?
 6      A.   I am 5'9".
 7      Q.   Compared to you, approximately what
 8  height was this gentleman?
 9      A.   He was probably about 6'1".  Taller than
10  me.  It was a video.  I can see he was taller than
11  me.
12      Q.   Could you tell what his build was like?
13      A.   He was a slim gentleman.  He wasn't
14  skinny.
15      Q.   He wasn't somebody that was extremely
16  thin?
17      A.   No.
18      Q.   He wasn't somebody who was 6'3" or 6'4"?
19      A.   No.
20      Q.   You could see that clearly?
21      A.   Yes.
22      Q.   The officers, they watched the video
23  with you how many times?
24      A.   Twice.
25      Q.   To your knowledge, did they take any
```

```
1                          Smith
2     minor details.  You would not be able to see
3     someone face.
4          Q.    You wouldn't be able to see a license
5     plate would you?
6          A.    No, the way the angle of the car is
7     going down the street.  No.
8          Q.    Were there generators obstructing the
9     view?
10         A.    No.
11         Q.    Were there trees obstructing the view?
12         A.    No.
13         Q.    You said there was no scaffolding
14    obstructing the view?
15         A.    Correct.
16         Q.    Did the NYPD officials or detectives
17    inquire, if you could zoom in on the person and
18    the vehicle depicted in the surveillance video?
19         A.    I don't recall that.
20         Q.    Did they ask you if you could do a stop
21    frame?
22         A.    No.
23         Q.    When officers, detectives or police
24    officers entered the Goldie Maple Academy do they
25    have to enter their names in any kind of logbook?
```



PLAINTIFF'S EXHIBIT

PENGAD 800-631-6989

# C.R.I.M.M.E.S.

## INVESTIGATIONS & SECURITY CONSULTANTS LLC
### 4768 Broadway #707
### New York, N.Y. 10034
#### Tel# 646.963.9032

DATE:               August 4, 2017
INVESTIGATION:     PSNY vs RASHAUN FERGUSON
LOCATION:           ARVERNE, N.Y.
CLIENT:               RASHAUN FERGUSON
SUBJECT:              SUMMARY INTERVIEW OF ORRIS WHEELING

On Friday 8/4/2017 at 10:30 hrs., I spoke with Orris Wheeling on the 2nd floor of 5505 Beach Channel Drive Arverne, NY. I showed Mr. Wheeling DD5 follow up #4 dated 6/15/2013 as reported by Dt3 Michael Gildea: He said he described the SUV as being similar to a jeep and silver gray in color. He said the SUV seemed to be a 1997 or 1998. He said what stood out about the SUV was that the catalytic converter made a lot of noise. Orris said he never told the detective the SUV was a Ford Escape. Orris said the detectives showed him a photo of a man and asked him if he had ever seen this man driving a Ford SUV. Orris told the detectives he had seen that man in a Ford SUV before in the area. Orris said the detectives had him sign the photo. I showed Orris the photo and he said the writing under the photo "This is man the one who was the driver. I do see him all the time" was not written on the paper before he signed it and that was not his writing. Orris told me he did not know the man in the photo by name. Orris said the detectives asked him to describe the passenger who exited the SUV. He told me he described the man as a light skin male, 5'9" tall, slim, about 160 lbs. I showed Orris a sketch of the crime scene, where they said he was parked and where the SUV had parked. He said the diagram was wrong. Orris then wanted to go outside. He showed me where his car was parked with the hood up. He said his wife was in the driver's seat. He was parked more in the middle of the block, on Beach 56th Street, under a lamp post and the SUV had parked across the street close to the entrance to PS/MS 333. Orris said the detectives wanted him to identify the man he saw with the gun.

They showed him a photo array. He said he did not recognize anyone. Orris said he told the detective that the men in the array were to dark. He said the detective told him that witnesses were saying it was number 1 and he had to pick him. Orris said to me that since people were saying it was number 1 it must be him, so he signed his name under the number 1photo. Orris said he later viewed a line up at the 101 Detective squad. He said he asked the detectives to have the guy in position number 5 stand up, but that was not him. When Orris came out of the lineup he said the detective told Orris the guy was in position number 4. Orris said he told the detective the guy in number 4 was to dark and to heavy. Orris said he had a Fed case pending and they were trying to cut him a deal to cooperate in this murder case. He was undecided with what he wanted to do. Orris told me that the word on the street was that Marcus Ortiz had shot the two guys. I then showed Orris two single color photos of Marcus Ortiz I had on my cellphone. Orris said that was the man he saw exit the SUV and take his shoes off. The man with the gun. Orris said he is afraid for his family and did not want to get involved. I told Orris, Marcus had been killed outside of New York. I told Orris the man arrested in this case is Rashaun Ferguson. Orris said the detectives wanted him to identify Ferguson but he wouldn't do it. Orris said he would be willing to help Ferguson out but was afraid for his family, and unsure about his fed deal.

B A De Leon

Signed _____

**LICENSED BY THE STATE OF NEW YORK**

Complaint# 2013-101-01689                                                              Page 8 of 67

| CANVASS | | Crime/Condition<br>MURDER & NON-NEGL.<br>MANSLAUGHTE | Command<br>101-101ST<br>PRECINCT<br>Date of This<br>Report<br>05/04/2013 |
|---|---|---|---|

| Date of<br>UF61<br>05/03/2013 | Complaint No.<br>2013-101-<br>01689 | Date Case<br>Assigned<br>05/04/2013 | Case No.<br>2013 -<br>642 | Unit Reporting<br>SQUAD | Follow-Up No.<br>1 |
|---|---|---|---|---|---|

| Complainant's Name<br>GULLEY, KEITH | | Address | | Apt No. |
|---|---|---|---|---|

| Nickname/Alias/Middle Name |
|---|

| Sex<br>MALE | Race<br>BLACK | Date of Birth | Age |
|---|---|---|---|

| Home Telephone | Business Telephone | Cell Phone | Beeper # | E-Mail Address |
|---|---|---|---|---|

| Person Interviewed Last Name, First M.I.<br>GULLEY, KEITH | | Address | | Apt No. |
|---|---|---|---|---|

| Nickname/Alias/Middle Name |
|---|

| Position/Relationship | Sex<br>MALE | Race<br>BLACK | Date of Birth | Age |
|---|---|---|---|---|

| Home Telephone | Business Telephone | Cell Phone | Beeper # | E-Mail Address |
|---|---|---|---|---|

| Activity Address<br>Location<br>NYC | Street | City<br>QUEENS | | State<br>NY | Zip | Apt # |
|---|---|---|---|---|---|---|

| Cross Street | | Intersection of<br>BEACH CHANNEL DRIVE and BEACH 56 STREET - NORTH WEST<br>CORNER | Premise<br>Type |
|---|---|---|---|

| Activity Date<br>05/03/2013 | Activity Time<br>10:15 |
|---|---|

**Topic/Subject:**
(CANVASS) CANVASS FOR VIDEO

**Summary of Investigation:**
1. On May 3, 2013, at approximately 1015 hrs the undersigned along with Detective Garofalo from the 113 Detective Squad did conduct a canvass for video in regards to this investigation. The results are as followed:

365 B56 Street- PS 333- Has video surveillance system that does face B56 Street. The undersigned did speak to Dennis Robinson who works for PS 333. Mr. Robinson stated that we cant view the video until Monday when the principle Angela Logan is working.

354 B56 Street- No video was observed at the location.

364 B56 Street- No video was observed at the location.

55-05 Beach Channel Drive- No video observed at the location.

342 B56 Street- No video was observed at the location.

334 B56 Street- No video was observed at the location.

316 B56 Street- No video was observed at the location.

306 B56 Street- No video was observed at the location.

NO ARGUS CAMERAS IN THE AREA.

2. Case is active.

Complaint# 2013-101-01689                                                      Page 9 of 67

| Reporting Officer: | Rank POM | Name KEITH EHRHART | | Tax Reg. No. 930095 | Command 343-113 DET SQUAD |
|---|---|---|---|---|---|
| Reviewing Supervisor: | Manner of Closing - | Date Reviewed 06/17/2013 | Date of Next Review | Name GEMMA MASTERSON | Supv. Tax No. 900321 |

| **GENERAL INVESTIGATION** | | **Crime/Condition**<br>ASSAULT | **Command**<br>101-101ST PRECINCT<br>**Date of This Report**<br>05/04/2013 |
|---|---|---|---|

| **Date of UF61**<br>05/03/2013 | **Complaint No.**<br>2013-101-01690 | **Date Case Assigned**<br>05/03/2013 | **Case No.**<br>2013 - 642 | **Unit Reporting**<br>SQUAD | **Follow-Up No.**<br>2 |
|---|---|---|---|---|---|

| **Complainant's Name**<br>EVANS, REGGIE | **Address** | | **Apt No.** |
|---|---|---|---|

**Nickname/Alias/Middle Name**

| **Sex**<br>MALE | **Race**<br>BLACK | **Date of Birth** | **Age**<br>36 | |
|---|---|---|---|---|

| **Home Telephone** | **Business Telephone** | **Cell Phone** | **Beeper #** | **E-Mail Address** |
|---|---|---|---|---|

| **Activity Address Location**<br>NYC | **Street**<br>54-30 BEACH CHANNEL DRIVE | **City**<br>QUEENS | **State**<br>NY | **Zip** | **Apt #** |
|---|---|---|---|---|---|

| **Cross Street**<br>BEACH 58 STREET and BEACH 54 STREET | **Intersection of** | **Premise Type**<br>RESIDENCE - PUBLIC HOUSING |
|---|---|---|

| **Activity Date**<br>05/03/2013 | **Activity Time**<br>20:08 |
|---|---|

**Topic/Subject:**
ASSAULT

**M.O.(Key Actions / Method of Perps / Entry Method):**
STADNING IN FRONT OF LOCATION

**Summary of Investigation:**
1. On May 3, 2013, at approximately 2010 hours I was informed via radio transmission from central that a male was shot in the confines of the 101 pct and was not likely to die. Details are as follows:

2. At t/p/o c/v was standing in front of the location when an unknown suspect did fire 3 shots from the walkway which consequently struck him in the back. Suspect fled on foot to a Gray Ford Escape which was parked on Beach 56 Street, and did flee the scene with another unknown suspect. Victim is identified as follows;

Evans, Reggie M/B/36 DOB- 

IDS NEGATIVE
NYSID

Arrest History:

3. Upon conferral with the 101 PDU Sgt Lopez, this is a gang motivated shooting since the c/v is the brother of the DOA victim Keith Gulley. At this time the c/v does not seem to be the target. This is a gang location and Keith Gulley was an active Bloods gang memember. Gang will continue to confer with the 101 PDU.

4. For your information.

| **Reporting Officer:** | **Rank**<br>DT3 | **Name**<br>NICHOLAS ROMANO | | **Tax Reg. No.**<br>935641 | **Command**<br>596-GANG SQUAD QUEENS<br>NORTH |
|---|---|---|---|---|---|
| **Reviewing Supervisor:** | **Manner of Closing** | **Date Reviewed**<br>06/17/2013 | **Date of Next Review** | **Name**<br>GEMMA MASTERSON | **Supv. Tax No.**<br>900321 |

# 101 PCT

| | UNUSUAL OCCURRENCE REPORT-ORIGINAL | | | | Crime/Condition MURDER & NON-NEGL. MANSLAUGHTE | | Command 101-101ST PRECINCT Date of This Report 05/04/2013 |
|---|---|---|---|---|---|---|---|

| Date of UF61 05/03/2013 | Complaint No. 2013-101-01689 | Date Case Assigned 05/04/2013 | Case No. 2013 - 642 | Unit Reporting SQUAD | | | Follow-Up No. 3 |
|---|---|---|---|---|---|---|---|

| Topic/Subject (UNUSUAL OCCURRENCE REPORT-ORIGINAL) UNUSUAL REPORT - HOMICIDE & MALE SHOT | Activity Date 05/03/2013 | Activity Time 20:08 |
|---|---|---|

## Offense Information

| Date of Offense 05/03/2013 | | Time of Offense 20:08 | | |
|---|---|---|---|---|
| Building # 54-30 | Address BEACH CHANNEL DRIVE | | Apt# | Borough/City QUEENS |
| Precinct 101 | Housing Dev. Name | | PSA Number | Premise Type OPEN AREAS (OPEN LOTS) |
| School Number | School Name | | Type of School | |

## Details

**Summary of Investigation:**
1. On May 30, 2013, at approximately 2008 hours members of the 101 squad were notified via Department radio of two (2) males shot in front of 54-30 Beach Channel Drive. Upon arrival the undersigned did observe the victims suffering from apparent gunshot wounds to the body. Victim #1 was identified as Keith Gulley; a M/B 22 Y/O who was unresponsive, and victim #2 was identified as Reginald Evans; a M/B 36 Y/O who was shot in the lower back and responsive but was unable to provide any information. .380 caliber shell casings were observed at the scene. The victims were removed to separate hospitals, with Gulley being transported to St. John's Hospital were he was pronounced at 2105 hours.

2. Interviews and canvasses were conducted and the investigation is on-going as the investigative process continues. Autopsy will be viewed by a member of the 101 squad.

***The information being transmitted to you is preliminary information and is subject to change as additional facts are discovered during the on-going investigation.***

| If Business, Business Name | Person's Last Name, First M.I. GULLEY, KEITH | Person/Business Role COMPLAINANT/VICTIM | Housing Res. | Probation No | Parole No |
|---|---|---|---|---|---|
| Nickname/Alias/Middle Name BUNKY | | | | | |
| Address | | | Apt No. | Res. Pct. | NYSID No. |

| Arrest # | Date | Top Charge | | | |
|---|---|---|---|---|---|
| Q10602377 | 01/12/2010 | PL 265.03 01B | | | |
| Q10626635 | 05/01/2010 | PL 125.25 01 | | | |

| Position/Relationship | Sex MALE | Race BLACK | Date of Birth | Age 22 | Height 5FT10IN | Weight 160 |
|---|---|---|---|---|---|---|
| Age From | Age To | Injured/Deceased DECEASED | Type of Injury GUNSHOT | | Removed to Hospital Yes | Hospital Name ST JOHNS |
| Home Telephone | Business Telephone | Cell Phone | Beeper # | E-Mail Address | U.S. Citizen Yes | State/Country of Birth USA |

**Description**
Eye Color:BLACK Hair Color:BLACK Hair Length:SHORT Hairstyle:CLOSE CUT Complexion:CLEAR Skin Tone:MEDIUM

| Accent No | Weapon | Describe Weapon (If firearm, give color, make, caliber, type, model, etc.) | | | Discharged |
|---|---|---|---|---|---|
| Gang Affiliation Yes | | Gang Name BLOODS | | Gang Identifier | |
| Mask NO | Mask Description | | Gloves NO | Gloves Description | |

| Clothing Description |
|---|
| Scars, Marks |
| Impersonation of | If other |

**Statements/Criminal History**
Extensive criminal history from 2005 through present is attached.

| If Business, Business Name | Person's Last Name, First M.I. EVANS, REGINALD | Person/Business Role VICTIM (ADDL) | Housing Res. | Probation No | Parole No |
|---|---|---|---|---|---|

| Nickname/Alias/Middle Name |
|---|

| Address | | Apt No. | Res. Pct. | NYSID No. |
|---|---|---|---|---|

| Arrest # | Date | Top Charge |
|---|---|---|

| Position/Relationship FRIEND/ACQUAINTANCE | Sex MALE | Race BLACK | Date of Birth | Age 36 | Height 6FT0IN | Weight 180 |
|---|---|---|---|---|---|---|
| Age From | Age To | Injured/Deceased INJURED | Type of Injury GUNSHOT | | Removed to Hospital Yes | Hospital Name JAMAICA |
| Home Telephone | Business Telephone | Cell Phone | Beeper # | E-Mail Address | U.S. Citizen Yes | State/Country of Birth USA |

**Description**
Eye Color:BLACK Hair Color:BLACK Hair Length:SHORT Hairstyle:CLOSE CUT Complexion:CLEAR Skin Tone:MEDIUM

| Accent | Weapon | Describe Weapon (If firearm, give color, make, caliber, type, model, etc.) | | | Discharged |
|---|---|---|---|---|---|
| Gang Affiliation No | | Gang Name | | Gang Identifier | |
| Mask NO | Mask Description | | Gloves NO | Gloves Description | |

| Clothing Description |
|---|
| Scars, Marks |
| Impersonation of | If other |

Complaint# 2013-101-01689

**Statements/Criminal History**
LIMITED CRIMINAL HISTORY FROM 1998 THROUGH 2008 IS ATTACHED

**VEHICLE**

**Recovered Weapons**

| Weapon Type | Weapon | Weapon Description | | | | NYSID |
|---|---|---|---|---|---|---|
| Gun | Discharged | Make | Color | | Caliber | Type |
| Type of Location Seized On | | If Other Location, Specify | | | Precinct Voucher # | |

**Notifications**

| Unit/Agency | Tax ID | Name | Rank | Cmd |
|---|---|---|---|---|
| N.Y. POLICE DEPT | 891260 | JOHN ZANFARDINO | CPT | 311-DISTRICT ATTORNEY SQD QUEENS |
| N.Y. POLICE DEPT | 905620 | PETER PAWELSKI | DT2 | 201-DETECTIVE BUREAU |
| N.Y. POLICE DEPT | 900321 | GEMMA MASTERSON | LCD | 331-DET SQD. QNS-101 |
| N.Y. POLICE DEPT | 920518 | JUAN LOPEZ | SGT | 331-DET SQD. QNS-101 |
| N.Y. POLICE DEPT | 874483 | STEVEN MATTHEWS | DT3 | 310-DET BORO QUEENS |

**ATTACHMENTS**

| Reporting Officer: | Rank DT3 | Name MICHAEL GILDEA | | Tax Reg. No. 928374 | Command 331-101 DET SQUAD |
|---|---|---|---|---|---|
| Reviewing Supervisor: | Manner of Closing - | Date Reviewed 06/16/2013 | Date of Next Review | Name CORTNEY CUMMINGS | Supv. Tax No. 928136 |

| Other Attachments | Crime/Condition MURDER & NON-NEGL. MANSLAUGHTE | Command 101-101ST PRECINCT Date of This Report 06/15/2013 |
|---|---|---|

| Date of UF61 05/03/2013 | Complaint No. 2013-101-01689 | Date Case Assigned 05/04/2013 | Case No. 2013 - 642 | Unit Reporting SQUAD | Follow-Up No. 4 |
|---|---|---|---|---|---|

| Complainant's Name GULLEY, KEITH | Address | Apt No. |
|---|---|---|

| Nickname/Alias/Middle Name BUNKY |
|---|

| Sex MALE | Race BLACK | Date of Birth | Age 22 |
|---|---|---|---|

| Home Telephone | Business Telephone | Cell Phone | Beeper # | E-Mail Address |
|---|---|---|---|---|

| Activity Address Location OFFICE | Street | City | State | Zip | Apt # |
|---|---|---|---|---|---|

| Cross Street | Intersection of and | Premise Type |
|---|---|---|

| Activity Date 05/03/2013 | Activity Time 21:15 |
|---|---|

**Topic/Subject:**
**(Other Attachments) INTERVIEW WITNESS / POSITIVE ID OF DRIVER**

**Summary of Investigation:**
1. On May 3, 2013, at approximately 2115 hours the undersigned; along with Detective Jaeger; did interview a witness known to the Department at the 101 sqd. The witness informed that they were working on their auto which was parked on Beach 56 Street when they did observe a gray colored Ford SUV; later identified as an Escape; pull onto the block from Beach Channel Drive. The witness informed that the passenger of the auto exited the vehicle and then was called back by the driver. The witness then saw the passenger re-exit the vehicle and observed the witness, now with no sneakers, walk towards the Edgemere housing complex. The witness informed that moments later gunshots were heard and as the witness raised their head, the passenger was again observed running from the Edgemere, only this time with a gun in his hand. The witness further informed that the passenger re-entered the Ford which was being driven by a person that is known to the witness from the area. The Ford sped off down Beach 56 Street towards Seagirt. The witness informed that the driver is a person known as "Man" and resides in Ocean Village. The witness did not know the identity of the male passenger observed with the gun, but did provide a description of him.

2. By utilizing the witness' information and knowledge of "Man", the undersigned did retrieve a photo of a person matching the description of the driver who also lived in the same building and floor as described by the witness. Upon showing the witness the photo, the witness did identify Henry McCummings (Nysid # ) as the driver of the Ford.

3. The witness and undersigned did also draw a sketch of the crime location detailing where the witness was, the perps were, and their locations in relation to the crime scene.

**CASE ACTIVE**
**(photo and map attached)**

| Reporting Officer: | Rank DT3 | Name MICHAEL GILDEA | Tax Reg. No. 928374 | Command 331-101 DET SQUAD |
|---|---|---|---|---|
| Reviewing Supervisor: | Manner of Closing - | Date Reviewed 06/17/2013 | Date of Next Review | Name GEMMA MASTERSON | Supv. Tax No. 900321 |

JA-385

Complaint# 2013-101-01689                                        Page 15 of 67



| | DETECTIVE BUREAU<br>ATTACHMENT A | DD5 ATTACHED FILES |
|---|---|---|

**ATTACHMENT A : ADDITIONAL ATTACHMENTS**

CONFIRMATORY PHOTO / MAP-05/03/2013 21:15

000663

JA-386

| GENERAL INVESTIGATION | | | | Crime/Condition<br>MURDER & NON-NEGL.<br>MANSLAUGHTE | | | | Command<br>101-101ST<br>PRECINCT<br>Date of This<br>Report<br>05/04/2013 | |
|---|---|---|---|---|---|---|---|---|---|
| Date of<br>UF61<br>05/03/2013 | Complaint No.<br>2013-101-<br>01689 | Date Case<br>Assigned<br>05/04/2013 | Case No.<br>2013 -<br>642 | Unit Reporting<br>BRAM | | | | Follow-Up No.<br>5 | |

| Complainant's Name<br>GULLEY, KEITH | | | Address | | | | Apt No. | |
|---|---|---|---|---|---|---|---|---|
| Nickname/Alias/Middle Name | | | | | | | | |
| Sex<br>MALE | Race<br>BLACK | | Date of Birth | Age<br>22 | | | | |
| Home Telephone | Business Telephone | Cell Phone | | Beeper # | | | E-Mail Address | |

| Activity Address Location<br>NYC | | Street<br>54-30 BEACH CHANNEL DRIVE | | | City<br>QUEENS | State<br>NY | Zip | Apt # |
|---|---|---|---|---|---|---|---|---|
| Cross Street<br>BEACH 58 STREET and BEACH 54 STREET | | | | Intersection of | | | | Premise Type |

| Activity Address Location<br>NYC | | Street<br>327 BEACH 19 STREET | | | City | State<br>NY | Zip | Apt # |
|---|---|---|---|---|---|---|---|---|
| Cross Street<br>BROOKHAVEN AVENUE and PLAINVIEW AVENUE | | | | Intersection of | | | | Premise Type<br>HOSPITAL |

| Activity Date<br>05/03/2013 | Activity Time<br>21:45 |
|---|---|
| Topic/Subject:<br>NOTIFICATIONS | |

Summary of Investigation:
1. On May 3, 2013, at approximately 2145 hours the undersigned did speak with DET Joshi Tax 925525 of Crime Scene Unit. CSU RUN# 324.
At 2300 hours while at ST Johns Hospital undersigned did speak with ME Capellupo of the Queens Medical Examiners.
2. Undersigned did also speak with DET Weston of Queens Gang, DET Maguire of Queens Narcotics and LT Dunn EMS at the scene.

| Reporting Officer: | Rank<br>DT2 | Name<br>BRAD FINE | | Tax Reg. No.<br>906231 | Command<br>331-101 DET<br>SQUAD |
|---|---|---|---|---|---|
| Reviewing<br>Supervisor: | Manner of<br>Closing<br>. | Date<br>Reviewed<br>06/17/2013 | Date of Next<br>Review | Name<br>GEMMA<br>MASTERSON | Supv. Tax No.<br>900321 |

| GENERAL INVESTIGATION | | | | Crime/Condition<br>MURDER & NON-NEGL.<br>MANSLAUGHTE | | Command<br>101-101ST<br>PRECINCT<br>Date of This<br>Report<br>05/04/2013 |
|---|---|---|---|---|---|---|
| Date of<br>UF61<br>05/03/2013 | Complaint No.<br>2013-101-<br>01689 | Date Case<br>Assigned<br>05/04/2013 | Case No.<br>2013 -<br>642 | Unit Reporting<br>SQUAD | | Follow-Up No.<br>6 |

| Complainant's Name<br>GULLEY, KEITH | | | Address | | Apt No. |
|---|---|---|---|---|---|
| Nickname/Alias/Middle Name | | | | | |
| Sex<br>MALE | Race<br>BLACK | | Date of Birth | Age<br>22 | |
| Home Telephone | Business Telephone | Cell Phone | | Beeper # | E-Mail Address |

| Activity Address Location<br>NYC | | Street<br>54-30 BEACH CHANNEL DRIVE | | City<br>QUEENS | State<br>NY | Zip | Apt # |
|---|---|---|---|---|---|---|---|
| Cross Street | | | | Intersection of | | | Premise Type |

| Activity Date<br>05/03/2013 | Activity Time<br>22:00 |
|---|---|

**Topic/Subject:**
**RESPONSE OF THE R.T.C.C. VAN**

**Summary of Investigation:**
1. On May 3, 2013, at approximately 2200 hrs. Det. Bey and the undersigned assigned the the Queens Homicide SQD. did respond to 54-30 Beach Channel Drive with the R.T.C.C. Van.

R.T.C.C. LOG # 2335

2.CASE ACTIVE.....

| Reporting Officer: | Rank<br>DT1 | Name<br>CARMINE CARUSO | | Tax Reg.<br>No.<br>897158 | Command<br>316-DET BORO QNS NORTH<br>HOMICIDE SQ |
|---|---|---|---|---|---|
| Reviewing<br>Supervisor: | Manner of<br>Closing<br>- | Date<br>Reviewed<br>05/08/2013 | Date of Next<br>Review | Name<br>JUAN<br>LOPEZ | Supv. Tax No.<br>920518 |

| GENERAL INVESTIGATION | | Crime/Condition MURDER & NON-NEGL. MANSLAUGHTE | Command 101-101ST PRECINCT Date of This Report 05/04/2013 |
|---|---|---|---|

| Date of UF61 05/03/2013 | Complaint No. 2013-101- 01689 | Date Case Assigned 05/04/2013 | Case No. 2013 - 642 | Unit Reporting SQUAD | | Follow-Up No. 7 |
|---|---|---|---|---|---|---|

| Complainant's Name GULLEY, KEITH | | | Address | | | Apt No. |
|---|---|---|---|---|---|---|
| Nickname/Alias/Middle Name | | | | | | |
| Sex MALE | Race BLACK | | Date of Birth | | Age 22 | |
| Home Telephone | Business Telephone | | Cell Phone | | Beeper # | E-Mail Address |

| Activity Address Location NYC | | Street 68-40 AUSTIN STREET | | City QUEENS | State NY | Zip | Apt # |
|---|---|---|---|---|---|---|---|
| Cross Street YELLOWSTONE BOULEVARD and 67 AVENUE | | | | Intersection of | | | Premise Type |

| Activity Date 05/03/2013 | Activity Time 22:00 |
|---|---|
| Topic/Subject: EVIDENCE SEARCH | |

**Summary of Investigation:**
1. On May 3, 2013, at approximately 2200 hours, I conducted a evidence search in and around 54-22 Beach Channel Drive. To assist in locating and other possible evidence. This search yielded no other results.

2. Case active

| Reporting Officer: | Rank DT3 | Name JOSEPH BEY | | Tax Reg. No. 920028 | Command 316-DET BORO QNS NORTH HOMICIDE SQ |
|---|---|---|---|---|---|
| Reviewing Supervisor: | Manner of Closing - | Date Reviewed 06/17/2013 | Date of Next Review | Name GEMMA MASTERSON | Supv. Tax No. 900321 |

| | GENERAL INVESTIGATION | | | Crime/Condition MURDER & NON-NEGL. MANSLAUGHTE | | | | Command 101-101ST PRECINCT Date of This Report 05/04/2013 |
|---|---|---|---|---|---|---|---|---|
| Date of UF61 05/03/2013 | Complaint No. 2013-101-01689 | Date Case Assigned 05/04/2013 | Case No. 2013 - 642 | Unit Reporting SQUAD | | | | Follow-Up No. 8 |

| Complainant's Name GULLEY, KEITH | | Address | | | Apt No. |
|---|---|---|---|---|---|

Nickname/Alias/Middle Name

| Sex MALE | Race BLACK | Date of Birth | Age 22 |
|---|---|---|---|

| Home Telephone | Business Telephone | Cell Phone | Beeper # | E-Mail Address |
|---|---|---|---|---|

| Activity Address Location OTHER | | Street | City | State | Zip | Apt # |
|---|---|---|---|---|---|---|
| Cross Street | | | Intersection of and | | Premise Type | |

| Activity Date 05/03/2013 | Activity Time 22:45 |
|---|---|

**Topic/Subject:**
911 CALLERS

**Summary of Investigation:**
1. On May 3, 2013, at approximately 2245 Hrs. I did call the following phone numbers which were used to call 911 in regards to this investigation. Details as follows:

a. # ▮▮▮▮▮, ▮▮▮▮▮, states he is an acquaintance of the victim and was in the lobby of 55-22 Beach Channel Drive during the time of occurrence. ▮▮▮▮▮ states he heard shots being fired and saw the victim get shot but does not know where the shots came from, who shot him or a direction of flight.

b. ▮▮▮▮▮ of ▮▮▮▮▮ states she was inside her apartment and heard 5 shots but did not see anything in regards to this incident. No further information provided.

c. # ▮▮▮▮▮ of ▮▮▮▮▮ states she heard 5 shots from outside her window. When she looked outside she saw a person laying on the ground ▮▮▮▮▮ was unable to provide any additional information in regards to this incident.

d. # ▮▮▮▮▮ refused to provide address. States he heard approx. 5 shots, looked outside and saw the victim on the ground. He did not see the shooter and has no additional information to provide.

e. # ▮▮▮▮▮ states no one called 911 from this phone number. Refused additional information.

f. # ▮▮▮▮▮ Unk. Female answered phone. States she heard 4-5 shots, saw nothing. Female refused to provide her name or address.

g. # ▮▮▮▮▮ Unk. Left voice mail to contact the 101 Squad.
h. # ▮▮▮▮▮ Unk. Left voice mail to contact the 101 Squad.
i. # ▮▮▮▮▮ Unk. Left voice mail to contact the 101 Squad.
j. # ▮▮▮▮▮ Unk. Left voice mail to contact the 101 Squad.
k. ▮▮▮▮▮ Calls 911 only phone.
l. # ▮▮▮▮▮ Calls 911 only phone.
m. ▮▮▮▮▮ Unk. Female answered phone. Refused to give name/address or any details. Stated shes too busy drinking to speak with Police.

2. Case Active.

| Reporting Officer: | Rank DT3 | Name JAMES PETRUZZI | Tax Reg. No. 935507 | Command 337-107 DET |
|---|---|---|---|---|

| | Reviewing Supervisor: | Manner of Closing | Date Reviewed 06/17/2013 | Date of Next Review | Name GEMMA MASTERSON | SQUAD Supv. Tax No. 900321 |
|---|---|---|---|---|---|---|

Complaint# 2013-101-01689

| GENERAL INVESTIGATION | | Crime/Condition MURDER & NON-NEGL. MANSLAUGHTE | Command 101-101ST PRECINCT Date of This Report 05/04/2013 |
|---|---|---|---|

| Date of UF61 05/03/2013 | Complaint No. 2013-101-01689 | Date Case Assigned 05/04/2013 | Case No. 2013-642 | Unit Reporting BRAM | | Follow-Up No. 9 |
|---|---|---|---|---|---|---|

| Complainant's Name GULLEY, KEITH | | Address | Apt No. |
|---|---|---|---|

| Nickname/Alias/Middle Name | | | |
|---|---|---|---|

| Sex MALE | Race BLACK | Date of Birth | Age 22 |
|---|---|---|---|

| Home Telephone | Business Telephone | Cell Phone | Beeper # | E-Mail Address |
|---|---|---|---|---|

| Activity Address Location NYC | Street 327 BEACH 19 STREET | City QUEENS | State NY | Zip | Apt # |
|---|---|---|---|---|---|

| Cross Street BROOKHAVEN AVENUE and PLAINVIEW AVENUE | Intersection of | Premise Type HOSPITAL |
|---|---|---|

| Activity Date 05/03/2013 | Activity Time 23:00 |
|---|---|

**Topic/Subject:**
ST JOHNS HOSPITAL<>DR FRANKEL

**Summary of Investigation:**
1. On May 3, 2013, at approximately 2300 hours the undersigned did speak with DR Frankel the Emergency room doctor who treated the victim at ST Johns Hospital. DR Frankel states it appears the victim was shot through his left side where it traveled through his chest then down and exited through his right groin area resting on his right thigh. DR Frankel states bullet was at right thigh inside of victims clothing.

2. DR Frankel also states there was another bullet wound to the rear of the right thigh. He was not sure if it had an exit or if it is still in the victim.
3. DR Frankel pronounced the victim at 2105 hours

| Reporting Officer: | Rank DT2 | Name BRAD FINE | | Tax Reg. No. 906231 | Command 331-101 DET SQUAD |
|---|---|---|---|---|---|
| Reviewing Supervisor: | Manner of Closing . | Date Reviewed 06/17/2013 | Date of Next Review | Name GEMMA MASTERSON | Supv. Tax No. 900321 |

| GENERAL INVESTIGATION | | | | Crime/Condition MURDER & NON-NEGL. MANSLAUGHTE | | | Command 101-101ST PRECINCT Date of This Report 05/04/2013 |
|---|---|---|---|---|---|---|---|
| Date of UF61 05/03/2013 | Complaint No. 2013-101- 01689 | Date Case Assigned 05/04/2013 | Case No. 2013 - 642 | Unit Reporting SQUAD | | | Follow-Up No. 10 |

| Complainant's Name GULLEY, KEITH | | | Address | | | | Apt No. |
|---|---|---|---|---|---|---|---|
| Nickname/Alias/Middle Name | | | | | | | |
| Sex MALE | | Race BLACK | | Date of Birth | | Age 22 | |
| Home Telephone | | Business Telephone | | Cell Phone | | Beeper # | E-Mail Address |

| Activity Address Location NYC | | Street 68-40 AUSTIN STREET | | | City QUEENS | State NY | Zip | Apt # |
|---|---|---|---|---|---|---|---|---|
| Cross Street YELLOWSTONE BOULEVARD and 67 AVENUE | | | | Intersection of | | | | Premise Type |

| Activity Date 05/03/2013 | Activity Time 23:00 |
|---|---|

**Topic/Subject:**
ATTEMPT TO INTERVIEW 911 CALERS

**Summary of Investigation:**
1. On May 4, 2013, at approximately 2300 hours, I contacted three 911 calers from numbers ███████ and ████████  None of the mentioned numbers responde at this time. Despite me leaving a message for them to contact me.

2. Case active.

| Reporting Officer: | Rank DT3 | Name JOSEPH BEY | | Tax Reg. No. 920028 | | Command 316-DET BORO QNS NORTH HOMICIDE SQ | |
|---|---|---|---|---|---|---|---|
| Reviewing Supervisor: | Manner of Closing - | Date Reviewed 06/17/2013 | Date of Next Review | Name GEMMA MASTERSON | | Supv. Tax No. 900321 | |

JA-393

| POLICE DEPARTMENT | **CANVASS** | | | | **Crime/Condition**<br>MURDER & NON-NEGL.<br>MANSLAUGHTE | | **Command**<br>101-101ST<br>PRECINCT<br>**Date of This Report**<br>05/04/2013 |
|---|---|---|---|---|---|---|---|
| **Date of UF61**<br>05/03/2013 | **Complaint No.**<br>2013-101-01689 | **Date Case Assigned**<br>05/04/2013 | **Case No.**<br>2013 - 642 | | **Unit Reporting**<br>SQUAD | | **Follow-Up No.**<br>11 |

| **Complainant's Name**<br>GULLEY, KEITH | | **Address** | | | | **Apt No.** |
|---|---|---|---|---|---|---|
| **Nickname/Alias/Middle Name** | | | | | | |
| **Sex**<br>MALE | **Race**<br>BLACK | | **Date of Birth** | | **Age**<br>22 | |
| **Home Telephone** | **Business Telephone** | | **Cell Phone** | | **Beeper #** | **E-Mail Address** |

| **Person Interviewed Last Name, First M.I.**<br>GULLEY, KEITH | | **Address** | | | | **Apt No.** |
|---|---|---|---|---|---|---|
| **Nickname/Alias/Middle Name** | | | | | | |
| **Position/Relationship** | **Sex**<br>MALE | | **Race**<br>BLACK | **Date of Birth** | | **Age**<br>22 |
| **Home Telephone** | **Business Telephone** | | **Cell Phone** | **Beeper #** | | **E-Mail Address** |

| **Activity Address Location**<br>NYC | **Street**<br>53-40 BEACH CHANNEL DRIVE | | **City**<br>QUEENS | **State**<br>NY | **Zip** | **Apt #** |
|---|---|---|---|---|---|---|
| **Cross Street**<br>BEACH 54 STREET and BEACH 51 STREET | | **Intersection of** | | | | **Premise Type** |

| **Activity Date**<br>05/03/2013 | **Activity Time**<br>23:15 |
|---|---|

**Topic/Subject:**
**(CANVASS) CANVASS FOR WITNESSES AT 53-40 BCD**

**Summary of Investigation:**
1. On May 3, 2013, at approximately 2315 hrs the undersigned along with Detective Garofalo from the 113 Detective Squad did conduct a canvass 53-40 Beach Channel Drive for witnesses in regards to this investigation. The results are as followed:

Apt 7F. No Answer

Apt 7G- Spoke to ███████ the mother-in-law of one of the victims. ███████ did not give the undersigned any new information and did not wish to speak to us.

Apt 7J- Spoke to ███████ ████ Stated that he did hear three (3) shots. ████ also stated that he did see one male run toward Beach Channel Drive but is unable to give a description and would be unable to identify the male.

Apt 7H- Spoke to ███████ ███ stated that he did not hear or see anything.

Apt 7C- No Answer.

Apt 7B- No Answer.

Apt 7D- No Answer.

Apt 7E- Spoke to ███████ stated that he did not hear or see anything.

Apt 7A- Spoke to ███████ stated that she did not hear or see anything.

Apt 6H- No Answer.

Apt 6G- No Answer.



Apt 6F- No Answer.

Apt 6J- No Answer.

Apt 6B. Spoke to ████████ stated that he was not at home during the time of incident.

Apt 6C. Spoke to ████████ stated that he did not hear or see anything.

Apt 6D- Spoke to ████████ stated that he did not hear or see anything.

Apt 6E- No Answer.

Apt 6A- Spoke to ████████ stated that she did not hear or see anything.

Apt 5H-No Answer.

Apt 5G- No Answer.

Apt 5F- No Answer.

Apt 5J- Spoke to Ms. ████████ stated that she did not hear or see anything.

Apt 5B- No Answer.

Apt 5C- Spoke to ████████ stated that he did not hear or see anything.

Apt 5D. No Answer.

Apt 5A. No Answer.

2. Case is active.

| Reporting Officer: | Rank POM | Name KEITH EHRHART | | Tax Reg. No. 930095 | Command 343-113 DET SQUAD |
|---|---|---|---|---|---|
| Reviewing Supervisor: | Manner of Closing - | Date Reviewed 06/17/2013 | Date of Next Review | Name GEMMA MASTERSON | Supv. Tax No. 900321 |

| CANVASS | | | | Crime/Condition MURDER & NON-NEGL. MANSLAUGHTE | | Command 101-101ST PRECINCT Date of This Report 05/04/2013 |
|---|---|---|---|---|---|---|
| Date of UF61 05/03/2013 | Complaint No. 2013-101-01689 | Date Case Assigned 05/04/2013 | Case No. 2013 - 642 | Unit Reporting SQUAD | | Follow-Up No. 12 |

| Complainant's Name GULLEY, KEITH | | Address | | | Apt No. |
|---|---|---|---|---|---|
| Nickname/Alias/Middle Name | | | | | |
| Sex MALE | Race BLACK | Date of Birth | | Age 22 | |
| Home Telephone | Business Telephone | Cell Phone | | Beeper # | E-Mail Address |

| Activity Address Location NYC | Street | | City QUEENS | State NY | Zip | Apt # |
|---|---|---|---|---|---|---|
| Cross Street BEACH 58 STREET and BEACH 54 STREET | | Intersection of | | | Premise Type RESIDENCE - APT. HOUSE | |

| Activity Date 05/03/2013 | Activity Time 23:15 |
|---|---|

**Topic/Subject:**
(CANVASS) CANVASS FOR WITNESSES 54-30 BEACH CHANNEL DRIVE

**Summary of Investigation:**
1. On May 3, 2013, at approximately 2315 hrs the undersigned along with Det Ehrhart of the 113 Det Sqd did respond to 54-30 Beach Channel Drive to canvass for witnesses in regards to this investigation.

The results are as follows:

Apt 1E - Spoke with ▮▮▮▮ who states she was not home during time of occurrence and didn't realize anything had happened..

Apt 1D- Vacant Apartment.

Apt 1C - No Answer at location.

Apt 1G - No answer at location.

Apt 1H - Spoke with ▮▮▮▮ who states she heard one shot but did not go to the window and did not see anything.

Apt 1A - No answer at location.

Apt 2A - No answer at location.

Apt 2E - Spoke with ▮▮▮▮ who states she was working during time of occurrence.

Apt 2D - Spoke with ▮▮▮▮ who states that she did not hear or see anything.

Apt 2B - No answer at location.

Apt 2J - Apartment is Vacant.

Apt 2F - No answer at location.

Apt 2G - Undersigned did speak with ▮▮▮▮ ▮▮▮▮ states she has no new information at this time.

Apt 2H - Spoke with ▮▮▮▮ who states she was home but did not hear or see anything.

Apt 2C - Spoke with ▮▮▮▮ who states she did not hear or see anything.

Apt 3A - No answer at location.

Apt 3E - No Answer at location.

Apt 3B - No answer at location.

Apt 3D - No answer at location.

Apt 3C - Spoke with ████████ who states he did hear four to five shots and someone screamed "get the kids down". He also states that he did not see anything as he did not go to the window.

Apt 3J - No answer at location.

Apt 3F - No answer at location.

Apt 3G - No answer at location.

Apt 3H - No answer at location.

Apt 4A - No answer at location.

Apt 4E - No answer at location.

Apt 4D - No answer at location.

Apt 4C - Apartment is vacant at this time.

Apt 4B - Spoke with ████████ who states he did not hear or see anything.

Apt 4F - No answer at location.

Apt 4G- Spoke with ████████ who states that he did not hear or see anything.

Apt 4H - No answer at location.

Case is active.

| Reporting Officer: | Rank POM | Name JOSEPH GAROFALO | | Tax Reg. No. 934906 | Command 343-113 DET SQUAD |
|---|---|---|---|---|---|
| Reviewing Supervisor: | Manner of Closing - | Date Reviewed 06/17/2013 | Date of Next Review | Name GEMMA MASTERSON | Supv. Tax No. 900321 |

| INTERVIEW IN-PERSON | | | | Crime/Condition MURDER & NON-NEGL. MANSLAUGHTE | | Command 101-101ST PRECINCT Date of This Report 05/04/2013 |
|---|---|---|---|---|---|---|
| Date of UF61 05/03/2013 | Complaint No. 2013-101-01689 | Date Case Assigned 05/04/2013 | Case No. 2013 - 642 | Unit Reporting BRAM | | Follow-Up No. 13 |

| Topic/Subject (INTERVIEW IN-PERSON) INTERVIEW KIMBERLY EVANS | | Activity Date 05/03/2013 | Activity Time 23:30 |
|---|---|---|---|

| Complainant's Name GULLEY, KEITH | Address | Apt No. |
|---|---|---|

**Nickname/Alias/Middle Name**

| Sex MALE | Race BLACK | Date of Birth | Age 22 | |
|---|---|---|---|---|

| Home Telephone | Business Telephone | Cell Phone | Beeper # | E-Mail Address |
|---|---|---|---|---|

| Person Interviewed Last Name, First M.I. EVANS, KIMBERLY | Address | Apt No. |
|---|---|---|

**Nickname/Alias/Middle Name**

| Position/Relationship | Sex FEMALE | Race BLACK | Date of Birth | Age 35 |
|---|---|---|---|---|

| Home Telephone | Business Telephone | Cell Phone | Beeper # | E-Mail Address |
|---|---|---|---|---|

**Details**

**Summary of Investigation:**
1. On May 3, 2013, at approximately 2330 hours U/S was present inside Jamaica Hospital and did conduct the following interview with Kimberly Evans. Mrs. Evans states she is the Wife of Victim Reginald Evans. Mrs. Evans states that on 05/03/2013 at approx. 1915 hours she was inside her apartment when her husband Reginald Evans decided to take their 3 daughters out of the apartment to go to the park.

- Mrs. Evans states that approx. 20 mins later she heard numerous gunshots coming from outside her apartment and people screaming. Mrs. Evans states she ran down stairs and outside her building where she saw Victim Keith Gulley lying on the ground bleeding with several gunshot wounds.

-Mrs. Evans states she then went to her husband Reginald Evans, who was lying several feet away and was also bleeding and had gunshot wounds. Mrs Evans states she waited with her husband until police and EMS arrived. Mrs Evans states she never saw anyone fleeing the scene only heard the gunshots. Mrs Evans stated "by the time I got outside my building it was like a Ghosttown, I just stayed with my husband until the ambulance arrived"

- Mrs Evans further stated that her 3 daughters were unharmed and were brought upstairs to her apartment by a neighbor. Mrs Evans stated she did not know the name of the neighbor or which apartment they lived in.

2. case active

| Activity Address Location OFFICE | | Street | City | State | Zip | Apt # |
|---|---|---|---|---|---|---|
| Cross Street | | | Intersection of and | | Premise Type | |

| Reporting Officer: | Rank DT3 | Name DAVID CORTES | | Tax Reg. No. 934687 | Command 340-110 DET SQUAD |
|---|---|---|---|---|---|
| Reviewing Supervisor: | Manner of Closing - | Date Reviewed 06/17/2013 | Date of Next Review | Name GEMMA MASTERSON | Supv. Tax No. 900321 |

| CANVASS | | Crime/Condition<br>MURDER & NON-NEGL.<br>MANSLAUGHTE | Command<br>101-101ST<br>PRECINCT<br>Date of This<br>Report<br>05/04/2013 |
|---|---|---|---|

| Date of<br>UF61<br>05/03/2013 | Complaint No.<br>2013-101-<br>01689 | Date Case<br>Assigned<br>05/04/2013 | Case No.<br>2013 -<br>642 | Unit Reporting<br>BRAM | Follow-Up No.<br>14 |
|---|---|---|---|---|---|

| Complainant's Name<br>GULLEY, KEITH | Address | Apt No. |
|---|---|---|

**Nickname/Alias/Middle Name**

| Sex<br>MALE | Race<br>BLACK | Date of Birth | Age<br>22 |
|---|---|---|---|

| Home Telephone | Business Telephone | Cell Phone | Beeper # | E-Mail Address |
|---|---|---|---|---|

| Activity Address Location<br>NYC | Street<br>54-22 BEACH CHANNEL DRIVE | City<br>QUEENS | State<br>NY | Zip | Apt # |
|---|---|---|---|---|---|

| Cross Street<br>BEACH 58 STREET and BEACH 54 STREET | Intersection of | Premise Type<br>RESIDENCE - PUBLIC HOUSING |
|---|---|---|

| Activity Date<br>05/03/2013 | Activity Time<br>23:45 |
|---|---|

**Topic/Subject:**
**(CANVASS) 54-22 BEACH CHANNEL DRIVE**

**Summary of Investigation:**
1. On May 3, 2013, at approximately 2345 hrs, Det Petruzzi and I conducted a canvass of 54-22 Beach Channel Drive in an effort to obtain witnesses and video. There were no Argus cameras observed during this canvass.

** First Floor
1C Vacant
1D Vacant
1G ████████ stated that she was not home at the time of the incident.
1H ████████ stated that she heard shots but did not see the incident.

** Second Floor
2A No answer
2B No answer
2C No answer
2D I spoke to ████ who stated that he was sleeping at the time of the incident.
2E No answer
2F No answer
2G No answer
2H I spoke to ████ and ████████ who stated that they heard the shots but did not see the incident.
2J No answer

**Third Floor
3A I spoke to ████ who stated that he heard 4 shots but did not see the incident.
3B Vacant
3C I spoke to ████████ who stated that she was not home at the time of the incident.
3D No answer
3E I spoke to ████████ who stated that she was not home at the time of the incident.
3F No answer
3G No answer
3H No answer
3J I spoke to ████████ who stated that she heard shots but did not see the incident.

**Fourth Floor
4A I spoke to ████████ who stated that he did not hear or see the incident.
4B No answer
4C I spoke to ████████ who stated that he heard the shots but did not see the incident.
4D No answer

4E I spoke to    (refused last name) who stated that she did not hear or see the incident.
4F No answer
4G No answer
4H No answer
4J I spoke to    who stated that she heard approximately 4 shots but did not see the incident.

**\*\* Fifth Floor**
5A No answer
5B I spoke to   who stated that he did not hear or see the incident.
5C I spoke to   who stated that he did not hear or see the incident.
5D I spoke to   who stated that she did not hear or see the incident.
5E I spoke to   who stated that he did not hear or see the incident.
5F No answer
5G I spoke to   who stated that she heard shots but did not see the incident.
5H No answer
5J No answer

**\*\* Sixth Floor**
6A I spoke to   911 Caller, stated that he heard 4 shots and heard commotion called 911,but did not see the incident.
6B No answer
6C No answer
6D No answer
6E I spoke to   who stated that he did not hear or see the incident.
6F No answer
6G No answer
6H No answer
6J Vacant

**\*\* Seventh Floor**
7A No answer
7B I spoke to   who stated that he wasn't home at the time of the incident.
7C I spoke to   who stated that she wasn't home at the time of the incident. I also spoke to   who stated that she heard approximately 5 shots but did not see the incident.
7D No answer
7E No answer
7F No answer
7G I spoke to   who stated that he heard shots but did not see the incident. I also spoke to   who stated that she wasn't home at the time of the incident.
7H I spoke to   who stated that she heard 4 shots but did not see the incident.
7J No answer

| Reporting Officer: | Rank | Name | | Tax Reg. No. | Command |
|---|---|---|---|---|---|
| | DT3 | JOHN DEVITO | | 915598 | 337-107 DET SQUAD |
| Reviewing Supervisor: | Manner of Closing | Date Reviewed 06/17/2013 | Date of Next Review | Name GEMMA MASTERSON | Supv. Tax No. 900321 |

| **GENERAL INVESTIGATION** | | | | Crime/Condition<br>MURDER & NON-NEGL.<br>MANSLAUGHTE | | Command<br>101-101ST<br>PRECINCT<br>Date of This<br>Report<br>05/04/2013 |
|---|---|---|---|---|---|---|
| Date of<br>UF61<br>05/03/2013 | Complaint No.<br>2013-101-<br>01689 | Date Case<br>Assigned<br>05/04/2013 | Case No.<br>2013 -<br>642 | Unit Reporting<br>BRAM | | Follow-Up No.<br>15 |

| Complainant's Name<br>GULLEY, KEITH | | Address | | Apt No. |
|---|---|---|---|---|
| Nickname/Alias/Middle Name | | | | |
| Sex<br>MALE | Race<br>BLACK | Date of Birth | Age<br>22 | |
| Home Telephone | Business Telephone | Cell Phone | Beeper # | E-Mail Address |

| Person Interviewed Last Name, First M.I.<br>GULLEY, KEITH | | Address | | Apt No. |
|---|---|---|---|---|
| Nickname/Alias/Middle Name | | | | |
| Position/Relationship | Sex<br>MALE | Race<br>BLACK | Date of Birth | Age<br>22 |
| Home Telephone | Business Telephone | Cell Phone | Beeper # | E-Mail Address |

| Activity Address Location<br>OFFICE | Street | City | State | Zip | Apt # |
|---|---|---|---|---|---|
| Cross Street | | Intersection of<br>and | | Premise Type | |

| Activity Date<br>05/04/2013 | Activity Time<br>00:10 |
|---|---|

Topic/Subject:
**JAMAICA HOSPITAL DR. SAURABH SULJA**

Summary of Investigation:
1. On May 4, 2013, at approximately 0010 hours U/S was present inside Jamaica Hospital and did conduct the following interview with Dr. Sulja in regards to the condition of Victim Reginald Evans.

-Dr. Sulja stated that Mr. Evans received 3 Gunshot wounds to his left Flank and is currently in Stable condition. Dr. States he is not likely to die and is conscious and alert.

2. Case active

| Reporting Officer: | Rank<br>DT3 | Name<br>DAVID CORTES | | Tax Reg. No.<br>934687 | Command<br>340-110 DET<br>SQUAD |
|---|---|---|---|---|---|
| Reviewing<br>Supervisor: | Manner of<br>Closing<br>- | Date<br>Reviewed<br>06/17/2013 | Date of Next<br>Review | Name<br>GEMMA<br>MASTERSON | Supv. Tax No.<br>900321 |

| PHOTO ARRAY | | | | Crime/Condition MURDER & NON-NEGL. MANSLAUGHTE | | Command 101-101ST PRECINCT Date of This Report 06/15/2013 |
|---|---|---|---|---|---|---|
| Date of UF61 05/03/2013 | Complaint No. 2013-101-01689 | Date Case Assigned 05/04/2013 | Case No. 2013-642 | Unit Reporting SQUAD | | Follow-Up No. 16 |

| Topic/Subject (PHOTO ARRAY) PHOTO ARRAY (FERGUSON +) | | Activity Date 05/04/2013 | Activity Time 02:30 |
|---|---|---|---|

| Complainant's Name GULLEY, KEITH | Address | | Apt No. |
|---|---|---|---|

| Nickname/Alias/Middle Name BUNKY | | | | |
|---|---|---|---|---|

| Sex MALE | Race BLACK | Date of Birth | Age 22 | |
|---|---|---|---|---|

| Home Telephone | Business Telephone | Cell Phone | Beeper # | E-Mail Address |
|---|---|---|---|---|

| Person Interviewed Last Name, First M.I. | Address | Apt No. |
|---|---|---|

| Nickname/Alias/Middle Name | | | | |
|---|---|---|---|---|

| Position/Relationship | Sex | Race | Date of Birth | Age |
|---|---|---|---|---|

| Home Telephone | Business Telephone | Cell Phone | Beeper # | E-Mail Address |
|---|---|---|---|---|

**Details**

**Summary of Investigation:**
1. On May 4, 2013, at approximately 0230 hours the undersigned; along with Detective Jaeger; did meet with a person to the Department who did witness the homicide. The photo array, compiled by the undersigned did contain an image of Rashaun Ferguson in image position #1. Upon showing the witness the array, the witness did identify position #1 as the person observed exiting a gray colored SUV, walking towards the victims, and then fleeing the scene after the gunshots were fired with a gun in his hand. The witness did sign their name to image position #1 and did also provide a brief written statement on the photo array. All appropriate photo array paperwork is attached.

**CASE ACTIVE**

| Activity Address Location OTHER | | Street | City | State | Zip | Apt # |
|---|---|---|---|---|---|---|
| Cross Street | | | Intersection of and | | | Premise Type |

| **ATTACHMENT** | | | |
|---|---|---|---|
| No | Attachment | | Description |
| 1 | PDF PHOTO ARRAY PAPERWORK | | PHOTO ARRAY PAPERWORK |

| Reporting Officer: | Rank DT3 | Name MICHAEL GILDEA | | Tax Reg. No. 928374 | Command 331-101 DET SQUAD |
|---|---|---|---|---|---|
| Reviewing Supervisor: | Manner of Closing - | Date Reviewed 06/17/2013 | Date of Next Review | Name GEMMA MASTERSON | Supv. Tax No. 900321 |

| SPRINT Reports Reviewed | | Crime/Condition MURDER & NON-NEGL. MANSLAUGHTE | Command 101-101ST PRECINCT Date of This Report 05/04/2013 |
|---|---|---|---|

| Date of UF61 05/03/2013 | Complaint No. 2013-101-01689 | Date Case Assigned 05/04/2013 | Case No. 2013 - 642 | Unit Reporting SQUAD | Follow-Up No. 17 |
|---|---|---|---|---|---|

| Topic/Subject (SPRINT Reports Reviewed) SPRINT REPORTS | Activity Date 05/04/2013 | Activity Time 05:20 |
|---|---|---|

**Details**

Summary of Investigation:
1. On May 4, 2013, at approximately 0520 the undersigned did review and scan the SPRINT reports in regards to this case.

**ATTACHMENT**

| No | Attachment | Description |
|---|---|---|
| 1 | PDF SPRINT report | SPRINT report |

| Reporting Officer: | Rank DT3 | Name QUINN JAEGER | | Tax Reg. No. 917786 | Command 331-101 DET SQUAD |
|---|---|---|---|---|---|
| Reviewing Supervisor: | Manner of Closing - | Date Reviewed 08/17/2013 | Date of Next Review | Name GEMMA MASTERSON | Supv. Tax No. 900321 |

| GENERAL INVESTIGATION | | | | Crime/Condition<br>MURDER & NON-NEGL.<br>MANSLAUGHTE | Command<br>101-101ST<br>PRECINCT<br>Date of This<br>Report<br>05/04/2013 |
|---|---|---|---|---|---|
| Date of<br>UF61<br>05/03/2013 | Complaint No.<br>2013-101-<br>01689 | Date Case<br>Assigned<br>05/04/2013 | Case No.<br>2013 -<br>642 | Unit Reporting<br>SQUAD | Follow-Up No.<br>18 |

| Complainant's Name<br>GULLEY, KEITH | | | | Apt No. |
|---|---|---|---|---|
| Nickname/Alias/Middle Name<br>BUNKY | | | | |
| Sex<br>MALE | Race<br>BLACK | Date of Birth | Age<br>22 | |
| Home Telephone | Business Telephone | Cell Phone | Beeper # | E-Mail Address |

| Activity Address Location<br>OFFICE | Street | City | State | Zip | Apt # |
|---|---|---|---|---|---|
| Cross Street | | Intersection of<br>and | | Premise Type | |

| Activity Date<br>05/04/2013 | Activity Time<br>08:40 |
|---|---|

Topic/Subject:
CONFER WITH ME'S OFFICE

Summary of Investigation:
1. On May 4, 2013, at approximately 0840 did confer with Detective Glynn from the Queens Medical Examines Office. He informs me the autopsy of the deceased Keith Gulley will be postponed till tomorrow.

2. For your information.

| Reporting Officer: | Rank<br>DT3 | Name<br>QUINN JAEGER | | Tax Reg. No.<br>917786 | Command<br>331-101 DET<br>SQUAD |
|---|---|---|---|---|---|
| Reviewing<br>Supervisor: | Manner of<br>Closing<br>. | Date<br>Reviewed<br>06/17/2013 | Date of Next<br>Review | Name<br>GEMMA<br>MASTERSON | Supv. Tax No.<br>900321 |

| GENERAL INVESTIGATION | | | | Crime/Condition MURDER & NON-NEGL. MANSLAUGHTE | | | Command 101-101ST PRECINCT Date of This Report 05/04/2013 |
|---|---|---|---|---|---|---|---|
| Date of UF61 05/03/2013 | Complaint No. 2013-101-01689 | Date Case Assigned 05/04/2013 | Case No. 2013-642 | Unit Reporting SQUAD | | | Follow-Up No. 19 |

| Complainant's Name GULLEY, KEITH | | Address | | | | Apt No. |
|---|---|---|---|---|---|---|
| Nickname/Alias/Middle Name BUNKY | | | | | | |
| Sex MALE | Race BLACK | Date of Birth | | Age 22 | | |
| Home Telephone | Business Telephone | Cell Phone | | Beeper # | | E-Mail Address |

| Activity Address Location NYC | Street | City | State NY | Zip | Apt # |
|---|---|---|---|---|---|
| Cross Street | | Intersection of and | | Premise Type | |

| Activity Date 05/04/2013 | Activity Time 09:30 |
|---|---|

**Topic/Subject:**
ATTEMPT TO RETRIEVE VIDEO FROM PS/MS 333

**Summary of Investigation:**
1. On May 4, 2013, at approximately 0930 THE U/S AND DET. CAPPOLLA DID RESPOND TO PS / MS 333 LOCATED AT THE C/O BEACH 57 ST. AND BEACH CHANNEL DR. IN A ATTEMPT TO RECOVER VIDEO FROM THE SCHOOLS CAMERAS. THE U/S SPOKE WITH SCHOOL SAFETY OFFICER BATES WHO INFORMED THE U/S THAT THE VIDEO WOULD NOT BE ACCESSIBLE UNTIL MONDAY 05/06/13 WHEN THE PRINCIPAL RETURNED TO WORK.

2. CASE ACTIVE.

| Reporting Officer: | Rank DT3 | Name CHRISTOPHE VELSOR | | Tax Reg. No. 907514 | Command 331-101 DET SQUAD |
|---|---|---|---|---|---|
| Reviewing Supervisor: | Manner of Closing - | Date Reviewed 06/17/2013 | Date of Next Review | Name GEMMA MASTERSON | Supv. Tax No. 900321 |

| **GENERAL INVESTIGATION** | | | | **Crime/Condition**<br>MURDER & NON-NEGL.<br>MANSLAUGHTE | | | | **Command**<br>101-101ST<br>PRECINCT<br>Date of This<br>Report<br>05/04/2013 |
|---|---|---|---|---|---|---|---|---|
| **Date of UF61**<br>05/03/2013 | **Complaint No.**<br>2013-101-01689 | **Date Case Assigned**<br>05/04/2013 | **Case No.**<br>2013-642 | **Unit Reporting**<br>SQUAD | | | | **Follow-Up No.**<br>20 |

| **Complainant's Name**<br>GULLEY, KEITH | | | **Address** | | | | | **Apt No.** |
|---|---|---|---|---|---|---|---|---|
| **Nickname/Alias/Middle Name**<br>BUNKY | | | | | | | | |
| **Sex**<br>MALE | **Race**<br>BLACK | | **Date of Birth** | | **Age**<br>22 | | | |
| **Home Telephone** | **Business Telephone** | | **Cell Phone** | | **Beeper #** | | | **E-Mail Address** |

| **Activity Address Location**<br>NYC | **Street**<br>54-30 BEACH CHANNEL DRIVE | | **City**<br>QUEENS | **State**<br>NY | **Zip**<br>11691 | **Apt #** |
|---|---|---|---|---|---|---|
| **Cross Street**<br>BEACH 58 STREET and BEACH 54 STREET | | **Intersection of** | | | | **Premise Type** |

| **Activity Date**<br>05/04/2013 | **Activity Time**<br>10:00 |
|---|---|

**Topic/Subject:**
DAY LIGHT EVIDENCE SEARCH

**Summary of Investigation:**
1. On May 4, 2013, at approximately 1000 HRS. THE U/S AND DET. CAPPOLLA CONDUCTED A DAY LIGHT EVIDENCE SEARCH IN FRONT OF 54-30 BEACH CHANNEL DRIVE AND THE AREA SURROUNDING 54-30 BEACH CHANNEL DRIVE. THE SEARCH MET WITH NO POSITIVE RESULTS.

2. CASE ACTIVE.

| **Reporting Officer:** | **Rank**<br>DT3 | **Name**<br>CHRISTOPHE VELSOR | | **Tax Reg. No.**<br>907514 | **Command**<br>331-101 DET SQUAD |
|---|---|---|---|---|---|
| **Reviewing Supervisor:** | **Manner of Closing -** | **Date Reviewed**<br>06/17/2013 | **Date of Next Review** | **Name**<br>GEMMA MASTERSON | **Supv. Tax No.**<br>900321 |

| ACTIVATE INVESTIGATION CARD | | | | Crime/Condition MURDER & NON-NEGL. MANSLAUGHTE | | Command 101-101ST PRECINCT Date of This Report 05/04/2013 |
|---|---|---|---|---|---|---|
| Date of UF61 05/03/2013 | Complaint No. 2013-101-01689 | Date Case Assigned 05/04/2013 | Case No. 2013 - 642 | Unit Reporting BRAM | | Follow-Up No. 21 |

| Topic/Subject (ACTIVATE INVESTIGATION CARD) HENRY MCCUMMINGS | Activity Date 05/04/2013 | Activity Time 20:00 |
|---|---|---|

## Details

**Summary of Investigation:**
1. On May 4, 2013, at approximately 2000 undersigned is issuing icard for above person.
Ejustice-last 2 arrests used address of ███████████
ADW-NO ACTIVE WARRANTS OR ICARDS
DALL-NO LICENSE FOUND OR WARRANTS
CRIMS-NO CASES NO WARRANTS ALL 5 BOROS

## ICard

| Control No. | | IDS No. I2013012536 | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Last Name MCCUMMINGS | | First Name HENRY | | M.I. | Aliases/Nicknames NYSID No. | | | |
| Last known address (Street, Apt, State, Zip) ██████████ | | | | | Pct. 101 | | | |
| Sex MALE | Race BLACK | Date of Birth ████ | Social Security No. | Height 5-4 | Weight 130 | | Hair Color BLACK | Eye Color BROWN |
| Sought As PERPETRATOR - PROBABLE CAUSE TO ARREST | | Precautions to be Observed ARMED AND DANGEROUS | | | Other | | | |
| Domestic Violence? Yes | | Misd No | | | Felony Yes | | | |
| Law Title PL | | Law Section PL 125 | CRIMINALLY NEGLIGENT HOMICIDE | | | Law Code/Description PL 125.25 02 | F | A | 2 | | | |
| Attempt NO | | Type F | | Class A | | Count 1 | | |

**Additional Information Regarding Subject (e.g. Friends, Relatives, Phone Numbers, Additional Addresses)**
GIRLFRIENDS ADDRESS
USED TO LIVE IN BROOKLYN

**Additional Descriptive Information (Tattoos, Piercings, Facial Hair, Eyewear)**
IN PHOTO BUSHY HAIR PULLED INTO PONYTIAL

**Specific Instructions For Apprehending Officers:**
N/A

## Required Computer Checks

| ADW Checked YES | Active I-Card NO | Notified TaxId 906231 | Name BRAD FINE | Rank DT2 | Cmd 331-DET SQD. QNS-101 |
|---|---|---|---|---|---|
| | Active Warrant NO | Notified TaxId 906231 | Name BRAD FINE | Rank DT2 | Cmd 331-DET SQD. QNS-101 |
| DALL Checked YES | Active Warrant NO | Notified TaxId 906231 | Name BRAD FINE | Rank DT2 | Cmd 331-DET SQD. QNS-101 |

Complaint# 2013-101-01689                                                      Page 37 of 67

| EJustice Checked YES | Active Warrant NO | Notified TaxId 906231 | Name BRAD FINE | Rank DT2 | Cmd 331-DET SQD. QNS-101 | | | |
| NYSID Checked YES | Multiple Active NYSIDs NO | Notified TaxId 906231 | Name BRAD FINE | Rank DT2 | Cmd 331-DET SQD. QNS-101 | | | |
| CRIMS Checked YES | Scheduled Court Date NO | Date of Next Court Appearance | Court Location | Court Part | Notified TaxId 906231 | Name BRAD FINE | Rank DT2 | Cmd 331-DET SQD. QNS-101 |

**Command Phone Number**
718-888-3429

| Reporting Officer: | Rank DT2 | | Name BRAD FINE | | Tax Reg. No. 906231 | Command 331-101 DET SQUAD |
|---|---|---|---|---|---|---|
| Reviewing Supervisor: | Manner of Closing - | | Date Reviewed 05/04/2013 | Date of Next Review | Name GEMMA MASTERSON | Supv. Tax No. 900321 |

| **ACTIVATE INVESTIGATION CARD** | | | | **Crime/Condition**<br>**MURDER & NON-NEGL.**<br>**MANSLAUGHTE** | | | **Command**<br>101-101ST<br>**PRECINCT**<br>**Date of This**<br>**Report**<br>05/04/2013 |
|---|---|---|---|---|---|---|---|

| Date of<br>**UF61**<br>05/03/2013 | **Complaint No.**<br>2013-101-<br>01689 | **Date Case**<br>**Assigned**<br>05/04/2013 | **Case No.**<br>**2013 -**<br>**642** | **Unit Reporting**<br>**BRAM** | | | Follow-Up No.<br>22 |

| **Topic/Subject**<br>(ACTIVATE INVESTIGATION CARD) RASHAUN FERGUSON | **Activity Date**<br>05/04/2013 | **Activity Time**<br>20:30 |
|---|---|---|

**Details**

**Summary of Investigation:**
1. On May 4, 2013, at approximately 2030 UNDERSIGNED IS ISSUING ICARD FOR ABOVE NAMED PERSON.

**ICard**

| **Control No.** | | **IDS No.**<br>I2013012537 | | | | | |
|---|---|---|---|---|---|---|---|

| **Last Name**<br>**FERGUSON** | | **First Name**<br>**RASHAUN** | | | **M.I.**<br>H | **Aliases/Nicknames**<br>**RA RA** | **NYSID No.**<br>02815035H |
|---|---|---|---|---|---|---|---|

| Last known address (Street, Apt, State, Zip)<br>NYC 155-01 71 AVENUE Apt#2A QUEENS, NY 11367 | | | | | | **Pct.**<br>107 | |
|---|---|---|---|---|---|---|---|

| **Sex**<br>**MALE** | **Race**<br>**BLACK** | **Date of Birth**<br>02/10/1994 | **Social Security No.** | **Height**<br>**6-1** | **Weight**<br>165 | **Hair**<br>**Color**<br>**BLACK** | **Eye**<br>**Color**<br>**BROWN** |
|---|---|---|---|---|---|---|---|

| **Sought As**<br>PERPETRATOR - PROBABLE<br>**CAUSE TO ARREST** | | **Precautions to be Observed**<br>ARMED AND DANGEROUS | | | **Other** | | |
|---|---|---|---|---|---|---|---|

| **Domestic Violence?**<br>No | | **Misd**<br>No | | | **Felony**<br>Yes | | |
|---|---|---|---|---|---|---|---|

| **Law Title**<br>PL | | **Law Section**<br>PL 125 | CRIMINALLY NEGLIGENT<br>**HOMICIDE** | | | **Law Code/Description**<br>PL 125.25 02 | F | A | 2 | | |
|---|---|---|---|---|---|---|---|

| **Attempt**<br>**NO** | | **Type**<br>F | | **Class**<br>A | | **Count**<br>1 | |
|---|---|---|---|---|---|---|---|

**Additional Information Regarding Subject (e.g. Friends, Relatives, Phone Numbers, Additional Addresses)**
USED ABOVE ADDRESS ON LAST ARREST -ACTUALLY USED 151-01 71ST AVE FLUSHING A2, BUT ITS BELIEVED
TO BE ABOVE ADDRESS

**Additional Descriptive Information (Tattoos, Piercings, Facial Hair, Eyewear)**
N/A

**Specific Instructions For Apprehending Officers:**
N/A

| **Required Computer Checks** | | | | | | |
|---|---|---|---|---|---|---|
| **ADW**<br>**Checked**<br>**YES** | **Active I-Card**<br>**NO** | **Notified TaxId**<br>906231 | **Name**<br>**BRAD FINE** | **Rank**<br>DT2 | **Cmd**<br>331-DET SQD. QNS-101 | |
| | **Active Warrant**<br>**NO** | **Notified TaxId**<br>906231 | **Name**<br>**BRAD FINE** | **Rank**<br>DT2 | **Cmd**<br>331-DET SQD. QNS-101 | |
| **DALL**<br>**Checked**<br>**YES** | **Active Warrant**<br>**NO** | **Notified TaxId**<br>906231 | **Name**<br>**BRAD FINE** | **Rank**<br>DT2 | **Cmd**<br>331-DET SQD. QNS-101 | |
| **EJustice**<br>**Checked**<br>**YES** | **Active Warrant**<br>**NO** | **Notified TaxId**<br>906231 | **Name**<br>**BRAD FINE** | **Rank**<br>DT2 | **Cmd**<br>331-DET SQD. QNS-101 | |
| | | | | | | |

Complaint# 2013-101-01689                                      Page 39 of 67

| NYSID Checked YES | Multiple Active NYSIDs NO | Notified TaxId 906231 | Name BRAD FINE | Rank DT2 | Cmd 331-DET SQD. QNS-101 | | | |
|---|---|---|---|---|---|---|---|---|
| CRIMS Checked YES | Scheduled Court Date NO | Date of Next Court Appearance | Court Location | Court Part | Notified TaxId 906231 | Name BRAD FINE | Rank DT2 | Cmd 331-DET SQD. QNS-101 |

| Command Phone Number 718-868-3429 |
|---|

| Reporting Officer: | Rank DT2 | | Name BRAD FINE | | Tax Reg. No. 906231 | Command 331-101 DET SQUAD |
|---|---|---|---|---|---|---|
| Reviewing Supervisor: | Manner of Closing - | Date Reviewed 05/04/2013 | Date of Next Review | Name GEMMA MASTERSON | | Supv. Tax No. 900321 |

000687

JA-410

Complaint# 2013-101-01689

| NYPD LABORATORY REPORT | | | | Crime/Condition MURDER & NON-NEGL. MANSLAUGHTE | | Command 331-101 DET SQUAD Date of This Report 05/07/2013 |
|---|---|---|---|---|---|---|
| Date of UF61 05/03/2013 | Complaint No. 2013-101-01689 | Date Case Assigned 05/04/2013 | Case No. 2013 - 642 | Unit Reporting SYSTEM GENERATED | | Follow-Up No. 23 |

| Topic/Subject (NYPD LABORATORY REPORT) NYPD LABORATORY REPORT | Activity Date 05/07/2013 | Activity Time 00:00 |
|---|---|---|

**Details**

Summary of Investigation:

**ATTACHMENTS**

PDF

NYPD LABORATORY REPORT-05/07/2013 00:00

| Reporting Officer: | Rank 999 | | Name SYSTEM GENERATED | | Tax Reg. No. 999999 | Command 331-101 DET SQUAD |
|---|---|---|---|---|---|---|
| Reviewing Supervisor: | Manner of Closing - | Date Reviewed 05/08/2013 | Date of Next Review | Name JUAN LOPEZ | Supv. Tax No. 920518 | |

000688

JA-411

| **LINE UP** | | | | **Crime/Condition**<br>MURDER & NON-NEGL.<br>MANSLAUGHTE | | **Command**<br>101-101ST<br>PRECINCT<br>Date of This<br>Report<br>06/08/2013 |
|---|---|---|---|---|---|---|
| **Date of UF61**<br>05/03/2013 | **Complaint No.**<br>2013-101-01689 | **Date Case Assigned**<br>05/04/2013 | **Case No.**<br>2013 - 642 | **Unit Reporting**<br>SQUAD | | **Follow-Up No.**<br>24 |

| **Topic/Subject**<br>(LINE UP) LINE-UP CONDUCTED; FERGUSON | **Activity Date**<br>05/07/2013 | **Activity Time**<br>00:01 |
|---|---|---|

| **Complaint's Name**<br>GULLEY, KEITH | **Address** | **Apt No.** |
|---|---|---|

| **Nickname/Alias/Middle Name**<br>BUNKY | | | |
|---|---|---|---|

| **Sex**<br>MALE | **Race**<br>BLACK | **Date of Birth** | **Age**<br>22 |
|---|---|---|---|

| **Home Telephone** | **Business Telephone** | **Cell Phone** | **Beeper #** | **E-Mail Address** |
|---|---|---|---|---|

| **Person Interviewed Last Name, First M.I.** | **Address** | **Apt No.** |
|---|---|---|

| **Nickname/Alias/Middle Name** | | | |
|---|---|---|---|

| **Position/Relationship** | **Sex** | **Race** | **Date of Birth** | **Age** |
|---|---|---|---|---|

| **Home Telephone** | **Business Telephone** | **Cell Phone** | **Beeper #** | **E-Mail Address** |
|---|---|---|---|---|

**Details**

**Summary of Investigation:**

1. On May 7, 2013, at approximately 0001 hours the undersigned; along with Queens Assistant District Attorney Kristin Fraser; did conduct a line-up with apprehended perpetrator; Rashaun Ferguson (Nysid #02815035H). Ferguson, whose lawyer declined to be present did request to be seated in line-up position #4 for the proceedings. The line-up consisted of Ferguson and five (5) fillers with similar features.

2. A witness known to the Department did view the line-up and did not make an outright positive identification, but did make several references to the person in line-up position #4. The witness made statements that position #4 looks like the guy but the skin color is off. The witness also requested that position #5 stand-up but immediately stated #5 was in now way the perp. Upon exiting the room the witness did make a comment as to line-up positions #4's weight, the comment in sum and substance was that either #4 had gained or lost weight since the incident. Additionally, the witness, once away from the viewing area stated to the undersigned "I can't be the only one doing this, I just can't do it, sorry".

3. The line-up proceedings concluded and all appropriate paperwork was file. The line-up report and photo of said line-up are attached.

**CASE ACTIVE**

| **Activity Address Location**<br>OFFICE | **Street** | **City** | **State** | **Zip** | **Apt #** |
|---|---|---|---|---|---|
| **Cross Street** | | **Intersection of**<br>and | | | **Premise Type** |

| **ATTACHMENT** | | |
|---|---|---|
| **No** | **Attachment** | **Description** |
| 1 |  PDF<br>FERGUSON LINE-UP PAPERWORK | FERGUSON LINE-UP PAPERWORK |

| **Reporting Officer:** | **Rank**<br>DT3 | **Name**<br>MICHAEL GILDEA | **Tax Reg. No.**<br>928374 | **Command**<br>331-101 DET |
|---|---|---|---|---|

Complaint# 2013-101-01689                                                      Page 42 of 67

| Reviewing Supervisor: | Manner of Closing | Date Reviewed 06/17/2013 | Date of Next Review | Name GEMMA MASTERSON | SQUAD Supv. Tax No. 900321 |
|---|---|---|---|---|---|
| | - | | | | |

| REQUEST FOR CRIME STOPPERS REWARD | | | | Crime/Condition MURDER & NON-NEGL. MANSLAUGHTE | Command 101-101ST PRECINCT Date of This Report 05/07/2013 |
|---|---|---|---|---|---|
| Date of UF61 05/03/2013 | Complaint No. 2013-101-01689 | Date Case Assigned 05/04/2013 | Case No. 2013 - 642 | Unit Reporting SQUAD | Follow-Up No. 25 |

| Topic/Subject (REQUEST FOR CRIME STOPPERS REWARD) REQUEST FOR CRIMESTOPPERS REWARD | Activity Date 05/07/2013 | Activity Time 13:45 |
|---|---|---|

**Narrative**

On Friday May 3, 2013 at approximately 2008 hours the V/C's Keith Gulley and Reginald Evans were shot in front of 54-30 Beach Channel Drive. The V/C Keith Gulley later died due to his injuries at a local Hospital.

**ATTACHMENT**

| No | Attachment | Description |
|---|---|---|
| 1 |  Victim    Printable Version | Victim |

**Crime Stoppers Information**

| Requestor's Email Address MICHAEL.GILDEA@NYPD.ORG | Poster Size [11 X 17] | Number of Posters 30 |
|---|---|---|

| Reporting Officer: | Rank DT2 | Name MICHAEL NAUS | | Tax Reg. No. 914387 | Command 331-101 DET SQUAD |
|---|---|---|---|---|---|
| Reviewing Supervisor: | Manner of Closing - | Date Reviewed 05/07/2013 | Date of Next Review | Name JUAN LOPEZ | Supv. Tax No. 920518 |

| CRIME STOPPERS REWARD | Crime/Condition<br>MURDER & NON-NEGL.<br>MANSLAUGHTE | Command<br>203-CENTRAL<br>INVESTIGATIONS DIV<br>Date of This Report<br>05/07/2013 |
|---|---|---|

| Date of UF61<br>05/03/2013 | Complaint No.<br>2013-101-01689 | Date Case Assigned<br>05/04/2013 | Case No.<br>2013 - 642 | Unit Reporting<br>SQUAD | Follow-Up No.<br>26 |
|---|---|---|---|---|---|

| Reference Case No<br>2013 - 642 | Command<br>331-DET SQD. QNS-101 | Complaint No<br>2013- 101- 1689 |
|---|---|---|

| Topic/Subject<br>(CRIME STOPPERS REWARD) CRIME STOPPER REWARD POSTER | Activity Date<br>05/07/2013 | Activity Time<br>16:50 |
|---|---|---|

**Narrative**

On Friday, May 3, 2013, at approximately 8:08 P.M., victims Keith Gulley pictured above and one other male victim were shot in front of 54-30 Beach Channel Drive in the confines of the 101 Precinct in Queens, New York. Keith Gulley later died from his injuries.

**Flyer Information**

| News Media<br>Distribute to News Media | INRU<br>Distribute to INRU |
|---|---|

| Person of Interest<br>GULLEY, VICTIM-KEITH | Wanted/Arrested<br>VICTIM |
|---|---|

**Nickname/Alias/Middle Name**

| Address | | | Apt No. | Res. Pct. | NYSID No. | |
|---|---|---|---|---|---|---|
| Position/Relationship | Sex | Race | Date of Birth | Age | Height | Weight |
| Home Telephone | Business Telephone | Cell Phone | Beeper # | E-Mail Address | U.S. Citizen | State/Country of Birth |

**Description**

| Accent | Weapon | Describe Weapon (If firearm, give color, make, caliber, type, model, etc.) | | Discharged |
|---|---|---|---|---|
| Gang Affiliation | | Gang Name | Gang Identifier | |
| M.O. | | Transit M.O. | | |
| Action Toward Victim | | Special Characteristics | New Burglary/Grand Larceny Specific M.O. | |
| Mask: | | | Gloves: | |
| Clothing Description | | | | |
| Scars, Marks | | | | |
| Impersonation of | | | If other | |
| Frequents Areas in the Confines of the Precinct(s) | | | | |

**Specific Crime**
Homicide

**ATTACHMENT**

| No | Attachment | Description |
|---|---|---|
| 1 | | Victim |



Victim   Printable Version

| Broadcast Location |
|---|

| Crime Stoppers Information |
|---|

| Reward<br>$2,000 | Poster Serial Number (Crime Stoppers Only) |
|---|---|

**Rewards Info**
$2,000.00 Reward payable by the Crime Stoppers upon arrest and indictment of the person(s) responsible for the following crime.

| Image Size Adjustment Tool |
|---|

**Image Size**
MEDIUM

| Routing Rules |
|---|

| Reporting Officer: | Rank<br>DT2 | Name<br>DAVID MCGILL | | Tax Reg.<br>No.<br>914136 | Command<br>203-CENTRAL INVESTIGATIONS<br>DIV |
|---|---|---|---|---|---|
| Reviewing<br>Supervisor: | Manner of<br>Closing<br>- | Date<br>Reviewed<br>05/08/2013 | Date of Next<br>Review | Name<br>ERIN RYAN | Supv. Tax No.<br>897929 |

Click here to view and print Crime Stopper Reward Flyer

| ![Police Department Logo] | **ACTIVATE INVESTIGATION CARD** | **Crime/Condition** MURDER & NON-NEGL. MANSLAUGHTE | **Command** 101-101ST PRECINCT **Date of This Report** 05/08/2013 |
|---|---|---|---|

| **Date of UF61** 05/03/2013 | **Complaint No.** 2013-101-01689 | **Date Case Assigned** 05/04/2013 | **Case No.** 2013 - 642 | **Unit Reporting** SQUAD | **Follow-Up No.** 27 |
|---|---|---|---|---|---|

| **Topic/Subject** (ACTIVATE INVESTIGATION CARD) WITNESS I-CARD | **Activity Date** 05/08/2013 | **Activity Time** 22:25 |
|---|---|---|

**Details**

**Summary of Investigation:**

1. On May 8, 2013, at approximately 2225 hours the Undersigned is submitting a witness I-Card for Reginald Evans NYSID in regards to this investigation.

2. Case Status Active.

**iCard**

| **Control No.** | | **IDS No.** I2013017242 |
|---|---|---|

| **Last Name** Evans | **First Name** Reginald | **M.I.** | **Aliases/Nicknames** | **NYSID No.** |
|---|---|---|---|---|

| Last known address (Street, Apt, State, Zip) | | | **Pct.** |
|---|---|---|---|

| **Sex** MALE | **Race** BLACK | **Date of Birth** | **Social Security No.** | **Height** 5-09 | **Weight** 260 | | **Hair Color** BLACK | **Eye Color** BROWN |
|---|---|---|---|---|---|---|---|---|

| **Sought As** WITNESS | **Precautions to be Observed** | **Other** |
|---|---|---|

| **Domestic Violence?** No | **Misd** No | **Felony** Yes |
|---|---|---|

| **Law Title** PL | **Law Section** PL 125 | CRIMINALLY NEGLIGENT HOMICIDE | **Law Code/Description** PL 125.25 01 | F | A | 2 |
|---|---|---|

| **Attempt** NO | **Type** F | **Class** A | **Count** 1 |
|---|---|---|---|

**Additional Information Regarding Subject (e.g. Friends, Relatives, Phone Numbers, Additional Addresses)**
x

**Additional Descriptive Information (Tattoos, Piercings, Facial Hair, Eyewear)**
x

**Specific Instructions For Apprehending Officers:**
x

**Required Computer Checks**

| **ADW Checked** YES | **Active I-Card** NO | **Notified TaxId** | **Name** | **Rank** | **Cmd** |
|---|---|---|---|---|---|
| | **Active Warrant** NO | **Notified TaxId** | **Name** | **Rank** | **Cmd** |
| **DALL Checked** YES | **Active Warrant** NO | **Notified TaxId** | **Name** | **Rank** | **Cmd** |
| **EJustice Checked** YES | **Active Warrant** NO | **Notified TaxId** | **Name** | **Rank** | **Cmd** |
| | | | | | |

| NYSID Checked YES | Multiple Active NYSIDs NO | Notified TaxId | Name | Rank | Cmd | | | |
|---|---|---|---|---|---|---|---|---|
| CRIMS Checked YES | Scheduled Court Date NO | Date of Next Court Appearance | Court Location | Court Part | Notified TaxId | Name | Rank | Cmd |

| Command Phone Number 718-868-3429 |
|---|

| Reporting Officer: | Rank DT2 | Name MICHAEL NAUS | | Tax Reg. No. 914387 | Command 331-101 DET SQUAD |
|---|---|---|---|---|---|
| Reviewing Supervisor: | Manner of Closing - | Date Reviewed 06/16/2013 | Date of Next Review | Name CORTNEY CUMMINGS | Supv. Tax No. 928136 |

Complaint# 2013-101-01689

Page 49 of 67

| ACTIVATE INVESTIGATION CARD | Crime/Condition MURDER & NON-NEGL. MANSLAUGHTE | Command 101-101ST PRECINCT Date of This Report 05/08/2013 |
|---|---|---|

| Date of UF61 05/03/2013 | Complaint No. 2013-101-01689 | Date Case Assigned 05/04/2013 | Case No. 2013-642 | Unit Reporting SQUAD | | Follow-Up No. 28 |
|---|---|---|---|---|---|---|

| Topic/Subject (ACTIVATE INVESTIGATION CARD) WITNESS I-CARD | Activity Date 05/08/2013 | Activity Time 22:30 |
|---|---|---|

**Details**

**Summary of Investigation:**
1. On May 8, 2013, at approximately 2230 hours the Undersigned is submitting a Witness I-Card for Robert Price NYSID in regards to this investigation.

2. Case Status Active.

**ICard**

| Control No. | | IDS No. I2013017243 | |
|---|---|---|---|

| Last Name Price | First Name Robert | M.I. | Aliases/Nicknames | NYSID No. |
|---|---|---|---|---|

| Last known address (Street, Apt, State, Zip) | | Pct. |
|---|---|---|

| Sex MALE | Race BLACK | Date of Birth | Social Security No. | Height 5-08 | Weight 280 | Hair Color BLACK | Eye Color BROWN |
|---|---|---|---|---|---|---|---|

| Sought As WITNESS | Precautions to be Observed | Other |
|---|---|---|

| Domestic Violence? No | Misd No | Felony Yes |
|---|---|---|

| Law Title PL | Law Section PL 125 | CRIMINALLY NEGLIGENT HOMICIDE | Law Code/Description PL 125.25 01 | F | A | 2 |
|---|---|---|

| Attempt NO | Type F | Class A | Count 1 |
|---|---|---|---|

Additional Information Regarding Subject (e.g. Friends, Relatives, Phone Numbers, Additional Addresses)
X

Additional Descriptive Information (Tattoos, Piercings, Facial Hair, Eyewear)
X

Specific Instructions For Apprehending Officers:
X

**Required Computer Checks**

| ADW Checked YES | Active I-Card YES | Notified TaxId 914387 | Name MICHAEL NAUS | Rank DT2 | Cmd 331-DET SQD. QNS-101 |
|---|---|---|---|---|---|
| | Active Warrant NO | Notified TaxId | Name | Rank | Cmd |
| DALL Checked YES | Active Warrant NO | Notified TaxId | Name | Rank | Cmd |
| EJustice Checked | Active Warrant NO | Notified TaxId | Name | Rank | Cmd |

Complaint# 2013-101-01689

| YES | | | | | | | | | |
|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|
| **NYSID Checked** YES | **Multiple Active NYSIDs** NO | **Notified TaxId** | **Name** | **Rank** | **Cmd** | | | | |
| **CRIMS Checked** YES | **Scheduled Court Date** NO | **Date of Next Court Appearance** | **Court Location** | **Court Part** | **Notified TaxId** | **Name** | **Rank** | **Cmd** | |

| **Command Phone Number** 718-868-3429 |
|---|

| **Reporting Officer:** | **Rank** DT2 | **Name** MICHAEL NAUS | | **Tax Reg. No.** 914387 | **Command** 331-101 DET SQUAD |
|-----|-----|-----|-----|-----|-----|
| **Reviewing Supervisor:** | **Manner of Closing** - | **Date Reviewed** 06/16/2013 | **Date of Next Review** | **Name** CORTNEY CUMMINGS | **Supv. Tax No.** 928136 |

000698

JA-421

| PHOTO ARRAY | Crime/Condition MURDER & NON-NEGL. MANSLAUGHTE | Command 101-101ST PRECINCT Date of This Report 06/15/2013 |
|---|---|---|

| Date of UF61 05/03/2013 | Complaint No. 2013-101-01689 | Date Case Assigned 05/04/2013 | Case No. 2013-642 | Unit Reporting SQUAD | | Follow-Up No. 29 |
|---|---|---|---|---|---|---|

| Topic/Subject (PHOTO ARRAY) PHOTO ARRAY W/ VICTIM (FERGUSON +) | | Activity Date 05/09/2013 | Activity Time 17:40 |
|---|---|---|---|

| Complainant's Name GULLEY, KEITH | Address | Apt No. |
|---|---|---|

**Nickname/Alias/Middle Name**
BUNKY

| Sex MALE | Race BLACK | Date of Birth | Age 22 |
|---|---|---|---|

| Home Telephone | Business Telephone | Cell Phone | Beeper # | E-Mail Address |
|---|---|---|---|---|

| Person Interviewed Last Name, First M.I. | | Address | Apt No. |
|---|---|---|---|

**Nickname/Alias/Middle Name**

| Position/Relationship | Sex | Race | Date of Birth | Age |
|---|---|---|---|---|

| Home Telephone | Business Telephone | Cell Phone | Beeper # | E-Mail Address |
|---|---|---|---|---|

**Details**

**Summary of Investigation:**

1. On May 9, 2013, at approximately 1740 hours the undersigned; along with Detective Jaeger; did meet with victim; Reginald Evans for the purposes of showing the victim a photo array. The photo array, compiled by the undersigned did contain an image of Rashaun Ferguson in image position #1. Upon showing Evans the array, he did identify position #1 as the person that approached both him and his brother with a gun in his hand and shot in their direction. Evans did sign his name to image position #1 and did also provide a brief written statement on the photo array.

2. Evans did inform that undersigned that he knowingly did not identify Ferguson during the first photo array and interview because at that point he believed his brother to still be alive and didn't want to get involved. He stated that "street code" is not to snithc when its just a shooting or something, but now that his brother is dead "all bets are off". All appropriate photo array paperwork is attached.

**CASE ACTIVE**

| Activity Address Location OTHER | Street | City | State | Zip | Apt # |
|---|---|---|---|---|---|

| Cross Street | Intersection of and | Premise Type |
|---|---|---|

**ATTACHMENT**

| No | Attachment | Description |
|---|---|---|
| 1 | PDF photo array (victim/ferguson) | photo array (victim/ferguson) |

| Reporting Officer: | Rank DT3 | Name MICHAEL GILDEA | Tax Reg. No. 928374 | Command 331-101 DET SQUAD |
|---|---|---|---|---|
| Reviewing Supervisor: | Manner of Closing - | Date Reviewed 06/20/2013 | Date of Next Review | Name GEMMA MASTERSON | Supv. Tax No. 900321 |

| DEAD BODY OR BODY PART | | | | Crime/Condition MURDER & NON-NEGL. MANSLAUGHTE | | Command 101-101ST PRECINCT Date of This Report 06/03/2013 |
|---|---|---|---|---|---|---|
| Date of UF61 05/03/2013 | Complaint No. 2013-101-01689 | Date Case Assigned 05/04/2013 | Case No. 2013 - 642 | Unit Reporting SQUAD | | Follow-Up No. 30 |

| Topic/Subject (DEAD BODY OR BODY PART) DEAD BODY LOG# 1076 | Activity Date 06/03/2013 | Activity Time 18:45 |
|---|---|---|

**Dead Body/Parts Log Association**

| Borough Wheel DB QUEENS | Dead Body/Parts Log# 2013 - 1076 |
|---|---|

**Details**

Details. Include "Dead Body or Body Part" Log Serial Number, and if available, M.E. Case Number
1. On June 3, 2013, at approximately 1845 hours this case was assigned Dead Body Log #1076.

CASE ACTIVE

**Person**

| Person's Last Name, First M.I. GULLEY, KEITH | | Role COMPLAINANT/VICTIM | Housing Res. | Probation | Parole |
|---|---|---|---|---|---|
| Nickname/Alias/Middle Name BUNKY | | | | | |
| Address | | Apt No. | Res. Pct. | NYSID No. | |

| Arrest # | Date | Top Charge | | | |
|---|---|---|---|---|---|
| Q10602377 | 01/12/2010 | PL 265.03 01B | | | |
| Q10626635 | 05/01/2010 | PL 125.25 01 | | | |

| Position/Relationship | Sex MALE | Race BLACK | Date of Birth | Age 22 | Height 5FT10IN | Weight 160 |
|---|---|---|---|---|---|---|
| Age From | Age To | Injured/Deceased | Type of Injury | | Removed to Hospital | Hospital Name |
| Home Telephone | Business Telephone | Cell Phone | Beeper # | E-Mail Address | U.S. Citizen Yes | State/Country of Birth USA |

**Description**
Eye Color:BLACK Hair Color:BLACK Hair Length:SHORT Hairstyle:CLOSE CUT Complexion:CLEAR Skin Tone:MEDIUM

| Accent No | Weapon | Describe Weapon (If firearm, give color, make, caliber, type, model, etc.) | | Discharged |
|---|---|---|---|---|
| Gang Affiliation Yes | | Gang Name BLOODS | Gang Identifier | |
| Mask: | | Gloves: | | |
| Clothing Description | | | | |

| CANCEL INVESTIGATION CARD | | Crime/Condition MURDER & NON-NEGL. MANSLAUGHTE | Command 331-101 DET SQUAD Date of This Report 10/09/2013 |
|---|---|---|---|

| Date of UF61 05/03/2013 | Complaint No. 2013-101-01689 | Date Case Assigned 05/04/2013 | Case No. 2013 - 642 | Unit Reporting BRAM | Follow-Up No. 31 |
|---|---|---|---|---|---|

| Topic/Subject (CANCEL INVESTIGATION CARD) CANCELLATION OF I-CARD | Activity Date 10/09/2013 | Activity Time 12:20 |
|---|---|---|

**Details**

**Summary of Investigation:**
1. On October 9, 2013, at approximately 1220 hrs the undersigned did cancel the I-CARD for Henry McCummings in regard to 54-30 Beach Channel Drive which is the scene of a homicide.

**ICard Cancellation**

**Reason to Cancel ICard**
NO LONGER WANTED

**Details of Apprehension (Include Date, Time and Location of Arrest and/or Where the Subject was Residing), or Indicate why Investigation Card was Discontinued (Non-Arrest)**
Suspect no longer wanted

| Control No. | IDS No. I2013012536 |
|---|---|

| Last Name MCCUMMINGS | First Name HENRY | M.I. | Aliases/Nicknames | NYSID No. |
|---|---|---|---|---|

| Last known address (Street, Apt, State, Zip) | | | Pct. |
|---|---|---|---|

| Sex MALE | Race BLACK | Date of Birth | Social Security No. | Height 5-4 | Weight 130 | Hair Color BLACK | Eye Color BROWN |
|---|---|---|---|---|---|---|---|

| Sought As PERPETRATOR - PROBABLE CAUSE TO ARREST | Precautions to be Observed ARMED AND DANGEROUS | Other |
|---|---|---|

| Domestic Violence? Yes | Misd No | Felony Yes |
|---|---|---|

| Law Title PL | Law Section PL 125 | CRIMINALLY NEGLIGENT HOMICIDE | Law Code/Description PL 125.25 02 | F | A | 2 |
|---|---|---|

| Attempt NO | Type F | Class A | Count 1 |
|---|---|---|---|

**Additional Information Regarding Subject (e.g. Friends, Relatives, Phone Numbers, Additional Addresses)**
GIRLFRIENDS ADDRESS
USED TO LIVE IN BROOKLYN

**Additional Descriptive Information (Tattoos, Piercings, Facial Hair, Eyewear)**
IN PHOTO BUSHY HAIR PULLED INTO PONYTIAL

**Specific Instructions For Apprehending Officers:**
N/A

| Required Computer Checks | | | | | | |
|---|---|---|---|---|---|---|
| ADW Checked YES | Active I-Card NO | Notified TaxId 906231 | Name BRAD FINE | Rank DT2 | Cmd 331-DET SQD. QNS-101 |
| | Active Warrant | Notified TaxId | Name | Rank | Cmd |

| Scars, Marks | | | | | | |
|---|---|---|---|---|---|---|
| Impersonation of | | | If other | | | |
| Frequents Areas in the Confines of the Precinct(s) | | | | | | |

| ATTACHMENT | | | | | | |
|---|---|---|---|---|---|---|
| No | Attachment | | | Description | | |

| Reporting Officer: | Rank DT3 | Name MICHAEL GILDEA | | Tax Reg. No. 928374 | | Command 331-101 DET SQUAD |
|---|---|---|---|---|---|---|
| Reviewing Supervisor: | Manner of Closing - | Date Reviewed 06/04/2013 | Date of Next Review | Name CORTNEY CUMMINGS | | Supv. Tax No. 928136 |

| | NO | 906231 | BRAD FINE | DT2 | 331-DET SQD. QNS-101 | | | |
|---|---|---|---|---|---|---|---|---|
| DALL Checked YES | Active Warrant NO | Notified TaxId 906231 | Name BRAD FINE | Rank DT2 | Cmd 331-DET SQD. QNS-101 | | | |
| EJustice Checked YES | Active Warrant NO | Notified TaxId 906231 | Name BRAD FINE | Rank DT2 | Cmd 331-DET SQD. QNS-101 | | | |
| NYSID Checked YES | Multiple Active NYSIDs NO | Notified TaxId 906231 | Name BRAD FINE | Rank DT2 | Cmd 331-DET SQD. QNS-101 | | | |
| CRIMS Checked YES | Scheduled Court Date NO | Date of Next Court Appearance | Court Location | Court Part | Notified TaxId 906231 | Name BRAD FINE | Rank DT2 | Cmd 331-DET SQD. QNS-101 |

| Command Phone Number |
|---|
| 718-888-3429 |

| Reporting Officer: | Rank DT3 | Name JOHN RUSSO | | Tax Reg. No. 880293 | Command 331-101 DET SQUAD |
|---|---|---|---|---|---|
| Reviewing Supervisor: | Manner of Closing - | Date Reviewed 02/03/2014 | Date of Next Review | Name GEMMA MASTERSON | Supv. Tax No. 900321 |

| OCME FINAL DEATH CERTIFICATE | | | | Crime/Condition MURDER & NON-NEGL. MANSLAUGHTE | | Command 101-101ST PRECINCT Date of This Report 12/18/2013 |
|---|---|---|---|---|---|---|
| Date of UF61 05/03/2013 | Complaint No. 2013-101-01689 | Date Case Assigned 05/04/2013 | Case No. 2013 - 642 | Unit Reporting QUEENS OCME LIAISON | | Follow-Up No. 32 |

| Topic/Subject (OCME FINAL DEATH CERTIFICATE) DEATH CERTIFICATE KEITH GULLEY | Activity Date 12/18/2013 | Activity Time 09:50 |
|---|---|---|

**Details**

**Summary of Investigation:**
1. On December 18, 2013, at approximately 0950 Hrs, I received a final death certificate from the OCME Identification Section that provides the cause and manner of death regarding Keith Gulley.

**OCME FINAL DEATH CERTIFICATE**

| OCME Case# Q1302195 | Certificate No. | | |
|---|---|---|---|
| OCME Certifier Name Jason Graham | Title Medical Examiner | Phone # 2124472321 | Email jgraham@ocme.nyc.gov |

**ATTACHMENT**

| No | Attachment | Description |
|---|---|---|
| 1 | **PDF** Death Certificate | Death Certificate |

| Reporting Officer: | Rank DT3 | Name JOHN GLYNN | | Tax Reg. No. 921372 | Command 229-MISSING PERSONS SQUAD |
|---|---|---|---|---|---|
| Reviewing Supervisor: | Manner of Closing - | Date Reviewed 03/02/2014 | Date of Next Review | Name CORTNEY CUMMINGS | Supv. Tax No. 928136 |

Complaint# 2013-101-01689                                    Page 58 of 67

| ![NYPD] NYPD LABORATORY REPORT | | | | Crime/Condition MURDER & NON-NEGL. MANSLAUGHTE | | Command 331-101 DET SQUAD Date of This Report 12/24/2013 |
|---|---|---|---|---|---|---|
| Date of UF61 05/03/2013 | Complaint No. 2013-101- 01689 | Date Case Assigned 05/04/2013 | Case No. 2013 - 642 | Unit Reporting SYSTEM GENERATED | | Follow-Up No. 34 |

| Topic/Subject (NYPD LABORATORY REPORT) NYPD LABORATORY REPORT | Activity Date 12/24/2013 | Activity Time 00:00 |
|---|---|---|

**Details**

**Summary of Investigation:**

**ATTACHMENTS**

**PDF**

NYPD LABORATORY REPORT-12/24/2013 00:00

| Reporting Officer: | Rank 999 | Name SYSTEM GENERATED | | Tax Reg. No. 999999 | Command 331-101 DET SQUAD |
|---|---|---|---|---|---|
| Reviewing Supervisor: | Manner of Closing - | Date Reviewed 01/05/2014 | Date of Next Review | Name CORTNEY CUMMINGS | Supv. Tax No. 928136 |

| NYPD LABORATORY REPORT | | | | Crime/Condition<br>MURDER & NON-NEGL.<br>MANSLAUGHTE | | Command<br>331-101 DET<br>SQUAD<br>Date of This<br>Report<br>12/24/2013 |
|---|---|---|---|---|---|---|
| Date of<br>UF61<br>05/03/2013 | Complaint No.<br>2013-101-<br>01689 | Date Case<br>Assigned<br>05/04/2013 | Case No.<br>2013 -<br>642 | Unit Reporting<br>SYSTEM GENERATED | | Follow-Up No.<br>34 |

| Topic/Subject<br>(NYPD LABORATORY REPORT) NYPD LABORATORY REPORT | Activity Date<br>12/24/2013 | Activity Time<br>00:00 |
|---|---|---|

**Details**

Summary of Investigation:

**ATTACHMENTS**

PDF

NYPD LABORATORY REPORT-12/24/2013 00:00

| Reporting Officer: | Rank<br>999 | Name<br>SYSTEM GENERATED | | Tax Reg. No.<br>999999 | Command<br>331-101 DET<br>SQUAD |
|---|---|---|---|---|---|
| Reviewing<br>Supervisor: | Manner of<br>Closing<br>- | Date<br>Reviewed<br>01/05/2014 | Date of Next<br>Review | Name<br>CORTNEY<br>CUMMINGS | Supv. Tax No.<br>928136 |

| 101 PCT | | | | | |
|---|---|---|---|---|---|
| | **UNUSUAL OCCURRENCE REPORT-SUPPLEMENT** | | | **Crime/Condition** MURDER & NON-NEGL. MANSLAUGHTE | **Command** 101-101ST PRECINCT **Date of This Report** 01/28/2014 |

| Date of UF61 05/03/2013 | Complaint No. 2013-101-01689 | Date Case Assigned 05/04/2013 | Case No. 2013 - 642 | Unit Reporting SQUAD | Follow-Up No. 35 |
|---|---|---|---|---|---|

| Topic/Subject (UNUSUAL OCCURRENCE REPORT-SUPPLEMENT) SUPPLEMENTAL | Activity Date 01/27/2014 | Activity Time 15:30 |
|---|---|---|

**Offense Information**

| Date of Offense 05/03/2013 | | Time of Offense 20:08 | |
|---|---|---|---|
| Building # 54-30 | Address BEACH CHANNEL DRIVE | Apt# | Borough/City QUEENS |
| Precinct 101 | Housing Dev. Name | PSA Number | Premise Type RESIDENCE - PUBLIC HOUSING |
| School Number | School Name | Type of School | |

**Details**

**Summary of Investigation:**

1. On May 3, 2013, at approximately 2008 hours members of the 101 squad were notified via Department radio of two (2) males shot in front of 54-30 Beach Channel Drive. Upon arrival the undersigned did observe the victims suffering from apparent gunshot wounds to the body. Victim #1 was identified as Keith Gulley; a M/B 22 Y/O who was unresponsive, and victim #2 was identified as Reginald Evans; a M/B 36 Y/O who was shot in the lower back and responsive but was unable to provide any information. .380 caliber shell casings were observed at the scene. The victims were removed to separate hospitals, with Gulley being transported to St. John's Hospital were he was pronounced at 2105 hours.

2. Interviews and canvasses were conducted and the investigation is on-going as the investigative process continues. Autopsy will be viewed by a member of the 101 squad.

\*\*\*The information being transmitted to you is preliminary information and is subject to change as additional facts are discovered during the on-going investigation.\*\*\*

\*\*\*Update\*\*\*

1. On January 27, 2014, at approximately 1000 hours the subject Rashaun Ferguson NYSID# 02815035H was apprehended inside 51-49 Almeda Avenue by Violent Felony Squad and transported to the 101 squad.

2. On January 27, 2014 a witness known to the department did view a line up at the 101 squad. This line up yielded a positive identification of the shooter involved. Arrest numbers Q14605601 and 605 were assigned. The Queens District Attorneys Office drew up the charges murder in the second degree (125.25), criminal possession of a weapon (265.03)and attempted murder.(125.25)

| If Business, Business Name | Person's Last Name, First M.I. GULLEY, KEITH | Person/Business Role COMPLAINANT/VICTIM | Housing Res. Yes | Probation No | Parole No |
|---|---|---|---|---|---|
| Nickname/Alias/Middle Name | | | | | |
| Address | | | Apt No. | Res. Pct. | NYSID No. |
| Arrest # | Date | Top Charge | | | |

Complaint# 2013-101-01689

| Position/Relationship UNKNOWN/NONE | Sex MALE | Race BLACK | Date of Birth | Age 23 | Height | Weight |
|---|---|---|---|---|---|---|
| Age From | Age To | Injured/Deceased DECEASED | Type of Injury GUNSHOT | | Removed to Hospital Yes | Hospital Name ST JOHN'S |
| Home Telephone | Business Telephone | Cell Phone | Beeper # | E-Mail Address | U.S. Citizen Yes | State/Country of Birth USA |

**Description**
Eye Color:BROWN Hair Color:BLACK Hair Length:NORMAL

| Accent | Weapon | Describe Weapon (If firearm, give color, make, caliber, type, model, etc.) Gun:HANDGUN Type:PISTOL, SEMIAUTOMATIC Caliber:.380 CAL | Discharged Yes |
|---|---|---|---|
| Gang Affiliation Yes | | Gang Name BLOODS | Gang Identifier |
| Mask NO | Mask Description | Gloves NO | Gloves Description |

Clothing Description

Scars, Marks

| Impersonation of | If other |
|---|---|

**Statements/Criminal History**
CRIMINAL HISTORY ATTACHED

| If Business, Business Name | Person's Last Name, First M.I. EVANS, REGINALD | Person/Business Role VICTIM (ADDL) | Housing Res. | Probation | Parole |
|---|---|---|---|---|---|

Nickname/Alias/Middle Name

| Address | | Apt No. | Res. Pct. | NYSID No. |
|---|---|---|---|---|

| Arrest # | Date | Top Charge |
|---|---|---|

| Position/Relationship FRIEND/ACQUAINTANCE | Sex MALE | Race BLACK | Date of Birth | Age 37 | Height 6FT0IN | Weight 180 |
|---|---|---|---|---|---|---|
| Age From | Age To | Injured/Deceased INJURED | Type of Injury GUNSHOT | | Removed to Hospital Yes | Hospital Name JAMAICA HOSPITAL |
| Home Telephone | Business Telephone | Cell Phone | Beeper # | E-Mail Address | U.S. Citizen Yes | State/Country of Birth USA |

**Description**
Eye Color:BLACK Hair Color:BLACK Hair Length:SHORT Hairstyle:CLOSE CUT Complexion:CLEAR Skin Tone:MEDIUM

| Accent No | Weapon | Describe Weapon (If firearm, give color, make, caliber, type, model, etc.) Gun:HANDGUN Type:PISTOL, SEMIAUTOMATIC Caliber:.380 CAL | Discharged Yes |
|---|---|---|---|
| Gang Affiliation No | | Gang Name | Gang Identifier |

| Mask<br>NO | Mask Description | Gloves<br>NO | Gloves Description |
|---|---|---|---|
| Clothing Description | | | |
| Scars, Marks | | | |
| Impersonation of | | If other | |
| Statements/Criminal History<br>CRIMINAL HISTORY ATTACHED | | | |

| VEHICLE |
|---|

| Recovered Weapons | | | | | | |
|---|---|---|---|---|---|---|
| Weapon Type | Weapon | Weapon Description | | | | NYSID |
| Gun | Discharged | Make | | Color | Caliber | Type |
| Type of Location Seized On | | If Other Location, Specify | | | Precinct Voucher # | |

| Notifications | | | | | |
|---|---|---|---|---|---|
| Unit/Agency | Tax ID | Name | | Rank | Cmd |
| N.Y. POLICE DEPT | 900321 | GEMMA MASTERSON | | LCD | 331-DET SQD. QNS-101 |
| N.Y. POLICE DEPT | 928136 | CORTNEY CUMMINGS | | SGT | 331-DET SQD. QNS-101 |
| N.Y. POLICE DEPT | 922987 | JOHN POTKAY | | CPT | 698-DET BORO QUEENS ZONE #16 |

| ATTACHMENTS |
|---|

| Reporting Officer: | Rank<br>DT3 | Name<br>QUINN JAEGER | | Tax Reg. No.<br>917788 | Command<br>331-101 DET<br>SQUAD |
|---|---|---|---|---|---|
| Reviewing Supervisor: | Manner of Closing<br>- | Date Reviewed<br>03/02/2014 | Date of Next Review | Name<br>CORTNEY CUMMINGS | Supv. Tax No.<br>928136 |

| LINE UP | | | | Crime/Condition<br>MURDER & NON-NEGL.<br>MANSLAUGHTE | Command<br>101-101ST<br>PRECINCT<br>Date of This<br>Report<br>01/28/2014 |
|---|---|---|---|---|---|
| Date of<br>UF61<br>05/03/2013 | Complaint No.<br>2013-101-<br>01689 | Date Case<br>Assigned<br>05/04/2013 | Case No.<br>2013 -<br>642 | Unit Reporting<br>SQUAD | Follow-Up No.<br>36 |

| Topic/Subject<br>(LINE UP) LINE UP<>FERGUSON | | Activity Date<br>01/27/2014 | Activity Time<br>21:48 |
|---|---|---|---|

| Complainant's Name<br>GULLEY, KEITH | | Address | | Apt No. |
|---|---|---|---|---|
| Nickname/Alias/Middle Name | | | | |
| Sex<br>MALE | Race<br>BLACK | Date of Birth | Age<br>23 | |
| Home Telephone | Business Telephone | Cell Phone | Beeper # | E-Mail Address |

| Person Interviewed Last Name, First M.I. | | Address | | Apt No. |
|---|---|---|---|---|
| Nickname/Alias/Middle Name | | | | |
| Position/Relationship | Sex | Race | Date of Birth | Age |
| Home Telephone | Business Telephone | Cell Phone | Beeper # | E-Mail Address |

**Details**

**Summary of Investigation:**

1. On January 27, 2014, at approximately 2148 hours the undersigned along with Queens District Attorney Briana Heymann did conduct a line up with the subject Rashaun Ferguson. His lawyer Scott Brettschneider was present as well. Rashaun chose position #5 for the proceeding.

2. A witness known to the department did view the line up and did make a positive identification of Rashaun Ferguson in position 5 as the person shooting on May 3, 2013. He stated He knows him from the shooting, that he shot me. He says the subject walked up shot him first then ran up the lane and shot his brother.

3. Line up reports and photos attached.

| Activity Address Location<br>OFFICE | | Street | City | State | Zip | Apt # |
|---|---|---|---|---|---|---|
| Cross Street | | | Intersection of<br>and | | | Premise Type |

| ATTACHMENT | | | |
|---|---|---|---|
| No | Attachment | | Description |
| 1 | PDF<br>Line Up | | Line Up |

| Reporting Officer: | Rank<br>DT3 | Name<br>QUINN JAEGER | | Tax Reg. No.<br>917786 | Command<br>331-101 DET<br>SQUAD |
|---|---|---|---|---|---|
| Reviewing<br>Supervisor: | Manner of<br>Closing<br>- | Date<br>Reviewed<br>03/13/2014 | Date of Next<br>Review | Name<br>GEMMA<br>MASTERSON | Supv. Tax No.<br>900321 |

| CLOSING | | | | Crime/Condition<br>MURDER & NON-NEGL.<br>MANSLAUGHTE | Command<br>101-101ST<br>PRECINCT<br>Date of This<br>Report<br>03/01/2014 |
|---|---|---|---|---|---|
| Date of<br>UF61<br>05/03/2013 | Complaint No.<br>2013-101-<br>01689 | Date Case<br>Assigned<br>05/04/2013 | Case No.<br>2013 -<br>642 | Unit Reporting<br>SQUAD | Follow-Up No.<br>37 |

| Complainant's Name<br>PSNY FOR GULLEY, KEITH | | Address | | Apt No. |
|---|---|---|---|---|

Nickname/Alias/Middle Name

| Sex<br>MALE | Race<br>BLACK | Date of Birth | Age<br>23 | |
|---|---|---|---|---|
| Home Telephone | Business Telephone | Cell Phone | Beeper # | E-Mail Address |

| Activity Address Location<br>OFFICE | | Street | City | State | Zip | Apt # |
|---|---|---|---|---|---|---|
| Cross Street | | | Intersection of<br>and | | Premise Type | |

| Activity Date<br>03/01/2014 | Activity Time<br>13:15 |
|---|---|

Topic/Subject:
**(CLOSING) CLOSING CASE A-1**

**Summary of Investigation:**
1. On March 1, 2014, at approximately 1315 hours the undersigned did review this case. On January 27, 2014 at approximately 2150 hours the undersigned did effect the arrest of Rashaun Ferguson as a result of this case. This arrest was assigned arrest# Q14605601. The Queens District Attorneys Office drew up the charges of Murder in the Second degree, Attempted Murder in the second degree and Criminal Possession of a Weapon in the Second degree.

2. The undersigned recommends this case closed A-1.

| Reporting Officer: | Rank<br>DT3 | Name<br>QUINN JAEGER | | Tax Reg. No.<br>917786 | Command<br>331-101 DET<br>SQUAD |
|---|---|---|---|---|---|
| Reviewing<br>Supervisor: | Manner of Closing<br>A - A ARREST BY<br>DETECTIVES | Date<br>Reviewed<br>03/13/2014 | Date of Next<br>Review | Name<br>GEMMA<br>MASTERSON | Supv. Tax No.<br>900321 |

| POLICE DEPARTMENT | CANCEL INVESTIGATION CARD | | | Crime/Condition MURDER & NON-NEGL. MANSLAUGHTE | | Command 331-101 DET SQUAD Date of This Report 03/01/2014 |
|---|---|---|---|---|---|---|
| Date of UF61 05/03/2013 | Complaint No. 2013-101-01689 | Date Case Assigned 05/04/2013 | Case No. 2013 - 642 | Unit Reporting BRAM | | Follow-Up No. 38 |

| Topic/Subject (CANCEL INVESTIGATION CARD) CANCEL I-CARD<>RASHAUN FERGUSON | Activity Date 03/01/2014 | Activity Time 13:30 |
|---|---|---|

**Details**

**Summary of Investigation:**
1. On March 1, 2014, at approximately 1330 hours the undersigned is cancelling the I-Card for Rashaun Ferguson. On January 27, 2014 at approximately 2150 hours the undersigned did effect the arrest of Rashaun Ferguson as a result of this case. This arrest was assigned arrest# Q14605601.

**ICard Cancellation**

**Reason to Cancel ICard**
ARREST

**Details of Apprehension (Include Date, Time and Location of Arrest and/or Where the Subject was Residing), or Indicate why Investigation Card was Discontinued (Non-Arrest)**
On January 27, 2014 at approximately 2150 hours the undersigned did effect the arrest of Rashaun Ferguson as a result of this case. This arrest was assigned arrest# Q14605601.

| Control No. | | IDS No. I2013012537 | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Last Name FERGUSON | | First Name RASHAUN | | M.I. | Aliases/Nicknames RA RA | | NYSID No. 02815035H | |
| Last known address (Street, Apt, State, Zip) NYC 155-01 71 AVENUE Apt#2A QUEENS, NY 11367 | | | | | Pct. 107 | | | |
| Sex MALE | Race BLACK | Date of Birth 02/10/1994 | Social Security No. | | Height 6-1 | Weight 165 | Hair Color BLACK | Eye Color BROWN |
| Sought As PERPETRATOR - PROBABLE CAUSE TO ARREST | | Precautions to be Observed ARMED AND DANGEROUS | | | Other | | | |
| Domestic Violence? No | | Misd No | | | Felony Yes | | | |
| Law Title PL | | Law Section PL 125 | CRIMINALLY NEGLIGENT HOMICIDE | | | Law Code/Description PL 125.25 02 | F | A | 2 | | | |
| Attempt NO | | Type F | | Class A | | | Count 1 | |

**Additional Information Regarding Subject (e.g. Friends, Relatives, Phone Numbers, Additional Addresses)**
USED ABOVE ADDRESS ON LAST ARREST -ACTUALLY USED 151-01 71ST AVE FLUSHING A2, BUT ITS BELIEVED TO BE ABOVE ADDRESS

**Additional Descriptive Information (Tattoos, Piercings, Facial Hair, Eyewear)**
N/A

**Specific Instructions For Apprehending Officers:**
N/A

**Required Computer Checks**

| ADW Checked YES | Active I-Card NO | Notified TaxId 906231 | Name BRAD FINE | Rank DT2 | Cmd 331-DET SQD. QNS-101 |
|---|---|---|---|---|---|

| | Active Warrant NO | Notified TaxId 906231 | Name BRAD FINE | Rank DT2 | Cmd 331-DET SQD. QNS-101 | | | |
|---|---|---|---|---|---|---|---|---|
| DALL Checked YES | Active Warrant NO | Notified TaxId 906231 | Name BRAD FINE | Rank DT2 | Cmd 331-DET SQD. QNS-101 | | | |
| EJustice Checked YES | Active Warrant NO | Notified TaxId 906231 | Name BRAD FINE | Rank DT2 | Cmd 331-DET SQD. QNS-101 | | | |
| NYSID Checked YES | Multiple Active NYSIDs NO | Notified TaxId 906231 | Name BRAD FINE | Rank DT2 | Cmd 331-DET SQD. QNS-101 | | | |
| CRIMS Checked YES | Scheduled Court Date NO | Date of Next Court Appearance | Court Location | Court Part | Notified TaxId 906231 | Name BRAD FINE | Rank DT2 | Cmd 331-DET SQD. QNS-101 |

| Command Phone Number 718-868-3429 |
|---|

| Reporting Officer: | Rank DT3 | Name QUINN JAEGER | | Tax Reg. No. 917786 | Command 331-101 DET SQUAD |
|---|---|---|---|---|---|
| Reviewing Supervisor: | Manner of Closing - | Date Reviewed 03/02/2014 | Date of Next Review | Name CORTNEY CUMMINGS | Supv. Tax No. 928136 |

Complaint# 2013-101-01689

| GENERAL INVESTIGATION | | | | Crime/Condition MURDER & NON-NEGL. MANSLAUGHTE | | | | | Command 101-101ST PRECINCT Date of This Report 08/14/2015 |
|---|---|---|---|---|---|---|---|---|---|
| Date of UF61 05/03/2013 | Complaint No. 2013-101-01689 | Date Case Assigned 05/04/2013 | Case No. 2013 - 642 | Unit Reporting BRAM | | | | | Follow-Up No. 39 |

| Complainant's Name GULLEY, KEITH | | | Address | | | | Apt No. |
|---|---|---|---|---|---|---|---|
| Nickname/Alias/Middle Name | | | | | | | |
| Sex MALE | Race BLACK | | Date of Birth | | Age 23 | | |
| Home Telephone | Business Telephone | | Cell Phone | | Beeper # | | E-Mail Address |

| Activity Address Location NYC | | Street 125-01 QUEENS BOULEVARD | | City QUEENS | State NY | Zip | Apt # |
|---|---|---|---|---|---|---|---|
| Cross Street HOOVER AVENUE and 82 AVENUE | | | | Intersection of | | | Premise Type |

| Activity Date 08/14/2015 | Activity Time 11:45 |
|---|---|
| Topic/Subject: QUEENS DISTRICT ATTORNEY'S OFFICE | |

**Summary of Investigation:**
1. On August 14, 2015, at approximately 1145 hours the undersigned was present at the Queens District Attorneys Office along with ADA Rosenblatt, LT Masterson of the 101 Squad and DET Gildea of the Major Case squad to speak with ▮▮▮▮ who stated he had information in regards to this case. ▮▮▮▮ states he has no evidence, witness' or direct statements but states everyone knows it was (Get em) Marcus Ortiz that killed the guy not Ra. ▮▮▮▮ states it is just assumed that since Gulley shot Get em in 2010 that he shot him when he got out of jail. He has no evidence to back this up and did not know the facts of the case or that there was another person shot at this incident. ▮▮▮▮ further states he knows the defendant Ra from juvenile and time at Rikers Island and was asked by Ra to speak to the police and tell them it was Get em and not him.

| Reporting Officer: | Rank DT2 | Name BRAD FINE | | Tax Reg. No. 906231 | Command 331-101 DET SQUAD |
|---|---|---|---|---|---|
| Reviewing Supervisor: | Manner of Closing - | Date Reviewed 01/12/2017 | Date of Next Review | Name CORTNEY CUMMINGS | Supv. Tax No. 928136 |

000714

JA-437

| AUTO REOPEN | | | | Crime/Condition<br>A-1<>GULLEY HOMICIDE | | Command<br>331-101 DET SQUAD<br>Date of This Report<br>08/14/2015 |
|---|---|---|---|---|---|---|
| Date of UF61 | Complaint No.<br>2013-101-01689 | Date Case Assigned<br>05/03/2013 | Case No.<br>2013 - 642 | Unit Reporting<br>SYSTEM GENERATED | | Follow-Up No.<br>40 |

| Topic/Subject<br>(AUTO REOPEN) THE CASE WAS REOPENED | Activity Date<br>08/14/2015 | Activity Time<br>18:56 |
|---|---|---|

**Details**

Summary of Investigation:
The Case was Reopened by
Taxid : 900321
Name : MASTERSON, GEMMA
Rank : LCD
Command : QS - 101 DET SQUAD

| Reporting Officer: | Rank<br>999 | Name<br>SYSTEM GENERATED | | Tax Reg. No.<br>999999 | Command<br>331-101 DET<br>SQUAD |
|---|---|---|---|---|---|
| Reviewing<br>Supervisor: | Manner of<br>Closing<br>- | Date<br>Reviewed<br>08/18/2015 | Date of Next<br>Review | Name<br>DAVID<br>LEONARDI | Supv. Tax No.<br>930557 |

2017-06771
SF *rogen* Ld/e

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF NEW YORK

        CASE# 1:17-cv-06871-ENV-SJB

----------------------------------------------x

RASHAUN FERGUSON,

               Plaintiff,

          -against-

THE CITY OF NEW YORK, DETECTIVE JAEGER, DETECTIVE

MICHAEL GILDEA SHIELD #465 and UNIDENTIFIED

MEMBERS OF THE NYPD all sued herein in their

individual capacities,

               Defendants.

Errata in back

------------------------------------

           116 West 23rd Street

           New York, New York

           January 3, 2019

           4:33 p.m.

           Deposition of the Non-Party Witness

TIMOTHY REGAN, pursuant to Notice, before

Robert S. Barletta, a Notary Public of the State

of New York.

Deitz Court Reporting
Certified
ORIGINAL
TRANSCRIPT

1                          Regan

2   on the phone, are you aware of any other time that

3   anyone from your office spoke to Mr. Wheeling?

4        A.   I spoke with him at the courthouse when

5   he responded to the subpoena, and then he met me

6   back in my office, then we had a conversation in

7   my office.  I brought him to Bob Didio's office

8   after I had my conversation with him.  Bob Didio's

9   office is in my building.

10       Q.   Did you speak with him substantively

11  about what happened during the events that trial

12  was going on for?

13       A.   Yes.

14       Q.   Did he explain to you at that time that

15  he witnessed anything relevant to the murder?

16       A.   First time I met him was the first floor

17  of the courthouse by the elevators.  I remember

18  the first thing he said to me is, you guys are

19  going to get me killed.  He said I don't want to

20  talk about this in public. ^I SAID Come back to my

21  office, ̶W̶e can talk at my office.  ̶H̶e said meet

22  me there at 1:00.  We eventually met at my office

23  and I started asking him questions about what

24  happened.  He told me it was a long time ago.  He

25  really doesn't remember.  I can't remember exactly

1                        Regan
2    what he said but I ended up asking him more
3    questions about what he witnessed, the lineup, and
4    the vehicle that was involved in the case, and he
5    started telling me that the vehicle was not -- I
6    showed him a photograph of the gray Ford Escape.
7    I said, do you recognize that.  He said, no.  The
8    vehicle I saw this guy got out of and go back into
9    was bigger or smaller.  It wasn't the vehicle I
10   showed him.
11       Q.   Did he tell you it was a Ford Explorer?
12   The size of a Ford Explorer?
13       A.   He said bigger. or smaller
14       Q.   You don't remember if he told you it was
15   bigger or smaller, he just told you that wasn't
16   the vehicle?
17       A.   Correct.
18       Q.   Did he talk to you about whether or not
19   it was Rashaun Ferguson he saw at any time during
20   the incident?
21       A.   He told me -- I think -- and put this on
22   the record, at the time, again, it would be he
23   told me the guy in the lineup was either darker
24   skinned or lighter skinned than the guy he saw get
25   out of the car.

PHOTO ARRAY VIEWING REPORT
PD 373-154 (Rev. 10-11)

| PART A — SHOWING THE PHOTO ARRAY | | | |
|---|---|---|---|
| Witness Name | Administrator Det. Michael O. Gildea | | Date 5/04/13 |
| Interpreter Used? ☐ Yes ☒ No | Name of Interpreter N/A | Command N/A | Tax No. N/A |

If interpreter is Not a Member of the Service, List Name, Address and Telephone No.
N/A

List any Additional Members of the Service Present:

| Rank/Name Det. Jaeger | Tax No. 917786 | Cmd. 101 Sqd | Rank/Name N/A | Tax No. N/A | Cmd. N/A |
|---|---|---|---|---|---|

Instructions to the Administrator Showing the Photo Array:
* Remain neutral. Do not comment on the identification before, during or after the identification procedure.
* Place the photo array in a closed letter-size manila folder when handing it to the witness.
* Stand out of the witness' line of sight, where practical, but still observe the witness as the witness views the photo array.
* So as not to distract the witness, do not comment during identification procedure.

| PART B — AFTER THE WITNESS HAS VIEWED THE ARRAY, ASK THESE QUESTIONS |
|---|

Did you recognize anyone in the photo array? __YES__

If so, what is the number of the person that you recognize? __1__

From where do you recognize that person? __That's the guy w/ the gun__

Record words and gestures of the witness: __Yeah. That's the guy w/ the gun.__

If the Witness Gives a Vague Answer (for example: "I think it is..." or "It might be...")
Then say the following: You said __N/A__

_(Insert witness' words, e.g., "I think it is...")_

What do you mean by that? (record the witness' answer) __N/A__

Date: 6/04/2013    Time: 0230    Witness Signature

FINAL INSTRUCTION TO WITNESS:
Do not discuss with any other witness what you observed or said during this identification procedure.

| Prepared by (Rank, Name Printed) Det. Michael D. Gildea | Tax No. 928314 | Cmd. 101 Sqd | Date Prepared 5/04/13 |
|---|---|---|---|




PLAINTIFF'S
EXHIBIT
PENGAD 800-631-6989
90 3/28/15

JA-442

SUPREME COURT OF THE STATE OF NEW YORK      NO FEE
QUEENS COUNTY
125-01 QUEENS BOULEVARD
KEW GARDENS, NY 11415

CERTIFICATE OF DISPOSITION ACQUITTAL

DATE: 01/17/2018                    CERTIFICATE OF DISPOSITION NUMBER: 31327

PEOPLE OF THE STATE OF NEW YORK      CASE NUMBER:            02723-2014
                VS.                  LOWER COURT NUMBER(S): 2014QN005128
                                     DATE OF ARREST:        01/27/2014
                                     ARREST #:              Q14605601
                                     NYSID #:               2815035H
                                     DATE OF BIRTH:         02/10/1994
FERGUSON,RASHAUN                     DATE FILED:            11/20/2014

_____
        DEFENDANT

I HEREBY CERTIFY THAT IT APPEARS FROM AN EXAMINATION OF THE RECORDS
ON FILE IN THIS OFFICE THAT ON 10/16/2017 THE ABOVE NAMED
DEFENDANT WAS TRIED AND FOUND NOT GUILTY OF ALL PENDING CRIMINAL
CHARGES AS TO THIS CRIMINAL ACTION BEFORE THE HONORABLE
LOPRESTO,CHARLES    THEN A JUDGE OF THIS COURT.

THE DEFENDANT WAS DISCHARGED FROM THE JURISDICTION OF THE COURT.

THE ABOVE MENTIONED ACQUITTAL IS A TERMINATION OF THE CRIMINAL
ACTION IN FAVOR OF THE ACCUSED AND PURSUANT TO SECTION 160.60 OF
THE CRIMINAL PROCEDURE LAW "THE ARREST AND PROSECUTION SHALL BE
DEEMED A NULLITY AND THE ACCUSED SHALL BE RESTORED, IN
CONTEMPLATION OF LAW, TO THE STATUS OCCUPIED BEFORE THE ARREST
AND PROSECUTION".

PURSUANT TO SECTION 160.50(1C) OF THE CRIMINAL PROCEDURE LAW, ALL
OFFICIAL RECORDS AND PAPERS RELATING TO THIS CASE ARE SEALED.

IN WITNESS WHEREOF,I HAVE HEREUNTO SET MY HAND AND AFFIXED MY
OFFICIAL SEAL ON THIS DATE 01/17/2018.

                              _Audrey I. Pheffer_
                              QUEENS COUNTY CLERK
                         _____
                              COURT CLERK

JA-443

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - x
                                    :
RASHAUN FERGUSON,

                                    :

                    Plaintiff,

                                    :

            -against-

                                    :

THE CITY OF NEW YORK, DETECTIVE
JAEGER, DETECTIVE MICHAEL GILDEA,    :
SHIELD #465 AND UNIDENTIFIED MEMBERS
OF THE NYPD ALL SUED HEREIN IN THEIR:
INDIVIDUAL CAPACITIES,

                                    :

                    Defendants.
- - - - - - - - - - - - - - - - - - x
                    116 West 23rd Street
                    New York, New York 10011

                    December 12, 2018
                    2:45 p.m.


EXAMINATION BEFORE TRIAL of ORRIS WHEELING, a
Non-Party Witness taken on behalf of the Plaintiff
herein, pursuant to Subpoena, before a Stenotype
Reporter and Notary Public within and for the
State of New York.



            JAY DEITZ & ASSOCIATES, LTD.
(516)678-0700   (212)374-7700  (718)527-7700

```
1              O. WHEELING
2       A    Yes.
3       Q    Where did you go when you left your
4   residence?
5       A    To his car around the corner.
6       Q    Where was his car approximately?
7       A    The name of the street and everything?
8       Q    Sure.
9       A    Beach 56th Street and Beach Channel.
10      Q    When you spoke to Mr. DeLeon did you
11  tell him the truth?
12      A    Yeah.
13      Q    Is there anything that you said to him
14  that wasn't accurate, if you remember?
15           MR. MORRIS:  Objection vague.
16           MR. LICHTMACHER:  You can't order him
17      not to answer.
18           MR. MORRIS:  Read back the question.
19           (The question was read back by the
20      court reporter).
21      A    No.
22           MR. LICHTMACHER:  He already answered
23      the question.
24           MR. MORRIS:  I didn't hear him answer.
25           MR. LICHTMACHER:  He said no.
```

D00515

## LINEUP INFORMATION REPORT
PD 373-151 (Rev. 10-11)

| Complaint Report No. | Crime Committed | | Date of Crime |
|---|---|---|---|
| 2018-101-1689 | MURDER | | 5 03 2018 |

| Location of Crime | | Juvenile Lineup Serial No. |
|---|---|---|
| P/O 54-30 BEACH CHANNEL DRIVE | | N/A |

| Lineup Date | Time | Location of Lineup |
|---|---|---|
| 5/07/13 | 0001 | 1/O 101 DETECTIVE Sqd. 6-12 MOTT AVENUE |

| Witness' Name | Was Witness Transported by Police? |
|---|---|
| CRES Wheeling | ☑ Yes ☐ No |

| | Command | Tax No. |
|---|---|---|
| Transporting Officer's Rank/Name | | |
| Det. MICHAEL D. GILDEA | 101 89D | 928314 |
| Case Investigator's Rank/Name | | |
| Det. MICHAEL D. GILDEA | 101 89D | 928314 |
| Lineup Administrator's Rank/Name | | |
| Det. MICHAEL D. GILDEA | 101 89D | 928314 |
| Security Officer's Rank/Name | | |
| Det. GARY MAZZEI | 101 SQD | |
| Officer Escorting Witness into Viewing Room, Rank/Name | | |
| Det. MICHAEL D. GILDEA | 101 89D | 928314 |
| Supervisor Present, Rank/Name | | |
| Sgt. CORTNEY CUMMINGS | 101 SQD | 928136 |

| Assistant District Attorney Present? | ☐ Yes ☑ No | Name of ADA | Telephone No. |
|---|---|---|---|
| | | KRISTIN FRAZIER | 918-286-6000 |

| Interpreter Used? | ☐ Yes ☑ No | Name of Interpreter | Command | Tax No. |
|---|---|---|---|---|
| | | N/A | N/A | N/A |

If Interpreter is Not a Member of the Service List Name, Address and Telephone No.

N/A

| Suspect's Name | Date of Birth |
|---|---|
| RASHAWN FERGUSON | 2/10/1994 |

Who Selected the Suspect's Position?
SELF SELECTED BY FERGUSON

### LINEUP MEMBERS

| | NAME | NUMBER HELD | POSITION | AGE | HEIGHT | WEIGHT |
|---|---|---|---|---|---|---|
| 1. | ▉▉▉▉▉ | 1 | 1 | 19 | 5'10" | 160 |
| 2. | ▉▉▉▉▉ | 2 | 2 | 21 | 5'11" | 165 |
| 3. | ▉▉▉▉▉ | 3 | 3 | 21 | 5'11" | 150 |
| 4. | RASHAWN FERGUSON | 4 | 4 | 19 | 6'0" | 165 |
| 5. | ▉▉▉▉▉ | 5 | 5 | 21 | 6'0" | 170 |
| 6. | ▉▉▉▉▉ | 6 | 6 | 19 | 5'10" | 165 |

| Prepared by (Rank, Name Printed) | Tax No. | Cmd. | Date Prepared |
|---|---|---|---|
| Det. MICHAEL D. GILDEA | 928314 | 101 89D | 5/7/13 |
| Supervisor's Signature | Tax No. | Cmd. | Date |
| | 928136 | 101 SQD | 5/7/13 |

D00515

JA-446

D00516

D00516

D00517



**LINEUP INSTRUCTIONS TO WITNESS REPORT**
PD 373-111 (Rev. 10-11)

Name of Witness  *Orris Wheeling*

## LINEUP ADMINISTRATOR MUST READ THE FOLLOWING TO THE WITNESS PRIOR TO VIEWING THE LINEUP

* As part of our on-going investigation into a crime that occurred at *64-30 Beach Channel*
  *Drive* _____ *(location)* on *5/03/2013* *(date)*, you are about
  to view a lineup.

* You will look through a one-way mirror and see six people in the lineup. They will not be able to see you.

* Each person on the other side of the mirror will have a painted number situated above their head or will be holding a card with a number on it.

* Take whatever time you want to view the lineup.

* The perpetrator may or may not be among the six people in the lineup.

* Do not assume I know who the perpetrator is.

* Do not ask me or anyone else in the room for guidance during the procedure.

* Individuals presented in the lineup may not appear exactly as they did on the date of the incident because features, such as head and facial hair, are subject to change.

* After you have had an opportunity to view the lineup I will ask you the following three questions:
  1. Do you recognize anyone?
  2. If you do, what is the number of the person you recognize?
  3. From where do you recognize the person?

* I may ask you follow-up questions.

* After the identification procedure is concluded, do not discuss with other witnesses what was said or observed during this identification procedure.                    *( REFUSED )*

## WITNESS MUST INITIAL:

*Refused* → The above instructions have been read to me: _____ *(initials).* Date: _____

| Prepared by (Rank, Name Printed) *Det. Michael C. GILDEA* | Tax No. *928314* | Cmd. *101 SQD* | Date Prepared *5/07/13* |
| Supervisor's Signature | Tax No. *928136* | Cmd. *101 SQD* | Date *5/7/13* |

D005-17

JA-448

**D00518**



**LINEUP ADMINISTRATION REPORT**
PD 373-152 (Rev. 10-11)

Witness' Name

*Orris Wheeling*

## PART A — CONDUCTING THE LINEUP AND RESULTS

**Instructions for Administrator When Entering the Viewing Room:**
- Remain neutral. Do not comment on the identification before, during or after the identification procedure
- Take a photograph of the lineup composition. Preserve the photograph and have the witness sign the photo, if possible.
- Have the witness escorted into the viewing room.
- So as not to distract the witness, do not comment during the identification procedure.
- Introduce by name all individuals present in the viewing room to the witness.
- Tell the witness when the identification procedure will begin (e.g., "You will now look through the one way mirror").
- If there is a need to have a lineup member speak, move, change clothing, or some other activity, then all the lineup members must do the same activity.
- While the witness is viewing the lineup, you should stand out of the witness' line of sight, while still being in a position to observe the witness.

## PART B — AFTER THE WITNESS HAS VIEWED THE LINEUP, ASK THE WITNESS THESE QUESTIONS:

- Did you recognize anyone in the lineup?   *Not Really*
- What is the number of the person that you recognize?   _____
- From where do you recognize that person?   *N/A*

Record words and gestures of the witness:

*WITNESS MADE REFERENCES to #4's SKIN COLOR while VIEWING LINE-UP AND COMMENTED ABOUT #4's WEIGHT AFTER VIEWING LINE-UP*

If the Witness Gives a Vague Answer *(for example: "I think it is..." or "It might be...")*
Then say the following: You said   *N/A*   _____
                                              *(insert witness' words, e.g., "I think it is...")*

what do you mean by that? *(record the witness' answer)*   *N/A*

_____
_____
_____
_____

Date: *5/04/13*   Time: *0801*   Witness Signature   *(REFUSED)*

**FINAL INSTRUCTION TO WITNESS:**
*Do not discuss with any other witness what you observed or said during this identification procedure.*

| Prepared by (Rank, Name Printed) | Tax No. | Cmd | Date Prepared |
|---|---|---|---|
| *Det. Michael O. Gilder* | *928314* | *18 Sq3* | *5/04/13* |
| Supervisor's Serial No. | Tax No. | Cmd | Date |
| | *928136* | *18S90* | *5/7/13* |

**D00518**

JA-449

D00519

**LINEUP DEFENSE COUNSEL REPORT**
PD 373-153 (Rev. 10-11)

Suspect's Attorney Present?  ☐ Yes  ☒ No

Defense Attorney's Name and Address

Scott Brettschneider

Telephone Number
516-984-3616

* The Defense Attorney was instructed *not* to speak while in the viewing room with the witness.
  ☐ Yes  ☐ No

* If Defense Attorney makes requests about the lineup, record the request and whether the request was agreed to or refused:

1. Request: N/A

☐ Agreed  ☐ Refused
Reason for Refusal N/A


2. Request: N/A

☐ Agreed  ☐ Refused
Reason for Refusal N/A


3. Request: N/A

☐ Agreed  ☐ Refused
Reason for Refusal N/A


**USE ADDITIONAL SHEETS IF NECESSARY**

| Prepared by (Rank, Name Printed) | Tax No. | Cmd | Date Prepared |
|---|---|---|---|
| Lt. Michael O. Guder | 928314 | 112 sqd | 5/02/13 |
| Supervisor's Signature | 928136 | 105 sq | 5/7/13 |

D00519

JA-450

D00520

Page 1 of 1



D00520

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------------x

RASHAUN FERGUSON,

                                    Plaintiff,

            - against -

THE CITY OF NEW YORK, DETECTIVE JAEGER,
DETECTIVE MICHAEL GILDEA SHIELD # 465 and
UNIDENTIFIED MEMBERS OF THE NYPD all sued
herein in their individual capacities,

                                    Defendants.
--------------------------------------------------------------x

DECLARATION OF
PARALEGAL
MADELINE ARNOLDY

17-cv-06871-ENV-SJB

STATE OF NEVADA      )
                     : SS. :
COUNTY OF CLARK      )

        **MADELINE ARNOLDY**, declares, pursuant to 28 U.S.C. §1746 and under penalty of

perjury as follows:

        1.      I work as a paralegal for the Law Office of Fred Lichtmacher PC and as such am

familiar with the facts surrounding the matter and have conducted research to the best of my

ability, and to my knowledge, the facts provided are current and updated, and come from reliable

sources, and reflect true values.

        2.      Annexed to this Declaration, for the convenience of the Court, is a true copy of

the following:

                Exhibit 1:      A true copy of a Data Chart showing the number of
                                Ford Escapes sold in the United States spanning from
                                2005 to 2016.

        3.      In my research I have determined that this data is the most accurate

and consistent data offered across multiple non-Ford sources on the internet, which

report on automotive sales data and statistics. I have compared the data provided by

these sources and have formed the belief that this data is an accurate representation of the true sales. Annexed hereto as Exhibit "28" is a true copy of the Ford Escape Data chart I compiled from my research.

4.    I have also made an attempt at obtaining official sale documents from Ford Motors, and have contacted their record department and expect to receive official documents within the next three weeks which will provide the most accurate data. Plaintiff's counsel intends to provide the Court with the Ford Motor documents as soon as they come into our possession.

Dated: Las Vegas, NV
       May 17, 2021

_____
Madeline Arnoldy

UNITED STATES DISTRICT COURT      17-cv-06871-ENV-SJB

EASTERN DISTRICT OF NEW YORK

------------------------------------------------------X

RASHAUN FERGUSON,

                         Plaintiff,      **DECLARATION OF PRIVATE**

                                        **INVESTIGATOR ELPIDIO DeLEON**

        -against-

THE CITY OF NEW YORK, et al,

                          Defendants.

------------------------------------------------------X

       **Elpidio DeLeon**, private investigator and retired First Grade detecitve with the NYPD

declares under penalty of perjury and pursuant to 28 U.S.C. § 1746, that the following is true and

correct:

1        I was a member of the NYPD for 23 years retiring with the rank of Detective First Grade.

During the course of my career I made and assisted in hundreds of arrests including 50 for

homicides. In 1995 I was awarded recognition by the NYPD and the community for solving a

triple murder. In 2001 I was awarded recognition by Essex County New Jersey for apprehending

three suspects who had shot an off-duty police officer in New Jersey and fled to New York. In

2002 I was awarded recognition by the Mexican Consulate for apprehending two men who

kidnapped two Mexican nationals from New Jersey then executing them in New York City. I did

three episodes of Americas Most Wanted with John Walsh. Two of my cleared homicide cases

became episodes in the made for T.V. series of Law and Order. I traveled to various parts of the

country apprehending some of New York City's most wanted. I've provided sworn testimony in

New York City, Dominican Republic, and Puerto Rico.

2        I appear in this matter as a fact witness as I have interviewed witnesses, inspected

the relevant scenes where the events occurred and even listened to the sound of a car in the

possession of Henry McCummings.

3       After interviewing witnesses I obtained photographs of Marcus Ortiz who I discovered

had been murdered prior to the criminal trial.

4       I interviewed Wynter Carter an eyewitness to the shooting.

5       I interviewed Principal Logn-Smith who viewed a surveillance video relevant to the

incident.

6       I interviewed Orris Wheeling on August 4, 2017 and  I generated a report based on said

interview annexed to these papers as Exhibit "21".

7       I did not ask Mr. Wheeling to sign the report.

8       Exhibit "21" is a true and accurate copy of my report generated after the August 4, 2016

interview with Mr. Wheeling.

Dated:  Bronx, New York
        May 17, 2021

_____
Elpidio DeLeon

UNITED STATES DISTRICT COURT     17-cv-06871-ENV-SJB
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------X
RASHAUN FERGUSON,

                Plaintiff,     **PLAINTIFF'S RESPONSES TO**
                          **DEFENDANTS' STATEMENT OF**
                          **ALLEGEDLY UNCONTESTED FACTS**
    -against-                **AS WELL AS PLAINTIFF'S**
                          **COUNTER STATEMENT OF**
                          **UNCONTESTED FACTS**

THE CITY OF NEW YORK


-----------------------------------------------------X


1. On May 3, 2013 Reginald Evans was watching his children play outside of 54-30 Beach Channel Drive, in the Edgemere housing complex ("Edgemere") in Queens, New York. **Ex. A1** (Trial Testimony of Reginald Evans ["Evans Trial Test."]) at 1078:9 - 1079:4.

**ANSWER 1**
    Admits


2. While Evans was outside with his daughters, his brother Keith Gulley arrived and the two   began talking. **Ex. A** (Evans Trial Test.) at 1081:20 - 1082:10; 1083:16-18.

**ANSWER 2**
    Admits


3. While Evans and Gulley were talking, a gunman approached and shot both Gulley and Evans multiple times. **Ex. A** (Evans Trial Test.) at 1084:4-13; **Ex. B** (Relevant Excerpts from the DD5 File ["DD5 File"]) at D00403.

**ANSWER 3**
    Admits


4. At approximately 8:08 p.m., Detective Jaeger and Detective Gildea were notified of the shooting by radio. **Ex. C** (Jaeger Dep.) at 49:13-20.

**ANSWER 4**
    Admits


5. Shortly thereafter, nonparty Police Officer Alfonso Vargas responded to the scene of

the shooting and encountered Orris Wheeling, who identified himself as a witness to the events surrounding the shooting. **Ex. D** (Vargas Dep.) at 29:11-7; 33:14 - 34:7; 49:5-7; 71:19-25.

**ANSWER 5**
 Admits

 6. Wheeling informed Vargas that the perpetrator fled in a dark gray Ford Escape heading westbound. **Ex. D** (Vargas Dep.) at 34:2-7.

**ANSWER 6**
 Denies. Wheeling when shown the photo of the dark gray Ford escape told the ADA trying the criminal case that was not the car (Exh "23"Regan at14:2 -10 ); he told Investigator DeLeon it was not a Dark Grey Ford Escape (Exh "21" DeLeon Report); and eyewitness Principal Logan Smith said it was a sedan (Exh "19" Logan-Smith Dep (Logan-Smith dep at15:15-19)

 7. At 8:18 p.m., either Vargas or his supervisor made a radio report of a dark gray Ford Escape heading westbound. **Ex. D** (Vargas Dep.) 34:8-12; **Ex. E** (Sprint Report) at D000062.

**ANSWER 7**
 Admits, only to the extent that someone made such a report. And the Sprint Report does not disclose who made such a report. (Sprint Report at D000062;).

 8. At 8:20 p.m., Detective Gildea and Detective Jaeger arrived at the scene. **Ex. C** (Jaeger Dep.) at 49:21-22; **Ex. B** (DD5 File) at D00387.

**ANSWER 8**
 Admits.

 9. When Detective Gildea and Detective Jaeger arrived at the scene, they encountered Gulley and Evans, who had each sustained gunshot wounds. **Ex. B** (DD5 File) at D00387.

**ANSWER 9**
 Admits.

 10. Gulley was transported to St. John's Hospital, where he was pronounced dead at 9:05 p.m. **Ex. B** (DD5 File) at D00387.

**ANSWER 10**
 Admits.

 11. Evans was also transported to a hospital, where it was determined he was likely to survive his injuries. **Ex. B (**DD5 File) at D00386.

**ANSWER 11**
 Admits.


 12. At approximately 9:15 p.m., Detective Gildea and Detective Jaeger interviewed Wheeling. **Ex. B** (DD5 File) at D00390.


**ANSWER 12**
 Admits.

13. Wheeling told Detective Gildea and Detective Jaeger the following: Prior to the shooting, Wheeling was working on his vehicle, which was parked on Beach 56th Street. While working on his vehicle, Wheeling saw a gray Ford SUV pull onto the block from Beach Channel Drive. Wheeling recognized the SUV's driver as a person who went by the name "Man" and lived in the Ocean Village housing complex. A black male exited the SUV's passenger side, took a couple of steps, then returned to the SUV. Someone from within the SUV said "take your shoes off." The same black male then exited the SUV, without shoes on, and proceeded toward Edgemere. Moments later, Wheeling heard multiple gun shots coming from Edgemere. The same black male ran back to the SUV from Edgemere with a gun in his hand. The black male re-entered the passenger side of the gray SUV, which then sped off down Beach 56 Street. **Ex. B** (DD5 File) at D00390; **Ex. F** (Detective Gildea's *Wade* Hearing Testimony ["Gildea *Wade* Test."]) at 13:4 - 16:8.

**ANSWER 13**

Admits in part and denies in part. Plaintiff denies that the vehicle Mr. Wheeling reported seeing was a Ford Escape. Mr. Wheeling specifically reported to ADA Regan, that the vehicle was not a Ford Escape. (Exh."23" Regan Dep 13:14 - 14:10). Wheeling reported to investigator DeLeon that he never told the officers who interviewed him it was a Ford Escape and that this was one of several lies the Detectives concocted. (Exh. "21" DeLeon Report)

14. Detective Gildea observed a surveillance camera at Goldie Maple Academy, a school located at 365 Beach 56th Street, but because it was not pointed north toward the intersection where the incident occurred, he determined it would not be of any value and neither he nor Detective Jaeger made any attempt to view or retrieve any video from the school. **Ex. G** (Gildea Dep.) at 44:3-18.

**ANSWER 14**

Admits in part and denies in part. Plaintiff admits that Gildea observed a surveillance camera a the Goldie Maple Academy, a school located at 365 Beach 56th Street. However, plaintiff denies it would not be of any value as Principal Logan-Smith viewed the video with two NYPD members, and quite possibly Detective Jaeger was one of them. (Gildea told the prosecutor that Detective Jaeger viewed the surveillance footage. (Exh."12"Tr Trans D01798 lines 18-25)). Jaegger completely denies knowing even of the existence of such video. (Exh."9" Jaeger's Dep p 17) Principal Logan-Smith showed the video to two officers. (Id. p 11;18-24).

> Q. Did they ask you to view any video?
> A. Yes.
> Q. What if any video footage did you show
> A. I showed them the footage that is focused on Beach 56th Street.
> Q. From that, I take it there was at least one surveillance camera that faced Beach 56th Street?
> A. There is one.
> Q. Was it obstructed? The view.
> A. No.

(Exh "19" Logan-Smith dep at 14:8-19)

      Q. To recap, you had a clear unobstructed
         view of the perp running down the street?
   A. Yes.
(Exh "19" at 46:6-8)

And Gildea even admits that  If there was a surveillance camera, as there was in the Goldie Maple Academy, that shows  somebody walking or running down Beach 56th Street, as this was the alleged escape route, it would be important to be preserved for trial (Exh. "10" Gildea's dep at 41:17- 42:7).

15. Detective Gildea learned that members of the NYPD had on prior occasions stopped plaintiff Rashaun Ferguson while he was driving a gray Ford Escape bearing New York License Plate No. GDX 7434 in the vicinity of Edgemere. **Ex. F** (Gildea *Wade* Test.) at 19:13-17; 19:23 - 20:11.

**ANSWER 15**
    Denies information sufficient to form a belief as to the veracity of what Gildea learned.

16. Detective Gildea conducted a Department of Motor Vehicles check, which revealed that License Plate No. GDX 7434 was registered to a gray 2003 Ford Escape, which was registered to plaintiff's mother, Monet Pierre. **Ex. F** (Gildea *Wade* Test.) at 19:23 - 20:20; **Ex. H** (Plf. Dep.) at 21:10-11.
**ANSWER 16**
    Denies information sufficient to form a belief as to what Gildea did, but admits that Mr. Ferguson's mother owns the vehicle discussed. And approximately 1,000,000 Ford Escapes were sold from the year 2010 to the year 2013. (Arnoldy Declaration).

17. In May 2013, plaintiff's mother, Monet Pierre, owned a gray Ford Escape SUV. **Ex. H** (Plf. Dep.) at 78:8-21.
**ANSWER 17**
    Admits.

18. Detective Gildea obtained a computer-generated photo array consisting of photographs of plaintiff and five other individuals. **Ex. G** (Gildea Dep.) at 67:8-24.
**ANSWER 18**
    Admits.

19. On May 4, 2013, Detective Gildea and Detective Jaeger presented the photo array to Wheeling. **Ex. F** (Gildea *Wade* Test.) at 21:13 - 23:11; **Ex. I** (Wheeling Photo Array Documents); **Ex. B** (DD5 File) at D00408.
**ANSWER 19**
    Admits.

20. Wheeling identified plaintiff in the photo array as the gunman he saw near the scene of the shooting. **Ex. F** (Gildea *Wade* Test.) at 21:13-23:11; **Ex. I** (Wheeling Photo Array Documents); **Ex. B** (DD5 File) at D00408.
**ANSWER 20**
      Denies. Wheeling picked Ferguson out of a photo array, shown to him by Gildea, only because Gildea told him to do so and Gildea told him everyone was picking Ferguson-which was a fabrication. (Exh. "21" DeLeon Report).

21. Wheeling wrote his initials on the Photo Array Pre-Viewing Instructions, signed his name on the Photo Array Viewing Report, signed his name under plaintiff's photograph, and wrote "this is the guy I saw with the gun" under the photo array. **Ex. I** (Wheeling Photo Array Documents) at D00486 - D00491.
**ANSWER 21**
      Denies. Gildea wrote the statement "this is the guy I saw with the gun." after Wheeling had signed the document and he signed the document because Gildea coerced him into doing so. (Exh. "21" DeLeon Report)

22. On May 4, 2013, Detective Gildea generated an I-Card for plaintiff based on Wheeling's positive photo array identification. **Ex. F** (Gildea *Wade* Test.) at 26:21-25.
**ANSWER 22**
      Admits

23. On May 4, 2013, Detective Gildea and Detective Jaeger visited Evans in the hospital and attempted to show him the previously generated photo array, but Evans refused to provide any information or make any identification. **Ex. F** (Gildea *Wade* Test.) at 25:15 - 26:20; **Ex. A** (Evans Trial Test.) at 1095:12 - 1096:15.
**ANSWER 23**
      Admits.

24. When Detective Gildea and Detective Jaeger visited Evans on May 4, 2013, Evans did not know that Gulley had died of his injuries. **Ex. A** (Evans Trial Test.) at 1095:3-11.

**ANSWER 24**
        Plaintiff admits, only that Evans provided such testimony.

25. On May 4, 2013, nonparty detectives Velsor and Cappolla went to Goldie Maple Academy, to attempt to view video from the school's surveillance cameras, but they were unable to view the video because they were told that it would not be accessible until May 6, 2013 when the school's principal returned to work. **Ex. B** (DD5 File) at D00411; **Ex. J** (Trial Testimony of Angela Logan-Smith ["Logan-Smith Trial Test."]) at 1322:2-10.

**ANSWER 25**
        Admits.

26. Detectives Gildea and Jaeger are unaware of whether nonparty detectives Velsor or Cappolla ever returned to the school to view the video. **Ex. C** (Jaeger Dep.) at 17:11-13; **Ex. F (**Gildea *Wade* Test.) at 98:13 - 99:5.

**ANSWER 26**
        Admits in part and denies in part.  Somehow Gildea became informed by Jaeger that the video was of little use. (Exh "10"Gildea dep at 41:17- 42:7). And the defendants fabricated  that there were obstructions to viewing the escape scene on the video.  This was completely rebutted by Principal Logan-Smith. (Exh "19" at 14:10-19; Exh "10" Gildea Dep at47:16-23)

27. On May 6, 2013, plaintiff was apprehended and taken into custody. **Ex. F** (Gildea *Wade* Test.) at 27:11-13.

**ANSWER 27**
        Admits.

28. On May 7, 2013 at 12:01 a.m., plaintiff was placed in a lineup in the presence of Detective Gildea, Detective Jaeger, and Assistant District Attorney Kristin Fraser, and the lineup was presented to Wheeling. **Ex. F** (Gildea *Wade* Test.) at 28:14 - 30:13; **Ex. K** (Wheeling Lineup Documents); **Ex. B** (DD5 File) at D00418.

**ANSWER 28**
        Admits.

29. Wheeling did not make an outright positive identification, but made several references to plaintiff, stating that he "looks like the guy but his skin color is off." **Ex. F** (Gildea *Wade* Test.) at 30:15 - 31:10; **Ex. K** (Wheeling Lineup Documents); **Ex. B** (DD5 File) at D00418.

**ANSWER 29**

    Admits in part and denies in part. Plaintiff admits that Wheeling did not see the shooter in the lineup. The information about references to plaintiff are fabricated by Gildea and did not come from Wheeling. (Exh. "21" DeLeon Report).

30. After viewing the lineup, Wheeling stated to Detective Gildea, "I can't be the only one doing this." **Ex. G** (Gildea Dep.) at 73:24 - 74:8.

**ANSWER 30**

    Denies. (Exh. "21" DeLeon Report).

31. After Wheeling did not make an outright positive identification, Detective Gildea voided plaintiff's arrest and released him from custody. **Ex. F** (Gildea *Wade* Test.) at 40:2-6; **Ex. H** (Plaintiff Dep.) at 141:5-10.

**ANSWER 31**

Plaintiff admits in part and denies in part. Wheeling did not make "any" positive identification. (Exh. "21" DeLeon Report).

32. On May 7, 2013, Detective Gildea spoke with Evans's wife, who informed Gildea that Evans would be willing to meet with Gildea. **Ex. F** (Gildea *Wade* Test.) at 40:7-21.

**ANSWER 32**

Denies information sufficient to form a a belief as to the veracity of this assertion.

33. On May 9, 2013, Detective Gildea and Detective Jaeger met with Evans and showed him the previously generated photo array. **Ex. F** (Gildea *Wade* Test.) at 40:22 - 44:15; **Ex. L** (Evans Photo Array Documents); **Ex. B** (DD5 File) at D00430.

**ANSWER 33**

Denies information sufficient to form a a belief as to the veracity of this assertion.

34. Evans made a positive photo array identification of plaintiff as the person who shot him and Gulley. **Ex. F** (Gildea *Wade* Test.) at 44:6-10; **Ex. L** (Evans Photo Array Documents); **Ex. B** (DD5 File) at D00430.

**ANSWER 34**

Denies information sufficient to form a a belief as to the veracity of this assertion. However it should be noted that the alleged Evans identification was made only after both Wheeling and McCumings refused to go along with Gildea's fabrication, and after the defendants failed to document the existence of the important surveillance video and the existence of the exonerating witness Logan-Smith. (Exh. "18" McCumings Dep at 20-23) (Exh "21" DeLeon Report).

35. Evans signed his name under plaintiff's photograph and wrote "that's the guy that walk [*sic*] up and shot me" under the photo array. **Ex. L** (Evans Photo Array Documents) at D00482.

**ANSWER 35**

Denies information sufficient to form a a belief as to the veracity of this assertion.

36. Evans told Detective Gildea and Detective Jaeger that the reason he previously refused to make an identification was that he believed Gulley was still alive and didn't want to get involved because it is "street code" not to "snitch," but chose to cooperate after learning that his brother had died. **Ex. B (**DD5 File) at D00430; **Ex. A** (Evans Trial Test.) at 1097:11 - 1098:7.

**ANSWER 36**
    Denies information sufficient to form a a belief as to the veracity of this assertion.

37. After Evans made a positive photo array identification, Detective Gildea reached out to nonparty Detective Thompson and requested that he attempt to locate and apprehend plaintiff. **Ex. F** (Gildea *Wade* Test.) at 45:2-12.

**ANSWER 37**
    Admits.

38. On January 27, 2014, once plaintiff was located, nonparty police officers apprehended plaintiff and took him into police custody. **Ex. F** (Gildea *Wade* Test.) at 47:3-8.

**ANSWER 38**
     Admits.


39. Plaintiff was placed in a lineup in the presence of Detective Jaeger, Lieutenant Gemma Masterson, Assistant District Attorney Briana Heymann, and plaintiff's criminal defense attorney, Scott Brettschneider. **Ex. H** (Plf. Dep.) at 152:3-5; **Ex. M** (Evans Lineup Documents); **Ex. B** (DD5 File) at D00442.

**ANSWER 39**
     Admits.


40. The lineup was presented to Evans. **Ex. A** (Evans Trial Test.) at 1098:15 - 1102:11; **Ex. M** (Evans Lineup Documents); **Ex. B** (DD5 File) at D00442.

**ANSWER 40**
     Admits.


41. Evans again identified plaintiff as the gunman who shot him and Keith Gulley on May 3, 2013. **Ex. A** (Evans Trial Test.) at 1101:17-1102:11.

**ANSWER 41**
     Admits only that he is alleged to have identified Ferguson at the lineup.  However, Reginald Evans initially described the shooter as being ***"light skinned"*** (Exh. "9" Jaeger Dep at 47:21-48:5; Exh "8" Jaeger notes).  Ferguson is darkly complected. (Exh. "15" Ferguson Mugshot) Additionally, when Gildea first spoke to shooting victim Reggie Evans on May 4, 2013 in the early morning hours, he provided Gildea with multiple descriptions of the shooter; he kept changing the description. (Tr Tran D01807:25- D01808:18).  Yet in the DD5's generated by Gildea the "multiple descriptions" do not appear.  Instead only one description, that being similar to Ferguson appears in any DD5.  (Lichtmacher Declaration). Nor were we provided with notes made by Gildea of the various other desriptions of the shooter which Evans gave him. (Lichtmacher declaration).

42. Plaintiff was arrested. **Ex. N** (Arrest Report # Q14605601-K).

**ANSWER 42**
     Admits.


43. On January 28, 2014, Detective Jaeger signed a criminal court complaint charging plaintiff with Murder in the Second Degree, Attempted Murder in the Second Degree, and Criminal Possession of a Weapon in the Second Degree. **Ex. O** (Criminal Court Complaint).

**ANSWER 43**

     Admits.

44. On November 3, 2014, an Assistant District Attorney presented the charges against plaintiff to a grand jury. **Ex. P** (Grand Jury Hearing Cover Page).

**ANSWER 44**

     Admits.  However, plaintiff reminds that at that point the exonerating video had been allowed to be destroyed; the multiple descriptions of the shooter had not been memorialized; and the defendants failed to generate a DD5 about Logan-Smith disclosing her as an exonerating witness;  which would have resulted in the DA not presenting the case to the grand jury and no true bill could have been returned.

45. Evans appeared before the grand jury and testified that plaintiff shot him and Gulley on May 3, 2013. **Ex. Q** (Deposition of ADA Timothy Regan ["Regan Dep."]) at 21:10-14.

**ANSWER 45**

     Admits.

46. Evans was the only witness to the incident to testify before the grand jury. **Ex. Q** (Regan Dep.) at 21:10-14.

**ANSWER 46**

     Admits. And points out that Orris Wheeling never seems to have been subpoenaed to appear before the grand jury, neither was Principal Angela Logan-Smith, nor Wynter Carter, all eyewitnesses who definitely would have presented exonerating evidence. (Lichtmacher Declaration).

47. On November 20, 2014, the grand jury indicted plaintiff on charges including Murder in the Second Degree and Attempted Murder in the Second Degree. **Ex. R** (Queens County Supreme Court Indictment # 2723/2014).

**ANSWER 47**
    Admits.

48. The charges against plaintiff proceeded to trial in 2017. **Ex. A** (Evans Trial Test.) at 1074.

**ANSWER 48**
    Admits.

49. At the trial, Evans once again testified that plaintiff shot him and Gulley. **Ex. A** (Evans Trial Test.) at 1098:15-1102:11.

**ANSWER 49**
    Admits.

50. The defense called Angela Logan-Smith, principal of Goldie Maple Academy, as a trial witness. **Ex. K** (Logan-Smith Trial Test.) at 1325:11-19.

**ANSWER 50**
    Admits.

51. Logan-Smith testified that on May 6, 2013, two police officers came to Goldie Maple Academy and viewed surveillance footage from a camera pointed at a portion of Beach 56th Street. **Ex. J** (Logan-Smith Trial Test.) at 1325:11-19; 1334:19-21.

**ANSWER 51**
    Admits, and that is exactly the escape route Gildea said the shooter went down. (Exh "20" Diagram)

52. The camera did not depict the intersection of Beach Channel Drive and Beach 56th Street. **Ex. J** (Logan-Smith Trial Test.) at 1334:19 – 1335:3.

**ANSWER 52**
    Admits but patently misleading. Said camera did view the person running on the escape route who was distinguishable from the shooter. Further, the defendants and their agents, failed to generate a DD5 as to their visit to the school their viewing of the video footage and how it was exculpatory evidence which they knowingly allowed to be destroyed.(Lichtmacher Declaration) and Gildea, incredibly, testified at his deposition that if there is a surveillance camera which captures the escape of a possible fleeing suspect it is not always important to preserve it. (Exh. "10" Gildea's Dep at 41:3-7).

53. Logan-Smith testified that on the video "you could see a person run by and a few seconds later a car went by," and testified that the car was a "dark sedan." **Ex. J** (Logan-Smith Trial Test.) at 1327:15-18; 1328:15 – 1329:2.

**ANSWER 53**
    Admits.

54. Logan-Smith testified that someone watching the video would not be able to determine "facial features and specifics of the individual." She further testified that "[y]ou could make out that there was a person. You can make out just general, like, superficial details of the person." She further testified that the video was not of sufficient quality to see if the person was holding something. **Ex. J** (Logan-Smith Trial Test.) at 1327:25 – 1328:7; 1338:2-4.

**ANSWER 54**
    Admits. However, Ms. Logan -Smith additionally stated at her deposition the following

    A. He was a slim gentleman. He wasn't skinny.
    Q. He wasn't somebody that was extremely thin?
    A. No.
    Q. He wasn't somebody who was 6'3" or 6'4"?
    A. No.
    Q. You could see that clearly?
    A. Yes.
    Q. The officers, they watched the video with you how many times?
    A. Twice.   (Exh. "19" at16:13-24).

Ferguson is extremely thin and he is apparently 6'3" tall. (Lichtmacher declaration; Exh. "21" DeLeon Report).

55. Logan-Smith does not know the identities the officers that viewed the surveillance footage. **Ex. J** (Exh 12 Logan-Smith Trial Test.) at 1327:5-12.

ANSWER 55

    Admits, however, she believes she has the names written down on apience of paper in locked her school desk which she was precluded from accessing due to Covid and which we have issued a subpoena for once she can return to her school. (Lichtmacher Declaration)

56. Neither Detective Gildea nor Detective Jaeger ever viewed any surveillance footage recorded by any of Goldie Maple Academy's surveillance cameras. **Ex. C** (Jaeger Dep.) at 13:15-21; **Ex. G** (Gildea Dep.) at 44:19-20.

ANSWER 56

     Plaintiff denies. Gildea told the prosecutor that Detective Jaeger viewed the surveillance footage. (Exh."12" Trial Tran. D0179:18-25).

57. Neither Detective Gildea nor Detective Jaeger has ever met Logan-Smith. **Ex G** (Gildea Dep.) at 17:24-18:5; **Ex. C** (Jaeger Dep.) at17:23-18:7.

**ANSWER 57**

    Denies, it seems apparent at least from Gildea's testimony that Jaegger met Logan Smith (Exh."12" Trial Tran. D01798:18-25).

58. On October 16, 2017, the jury returned a verdict acquitting plaintiff of all charges. **Ex. S** (Certificate of Disposition).

**ANSWER 57**

    Admits.


**PLAINTIFF'S STATEMENT OF UNCONTESTED FACTS**

**Plaintiff's Statment 1**

    Ten minutes after Jaegger admits he and Gildea were notified of the shootings on May 3, 2013, somebody put over the radio the vehicle was a Dark Grey Ford Escape (Sprint Report p 2

**Plaintiff's Statment 2**

    Shortly after the shootings on May 4, 2013 the Preliminary Investigation Report was generated at 3 am stating the shooter was 5'9"  (Exh. "13"Preliminary Investigation Report D2278: 1,  5)**.** Ferguson is well over 6' tall (Lichtmacher Declaration, Exh. "21" DeLeon Report).

**Plaintiff's Statement 3**
    No one has acknowledged putting over the air it was a Dark Gray Ford Escape.

**Plaintiff's Statement 4**

    Police Officer Alfonso Vargas allegedly interviewed eyewitness Wheeling but did not get the shooter's height, weight, race or any other description and only wrote in his memo book that the shooter got into a Dark Gray Ford Escape. According to Vargas the only factual description given to him by Wheeling was of the vehicle, allegedly a Dark Grey Ford Escape. (Exh."6" Vargas Depostion 34: 2-7). Vargas memo book says Dark Gray Ford Escape and it indicates he interviewed the witness at or after 8:35. (Exh. "7" Vargas Memo Book).

**Plaintiff's Statement 5**
    Ms. Wynter Carter an eyewitness to the murder testified at trial that the person she saw was chubby around the waist. (Exh."12" Trial Tran. 1948:18-25)

**Plaintiff's Statement 6**
    After Mr. Ferguson was asked to stand up during the criminal trial Ms. Carter testified at trial that the person she saw was definitely not Rashaun Carter (Exh."12" Trial Tran. D01949)

**Plaintiff's Statement 7**
    Detective Gildea has knew Ferguson and his mother before the May 3, 2013 (Exh. "10" Gildea Deposition 79:12-16)

**Plaintiff's Statement 8**
    Detective Gildea had interacted with Ferguson in 2004 and he was aggressive with Rashaun when he was only 10 years old. (Exh. "11" Ferguson Dep at 157:10 -158:17)

**Plaintiff's Statement 9**
    Only after Detective Gildea unsuccessfully tried to coerce McCummings to identify Ferguson (Exh. "18" McCummings dep at 25-26) and after Wheeling refused to lie to identify him, (Exh. "22" DA's DD5s # 24) did Evans first identify Ferguson as the shooter on May 9, 2013. Defendants' **Ex. F** (Gildea *Wade* Test.) at 44:6-10; **Ex. L** (Evans Photo Array Documents); **Ex. B** (DD5 File) at D00430.

**Plaintiff's Statement 10**
    Gildea knew that Marcus Ortiz was an alleged gang member who had been shot in the leg by Keith Gulley. (Exh. "10" Gildea Deposition 95:16- 96:2).

**Plaintiff's Statement 11**

Gildea did not interview Ortiz and never investigated whether or not he was the murderer. (Exh. "10" Gildea Deposition 96:11-15; 106:6-9).

**Plaintiff's Statement 12**

Gildea admits he never showed a photo of Marcus Ortiz to Wheeling. (Exh. "10" Gildea Deposition 98:16-19)

**Plaintiff's Statement 13**

Marcus Ortiz was 5'10" tall and light skinned. (Exh. "14"Ortiz Mugshot).

**Plaintiff's Statment 14**

Shortly after the shootings on May 4, 2013 the Preliminary Investigation Worksheet was generated at 3 am stating the shooter was 5'9", only an inch off from Marcus Ortiz' height. (Exh. "13"Preliminary Investigation Report; Exh "14" Ortiz Mugshot).

Dated: New York, New York
     May 17, 2021

                                 /s/
                                Fred Lichtmacher

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------------ x

RASHAUN FERGUSON,

                                            Plaintiff,

                    -against-                               **SECOND DECLARATION
THE CITY OF NEW YORK, DETECTIVE JAEGER,                     OF GEOFFREY M.
DETECTIVE MICHAEL GILDEA SHIELD # 464 and                  STANNARD**
UNIDENTIFIED MEMBERS OF THE NYPD all sued
herein in their individual capacities,                      17-CV-6871 (ENV)(SJB)

                                            Defendants.

------------------------------------------------------------------------ x

       **Geoffrey M. Stannard**, an attorney duly admitted to practice in the Eastern District

of New York, declares under penalty of perjury and pursuant to 28 U.S.C. § 1746, that the

following is true and correct:

       1.  I am an Assistant Corporation Counsel in the office of Georgia Pestana, Acting

Corporation Counsel of the City of New York, and the attorney for defendants City of New York,

Detective Michael Gildea, and Detective Quinn Jaeger ("defendants"). As such, I am familiar with

the facts and circumstances stated herein based on personal knowledge, the books and records of

the City of New York, and conversations with its agents and employees. I make this declaration in

support of defendants' motion for summary judgment pursuant to Rule 56 of the Federal Rules of

Civil Procedure.

       2.  **Annexed hereto as Exhibit "T"** are <u>additional</u> portions of Detective Jaeger's

deposition transcript. Detective Jaeger testified that he made notes regarding Evans's description

of the shooter as "light-skinned" and provided those notes to the prosecutor, which controverts

plaintiff's argument that Detective Jaeger maliciously withheld this information from the prosecutor.

      3.   **Annexed hereto as Exhibit "U"** are portions of alleged eyewitness Winter Carter's deposition transcript. Ms. Carter testified that she never told any police officer what she allegedly witnessed on May 3, 2013.

Dated:        New York, New York
               June 22, 2021

                                  JAMES E. JOHNSON
                                  Corporation Counsel of the
                                    City of New York
                                  *Attorney for Defendants City of New York,*
                                    *Gildea, and Jaeger*
                                  100 Church Street, Third Floor
                                  New York, New York 10007
                                  (212) 356-2409

                  By:       *G Stannard*
                                    Geoffrey M. Stannard
                                  *Assistant Corporation Counsel*
                                  Special Federal Litigation Division

To:    **BY ECF**
      Fred Lichtmacher, Esq., *Attorney for Plaintiff*

# EXHIBIT T

```
1                        Jaeger
2        answer.
3        A.    No.
4        Q.    In fact, isn't it fair to say that
5   Rashaun Ferguson has a dark complexion, dark
6   skinned?
7        A.    Yes.
8        Q.    Other than what you told the Grand Jury
9   about the lineups, both lineups?
10       A.    No.
11       Q.    Just which lineup did you tell them
12  about?
13       A.    Reginald Evans.
14       Q.    In fact, Orris Wheeling had questions
15  about who was the shooter when he viewed the
16  lineup; correct?
17       A.    I wasn't there.
18       Q.    Can you tell me the sum and substance?
19  Did you provide the DA with any of your DD-5
20  regarding this investigation?
21       A.    Yes.
22       Q.    Did you provide the DA with anything
23  else other than the DD-5s?
24       A.    My notes.
25       Q.    Those notes included the notes that are
```

```
 1                        Jaeger
 2      in Plaintiff's Exhibit 8?
 3           A.   Yes.
 4           Q.   Did you discuss with the DA that
 5      Reginald Evans described the shooter as light
 6      skinned?
 7           A.   Did I discuss with the DA?
 8           Q.   Yes.
 9           A.   No.
10           Q.   Did you give the DA the notes that said
11      that he was light skinned?  The shooter.
12           A.   Yes.
13           Q.   Did the DA question you about that?
14           A.   No, not that I remember.
15           Q.   Were you aware that Reginald Evans'
16      testimony changed during the course of the
17      investigation and trial?
18           A.   No.
19           Q.   Did Reggie Evans ever tell you he was
20      covering up while he was being shot?  He was
21      covering his face?
22           A.   No.
23           Q.   Did you ever speak with Winter Carter?
24      Do you know that name?
25           A.   No.
```

# EXHIBIT U

ORIGINAL

```
 1    UNITED STATES DISTRICT COURT
      EASTERN DISTRICT OF NEW YORK
 2    -------------------------------------------X
      RASHAUN FERGUSON,
 3
                                    PLAINTIFF,
 4
                  -against-        Index No.:
 5                                 17-CV-06871
                                   (ENV)(SJB)
 6
      THE CITY OF NEW YORK, DETECTIVE JAEGER,
 7    DETECTIVE MICHAEL GILDEA SHIELD #4165
      and UNIDENTIFIED MEMBERS OF THE NYPD,
 8
                                    DEFENDANTS.
 9    -------------------------------------------X

10

11                     DATE:  October 17, 2019

12                     TIME:  2:40 P.M.

13

14

15               DEPOSITION of a Non-Party Witness,

16    WINTER CARTER, taken by the respective parties, pursuant to

17    a Subpoena Duces Tecum, held at the offices of New York

18    City Law Department, 100 Church Street, New York, New York

19    10007, before LORI PICKMAN, a Notary Public of the State of

20    New York.

21

22

23

24

25
```

W. CARTER

1    the trial?

2                    MR. LICHTMACHER:   That is the same question.

3              I have the same objection.

4                    You can answer.

5         A.    When my mom got in contact with his mom.

6         Q.    Did your mom getting in contact with his mom

7    affect your decision to testify?

8         A.    No.

9         Q.    Why did you testify then exactly, what was your

10   reason for it?

11        A.    Because he was arrested for something he didn't

12   do.

13        Q.    When did you first find out that there was a

14   criminal case and that this person named Rashaun Ferguson

15   was being charged by the police?

16        A.    Repeat yourself.

17        Q.    When did you first learn that this person,

18   Rashaun Ferguson, was being charged for what happened

19   on May 3, 2013?

20        A.    When my mom was saying it was foul because she

21   seen a post about him being arrested for something he

22   didn't do.

23        Q.    Did you testify truthfully at the trial?

24        A.    Yes.

25        Q.    Have you ever spoken to any police officer

W. CARTER

1   regarding the events that happened on May 3, 2013?

2        A.      No.

3        Q.      Why did you not report what you saw; was there a

4   reason?

5                    MR. LICHTMACHER:  Objection.  That

6                    misrepresents the testimony.  Objection

7                    to the form.

8                    MR. ROSENKILDE:  I can rephrase it.

9        Q.      Why did you not report to the police what you saw

10  on May 3, 2013?

11                   MR. LICHTMACHER:  Objection.  You can

12                   answer.

13       A.      I just didn't want to.

14       Q.      Was there a reason you didn't want to?

15       A.      No.

16       Q.      For this question, I will clarify right off the

17  bat, I'm not asking you if you have ever been arrested.

18               My question is, have you ever had any

19  interactions with members of the NYPD?  An interaction can

20  be walking down the street, having a conversation, anything

21  at all.  Have you ever had any interactions with a member

22  of the NYPD?

23       A.      No.

24       Q.      Do you have any feelings toward the NYPD

25  generally?

W. CARTER

1           I see you are smiling.

2      A.    Yes.

3      Q.    What are your feelings about the NYPD?

4      A.    I just don't like them.

5      Q.    Is there a reason why, if you have not had any

6   personal interactions with them?

7      A.    I just don't like them.

8      Q.    Is there something that happened to either you or

9   somebody you know or somebody you care about that causes

10   you to feel that way?

11      A.    Someone I care about.

12      Q.    Who is that?

13           I will start with this, to the extent that

14   your answer impacts anyone with an open case, I'm not

15   asking about any facts about anyone who might have an

16   open criminal case.

17           Other than that limitation, is there someone who

18   you care about who you feel has not been treated well by

19   the NYPD?

20      A.    My brother.

21      Q.    What is your brother's name?

22      A.    Do I have to give his name?

23           MR. LICHTMACHER:  How old is your brother?

24           THE WITNESS:  Twenty-two.

25           MR. LICHTMACHER:  Yes.

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------------------------------------------ x

RASHAUN FERGUSON,

                                                    Plaintiff,

                        -against-

THE CITY OF NEW YORK, DETECTIVE JAEGER,
DETECTIVE MICHAEL GILDEA SHIELD # 464 and
UNIDENTIFIED MEMBERS OF THE NYPD all sued
herein in their individual capacities,

                                                    Defendants.

------------------------------------------------------------------------ x

**DEFENDANTS' REPLY TO PLAINTIFF'S STATEMENT IN OPPOSITION TO DEFENDANTS' LOCAL CIVIL RULE 56.1 STATEMENT**

17-CV-6871 (ENV)(SJB)

        Defendants City of New York, Detective Michael Gildea, and Detective Quinn Jaeger, by their attorney, Georgia E. Pestana, Acting Corporation Counsel of the City of New York, submit this counterstatement pursuant to Rule 56.1 of the Local Civil Rules of the United States District Court for the Eastern District of New York, responding to plaintiff's purportedly disputed and purportedly material facts.

### **ANSWER TO PLAINTIFF'S RESPONSE TO DEFEDNDANTS' 56.1 STATEMENT**

        As an initial matter, plaintiff admits without narrative or qualification the statements set forth in paragraphs 1, 2, 3, 4, 5, 8, 9, 10, 11, 12, 17, 18, 19, 22, 23, 25, 27, 28, 37, 38, 39, 40, 42, 43, 45, 47, 48, 49, 50, 53, and 57. Plaintiff has denied knowledge or information sufficient to form a belief, without narrative or qualification, as to the statements set forth in paragraphs 15, 32, 33, 34, 35, 36, and has therefore failed to raise any material dispute as to those statements. Defendants respond to the remaining paragraphs of plaintiff's response to defendants' Rule 56.1 Statement as follows:

JA-483

6. Defendants' statement should be deemed admitted as it is not controverted by citation to admissible evidence pursuant to Federal Rule of Civil Procedure 56(e) and Local Civil Rule 56.1(d). See Diarra v. City of New York, No. 16-CV-7075 (VSB), 2018 U.S. Dist. LEXIS 161895, at *9 (S.D.N.Y. Sep. 20, 2018) (dismissing plaintiff's counter-statement in response to defendant's Rule 56.1 statement where plaintiff lodged hearsay allegations, included arguments, and failed to cite to specific evidence controverting defendants' facts). Wheeling's purported statements to the prosecutor and a private investigator years after the incident constitute hearsay and are non-responsive, as they do not relate to what Wheeling told the officers on the date of the incident. Moreover, Logan-Smith did not testify that the perpetrator fled in a sedan—she testified that a surveillance video showed a sedan driving along Beach 56th Street at the approximate time of the incident. **Ex. J** (Logan-Smith Trial Test.) at 1327:15-18; 1328:15 – 1329:2; 1334:19-24.

7. Defendants' statement should be deemed admitted as the cited evidence does not dispute Officer Vargas's testimony that either he or his supervisor made a radio report of a dark gray Ford Escape heading westbound. **Ex. D** (Vargas Dep.) at 34:8-12.

13. Defendants' statement should be deemed admitted as it is not controverted by citation to admissible evidence pursuant to Federal Rule of Civil Procedure 56(e) and Local Civil Rule 56.1(d). Wheeling's purported statements to ADA Regan and a private investigator years after the incident constitute inadmissible hearsay and are nonresponsive, as they do not relate to what Wheeling told officers on the date of the incident.

14. Defendants' statement should be deemed admitted as it is not controverted by citation to admissible evidence pursuant to Federal Rule of Civil Procedure 56(e) and Local Civil Rule 56.1(d). The cited evidence does not raise a dispute as to Gildea's observation of the camera and the conclusion he drew as to its value. Plaintiff's statements that it is "quite possible" that

- 2 -

JA-484

Detective Jaeger viewed the video, and that the person allegedly depicted in the video is the "perpetrator" are pure speculation and cannot be used to controvert defendants' statement.

16. Defendants' statement should be deemed admitted as it is not controverted by citation to admissible evidence pursuant to Federal Rule of Civil Procedure 56(e) and Local Civil Rule 56.1(d). Plaintiff's statement regarding the number of Ford Escapes sold is immaterial and nonresponsive.

20. Defendants' statement should be deemed admitted as it is not controverted by citation to admissible evidence pursuant to Federal Rule of Civil Procedure 56(e) and Local Civil Rule 56.1(d). Wheeling's purported statements to Private Investigator DeLeon constitute inadmissible hearsay, and cannot be used to dispute paragraph 20 of defendants' 56.1 statement.

21. Defendants' statement should be deemed admitted as it is not controverted by citation to admissible evidence pursuant to Federal Rule of Civil Procedure 56(e) and Local Civil Rule 56.1(d). Wheeling's purported statements to Private Investigator DeLeon constitute inadmissible hearsay, and cannot be used to dispute paragraph 20 of defendants' 56.1 statement.

24. Defendants' statement should be deemed admitted as it is not controverted by citation to admissible evidence pursuant to Federal Rule of Civil Procedure 56(e) and Local Civil Rule 56.1(d).

26. Defendants' statement should be deemed admitted as it is not controverted by citation to admissible evidence pursuant to Federal Rule of Civil Procedure 56(e) and Local Civil Rule 56.1(d). Plaintiff's statement is nonresponsive to paragraph 26 of defendants' 56.1 statement.

29. Defendants' statement should be deemed admitted as it is not controverted by citation to admissible evidence pursuant to Federal Rule of Civil Procedure 56(e) and Local Civil Rule 56.1(d). Wheeling's purported statements to Private Investigator DeLeon constitute

JA-485

inadmissible hearsay, and cannot be used to dispute paragraph 29 of defendants' 56.1 statement. Moreover, the cited evidence does not indicate that any statements were "fabricated" by Detective Gildea.

30. Defendants' statement should be deemed admitted as it is not controverted by citation to admissible evidence pursuant to Federal Rule of Civil Procedure 56(e) and Local Civil Rule 56.1(d). Wheeling's purported statements to Private Investigator DeLeon constitute inadmissible hearsay, and cannot be used to dispute paragraph 29 of defendants' 56.1 statement. Moreover, the cited evidence does controvert Detective Gildea's testimony that plaintiff stated "I can't be the only one doing this."

31. Defendants' statement should be deemed admitted as it is not controverted by citation to admissible evidence pursuant to Federal Rule of Civil Procedure 56(e) and Local Civil Rule 56.1(d). Wheeling's purported statements to Private Investigator DeLeon constitute inadmissible hearsay, and cannot be used to dispute paragraph 29 of defendants' 56.1 statement. Moreover, the cited evidence does controvert Detective Gildea's testimony that plaintiff did not make an outright positive identification.

34. Defendants' statement should be deemed admitted as it is not controverted by citation to admissible evidence pursuant to Federal Rule of Civil Procedure 56(e) and Local Civil Rule 56.1(d), and plaintiff denies knowledge sufficient to form a belief as to the truth of the statement. Plaintiff's additional commentary is nonresponsive and improper pursuant to Rule 56.1.

41. Defendants' statement should be deemed admitted as it is not controverted by citation to admissible evidence pursuant to Federal Rule of Civil Procedure 56(e) and Local Civil Rule 56.1(d). Plaintiff admits that Evans identified plaintiff as the shooter in the photo array, which

is the only statement in paragraph 41. Plaintiff's additional commentary is nonresponsive and improper pursuant to Rule 56.1.

44. Defendants' statement should be deemed admitted as it is not controverted by citation to admissible evidence pursuant to Federal Rule of Civil Procedure 56(e) and Local Civil Rule 56.1(d). Plaintiff admits that the Assistant District Attorney presented the case to a grand jury, which is the only statement in paragraph 44. Plaintiff's additional commentary is nonresponsive, speculative, and argumentative, and therefore improper pursuant to Rule 56.1. See Diarra v. City of New York, No. 16-CV-7075 (VSB), 2018 U.S. Dist. LEXIS 161895, at *9 (S.D.N.Y. Sep. 20, 2018) (dismissing plaintiff's counter-statement in response to defendant's Rule 56.1 statement where plaintiff lodged hearsay allegations, included arguments, and failed to cite to specific evidence controverting defendants' facts).

46. Defendants' statement should be deemed admitted as it is not controverted by citation to admissible evidence pursuant to Federal Rule of Civil Procedure 56(e) and Local Civil Rule 56.1(d). Plaintiff admits that the Assistant District Attorney presented the case to a grand jury, which is the only statement in paragraph 44. Plaintiff's additional commentary is nonresponsive, speculative, and argumentative, and therefore improper pursuant to Rule 56.1. See Diarra v. City of New York, No. 16-CV-7075 (VSB), 2018 U.S. Dist. LEXIS 161895, at *9 (S.D.N.Y. Sep. 20, 2018) (dismissing plaintiff's counter-statement in response to defendant's Rule 56.1 statement where plaintiff lodged hearsay allegations, included arguments, and failed to cite to specific evidence controverting defendants' facts).

51. Defendants' statement should be deemed admitted as it is not controverted by citation to admissible evidence pursuant to Federal Rule of Civil Procedure 56(e) and Local Civil Rule 56.1(d). Plaintiff admits the only statement contained in paragraph 51. Plaintiff's additional

commentary is nonresponsive, speculative, and argumentative, and is therefore improper pursuant to Rule 56.1. See Diarra v. City of New York, No. 16-CV-7075 (VSB), 2018 U.S. Dist. LEXIS 161895, at *9 (S.D.N.Y. Sep. 20, 2018) (dismissing plaintiff's counter-statement in response to defendant's Rule 56.1 statement where plaintiff lodged hearsay allegations, included arguments, and failed to cite to specific evidence controverting defendants' facts). Moreover, the cited evidence does not indicate any "escape route."

52. Defendants' statement should be deemed admitted as it is not controverted by citation to admissible evidence pursuant to Federal Rule of Civil Procedure 56(e) and Local Civil Rule 56.1(d). Plaintiff admits the only statement contained in paragraph 52. Plaintiff's additional commentary is nonresponsive, speculative, and argumentative, and is therefore improper pursuant to Rule 56.1. See Diarra v. City of New York, No. 16-CV-7075 (VSB), 2018 U.S. Dist. LEXIS 161895, at *9 (S.D.N.Y. Sep. 20, 2018) (dismissing plaintiff's counter-statement in response to defendant's Rule 56.1 statement where plaintiff lodged hearsay allegations, included arguments, and failed to cite to specific evidence controverting defendants' facts). Moreover, the cited evidence does not show that the person allegedly seen running on the video was "distinguishable from the shooter," and plaintiff has failed to set forth any evidence that any defendants visited the school and viewed surveillance footage, or that the alleged video was "exculpatory" or that they "allowed [the video] to be destroyed."

54. Defendants' statement should be deemed admitted as it is not controverted by citation to admissible evidence pursuant to Federal Rule of Civil Procedure 56(e) and Local Civil Rule 56.1(d). Plaintiff admits the only statement contained in paragraph 54. Plaintiff's additional commentary is nonresponsive, speculative, and argumentative, and is therefore improper pursuant to Rule 56.1. See Diarra v. City of New York, No. 16-CV-7075 (VSB), 2018 U.S. Dist. LEXIS

- 6 -

JA-488

161895, at *9 (S.D.N.Y. Sep. 20, 2018) (dismissing plaintiff's counter-statement in response to defendant's Rule 56.1 statement where plaintiff lodged hearsay allegations, included arguments, and failed to cite to specific evidence controverting defendants' facts).

55. Defendants' statement should be deemed admitted as it is not controverted by citation to admissible evidence pursuant to Federal Rule of Civil Procedure 56(e) and Local Civil Rule 56.1(d). Plaintiff admits the only statement contained in paragraph 55. Plaintiff's additional commentary is nonresponsive and speculative.

56. Defendants' statement should be deemed admitted as it is not controverted by citation to admissible evidence pursuant to Federal Rule of Civil Procedure 56(e) and Local Civil Rule 56.1(d). Detective Gildea testified that he "believes" he told ADA Reagan that Detective Jaeger viewed the video. However, Detective Jaeger testified unconditionally that he did not view the video, and plaintiff has failed to dispute that fact. **Ex. C** (Jaeger Dep.) at 13:15-21.

57. Defendants' statement should be deemed admitted as it is not controverted by citation to admissible evidence pursuant to Federal Rule of Civil Procedure 56(e) and Local Civil Rule 56.1(d). Plaintiff's statement that it "seems apparent" that Jaeger met Logan-Smith is speculative and inadmissible.

## DEFENDANTS' RESPONSE TO PLAINTIFF'S 56.1 COUNTERSTATEMENT

1. Ten minutes after Jaegger admits he and Gildea were notified of the shootings on May 3, 2013, somebody put over the radio the vehicle was a Dark Grey Ford Escape (Sprint Report p 2.

   - **DEFENDANTS' RESPONSE:** Admit that an officer made a radio report at 8:18 p.m. regarding a dark grey Ford Escape heading westbound, ten minutes after

Detectives Gildea and Jaeger were notified of the shooting, and two minutes before Detectives Gildea and Jaeger arrived at the scene. **Defs. 56.1 ¶¶ 4, 7, 8.**

2.    Shortly after the shootings on May 4, 2013 the Preliminary Investigation Report was generated at 3 am stating the shooter was 5'9"  (Exh. "13"Preliminary Investigation Report D2278: 1,  5).  Ferguson is well over 6' tall (Lichtmacher Declaration, Exh. "21" DeLeon Report).

- **DEFENDANTS' RESPONSE:**  Disputed in part and immaterial. Defendants admit that the Preliminary Investigation Worksheet was generated on May 4, 2013 at 3:00 a.m., and that the worksheet described the perpetrator as 5'9". However, plaintiff has failed to cite to evidence showing that plaintiff is "well over 6' tall," and that purported fact is immaterial.

3.    No one has acknowledged putting over the air it was a Dark Gray Ford Escape.

- **DEFENDANTS' RESPONSE:** Disputed, immaterial, and in violation of Local Civil Rule 56.1(d), which requires citation to admissible evidence. Officer Vargas acknowledged that either he or his supervisor made a radio report of a dark gray Ford Escape heading westbound. **Defs. 56.1 ¶ 7.**

4.    Police Officer Alfonso Vargas allegedly interviewed eyewitness Wheeling but did not get the shooter's height, weight, race or any other description and only wrote in his memo book that the shooter got into a Dark Gray Ford Escape. According to Vargas the only factual description given to him by Wheeling was of the vehicle, allegedly a Dark Grey Ford Escape. (Exh."6" Vargas Depostion 34: 2-7). Vargas memo book says Dark Gray Ford Escape and it indicates he interviewed the witness at or after 8:35. (Exh. "7" Vargas Memo Book).

- 8 -

JA-490

- **DEFENDANTS' RESPONSE:** Disputed in part and immaterial. In the cited testimony, Officer Vargas states that, based on his memo book entries, it appears that Wheeling did not provide a physical description of the shooter. **Ex. 6** (Vargas Dep.) at 34:18-22. Officer Vargas further testified that the times in his memo book are a "rough estimate" made after the fact. **Ex. D** (Vargas Dep.) at 49:5-21.

5.   Ms. Wynter Carter an eyewitness to the murder testified at trial that the person she saw was chubby around the waist. (Exh."12" Trial Tran. 1948:18-25)

- **DEFENDANTS' RESPONSE:** The statement is immaterial. Winter Carter never told any police officer what she allegedly witnessed on May 3, 2013. **Ex. U** (Deposition of Winter Carter at 69:25 – 70:23. In addition, plaintiff has failed to attach the testimony cited in paragraph 5.

6.   After Mr. Ferguson was asked to stand up during the criminal trial Ms. Carter testified at trial that the person she saw was definitely not Rashaun Carter (Exh."12" Trial Tran. D01949)

- **DEFENDANTS' RESPONSE:** The statement is immaterial. Winter Carter never told any police officer what she allegedly witnessed on May 3, 2013. **Ex. U** (Deposition of Winter Carter at 69:25 – 70:23. In addition, plaintiff has failed to attach the testimony cited in paragraph 6.

7.   Detective Gildea has knew Ferguson and his mother before the May 3, 2013 (Exh. "10" Gildea Deposition 79:12-16).

- **DEFENDANTS' RESPONSE:** The statement is immaterial and plaintiff has failed to attach the cited testimony. Regardless, defendants admit that Detective Gildea testified that he "knew of [plaintiff's] mother before this incident."

- 9 -

JA-491

8.  Detective Gildea had interacted with Ferguson in 2004 and he was aggressive with Rashaun when he was only 10 years old. (Exh. "11" Ferguson Dep at 157:10 -158:17)

    - **DEFENDANTS' RESPONSE:** Disputed and immaterial.

9.  Only after Detective Gildea unsuccessfully tried to coerce McCummings to identify Ferguson (Exh. "18" McCummings dep at 25-26) and after Wheeling refused to lie to identify him, (Exh. "22" DA's DD5s # 24) did Evans first identify Ferguson as the shooter on May 9, 2013. Defendants' Ex. F (Gildea Wade Test.) at 44:6-10; Ex. L (Evans Photo Array Documents); Ex. B (DD5 File) at D00430.

    - **DEFENDANTS' RESPONSE:** Disputed in part and immaterial.  In the cited testimony, McCummings does not state that he was "coerced" to identify Ferguson and does not specify a date. The cited DD5 does not state that Wheeling "refused to lie to identify [plaintiff]." Defendants do not dispute that Evans identified plaintiff as the shooter in a photo array on May 9, 2013.

10. Gildea knew that Marcus Ortiz was an alleged gang member who had been shot in the leg by Keith Gulley. (Exh. "10" Gildea Deposition 95:16- 96:2).

    - **DEFENDANTS' RESPONSE:**  Disputed in part, vague, and immaterial. In the cited testimony, Detective Gildea states that at some point during the investigation, he became aware the Marcus Ortiz was an alleged gang member who was allegedly shot in the leg by Keith Gulley.

11. Gildea did not interview Ortiz and never investigated whether or not he was the murderer. (Exh. "10" Gildea Deposition 96:11-15; 106:6-9).

    - **DEFENDANTS' RESPONSE:**  Undisputed and immaterial.

- 10 -

JA-492

12.   Gildea admits he never showed a photo of Marcus Ortiz to Wheeling. (Exh. "10" Gildea Deposition 98:16-19)

- **DEFENDANTS' RESPONSE:** Undisputed and immaterial.

13.   Marcus Ortiz was 5'10" tall and light skinned. (Exh. "14"Ortiz Mugshot).

- **DEFENDANTS' RESPONSE:** Disputed in part and immaterial. The cited evidence indicates that Ortiz was 5'10". Defendants cannot confirm or deny that Ortiz was "light skinned," nor does the cited exhibit so demonstrate.

14.   Shortly after the shootings on May 4, 2013 the Preliminary Investigation Worksheet was generated at 3 am stating the shooter was 5'9", only an inch off from Marcus Ortiz' height. (Exh. "13"Preliminary Investigation Report; Exh "14" Ortiz Mugshot)..

- **DEFENDANTS' RESPONSE:** Undisputed and immaterial.

Dated:       New York, New York
             June 22, 2020

                                        JAMES E. JOHNSON
                                        Corporation Counsel of the
                                          City of New York
                                        *Attorney for Defendants City of New York,*
                                          *Gildea, and Jaeger*
                                        100 Church Street, Third Floor
                                        New York, New York 10007
                                        (212) 356-2409

                         By:   *G Stannard*
                                        _____
                                        Geoffrey M. Stannard
                                        *Assistant Corporation Counsel*
                                        Special Federal Litigation Division

cc:    **BY ECF**
       Fred Lichtmacher, Esq., *Attorney for Plaintiff*

- 11 -

JA-493

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
RASHAUN FERGUSON,

                          Plaintiff,                     JUDGMENT

       v.

                                                17-cv-6871 (ENV) (SJB)

THE CITY OF NEW YORK, et al.,

                        Defendants.
-------------------------------------------------------------X
       A Memorandum and Order of the Honorable Eric N. Vitaliano, United States District

Judge, having been filed on August 30, 2023, granting defendants' motion for summary

judgment; it is

       ORDERED and ADJUDGED that defendants' motion for summary judgment is granted

in full.

Dated: Brooklyn, New York                    Brenna B. Mahoney
        August 31, 2023                        Clerk of Court

                                 By:     */s/Jalitza Poveda*
                                      Deputy Clerk

JA-494

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------X

RASHAUN FERGUSON,

                              Plaintiff,

                                                        17-6871 ENV SJB
                                                        **NOTICE OF APPEAL**

            -against-

THE CITY OF NEW YORK, DETECTIVE
JAEGER, DETECTIVE MICHAEL GILDEA
SHIELD # 465 and UNIDENTIFIED MEMBERS
OF THE NYPD all sued herein in their individual
capacities,

                              Defendants

---

Notice is hereby given that the following party RASHAUN FERGUSON, Plaintiff in the above
named case appeals to the United States Court of Appeals for the Second Circuit
from the Judgment entered on August 31, 2023 that :
Dismissed the Plaintiff's action on summary judgment.

Dated: New York, New York
            September 21, 2023

                                                Fred Lichtmacher
                                                Attorney for the Plaintiff-Appellant
                                                116 West 23rd Street Suite 500
                                                New York, New York 10011
                                                (212) 922-9066
                                                Empirestatt@aol.com